IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 2:12-cv-00179-MHT-WC |
| STATE OF ALABAMA and HONORABLE BETH CHAPMAN, Secretary of State, in her official capacity, | ) ) ) ) ) |
| Defendants. | ) |

**STATE DEFENDANTS' THIRD RESPONSE TO THE
COURT'S OPINION AND ORDER (Doc. 8)
AND MOTION TO DISSOLVE INJUNCTION**

The State of Alabama and her Secretary of State, the Honorable Beth Chapman, sued in her official capacity, hereby respectfully offer this Third Response to the Court's February 28, 2012 Opinion and Order (doc. 8).

**I.   INTRODUCTION**

1.   On February 28, 2012, this Court granted the United States' motion for a temporary restraining order and preliminary injunction (doc. 8). The Court ordered the State Defendants to file certain information with the Court. The State Defendants did so in their Preliminary Response (doc. 10), their Second Response (doc. 12), and their Supplement to the Second Response (doc. 13).

2.   The Court also ordered the State Defendants to confer with the United States about the necessity of relief from the Court to protect the rights of UOCAVA voters. The parties engaged in conversations by telephone on March 2, 2012.

3.   Finally, the Court ordered the parties to file a report of their discussions, or separate reports if the parties were not in agreement.

4.   The parties are not in agreement.  While the State Defendants have never disputed that the rights of UOCAVA voters—and *all* voters—should be protected, the State Defendants have already taken steps to adequately protect those rights, and they have demonstrated a commitment to take additional steps, if necessary, in the exercise of their sound judgment.  Moreover, in discussing these issues with the United States, State officials agree that some of the relief the United States intends to seek is helpful, and the Secretary intends to take those steps, as discussed below.  Where the parties disagree is on what other steps should be taken to ensure that UOCAVA voters have sufficient time to vote, and whether State officials must be *ordered* to do what they represent to the Court they are going to do.

5.   This Third Response sets out the State Defendants' position that judicial intervention is not necessary to protect the rights of UOCAVA voters.  For these same reasons, the State Defendants move that the Court's temporary restraining order and preliminary injunction be dissolved.

II.   **STATEMENT OF THE STATE DEFENDANTS REGARDING THE NECESSITY OF FURTHER RELIEF**

6.   The rights of UOCAVA voters in Alabama will be protected without relief from the Court.

7.   While timely-requested UOCAVA ballots were transmitted to voters fewer than 45 days before the election, that does not mean that injunctive relief is appropriate.  *Declarative* relief may be appropriate at the final judgment stage, if the right defendants are before the

Court.[1]  But, for *injunctive* relief, more than a violation of the law must be shown.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) ("The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."); *id.* at 311 ("[A]n injunction is an equitable remedy.  It is not a remedy which issues as of course . . . .") (internal quotation marks and citation omitted).

8.  "A plaintiff seeking a preliminary injunction must establish" not only "that he is likely to succeed on the merits," but also "that he is likely to suffer irreparable harm in the

---

[1]  The United States contends that the State and the Secretary of State are responsible for ensuring compliance with UOCAVA, and can be held accountable in a court of law, even for any failures that occurred at the county level.  As we understand it, the argument is that 42 U.S.C. § 1973ff-1(a) provides that "*[e]ach State* shall—(1) permit [UOCAVA] voters . . . to vote by absentee ballot in general, special, primary, and runoff elections for Federal office; [and] (8) transmit a validly requested absentee ballot to a [UOCAVA] voter" 45 days in advance of a federal election, if a valid application has been received by that time.  42 U.S.C. § 1973ff-1(a)(1) (emphasis added); 42 U.S.C. § 1973ff-1(a)(8).  Thus, the United States reasons, Congress has put the responsibility squarely on the shoulders of the State.

That Congress wanted federal elections to be conducted a particular way throughout the Nation does not mean that Congress intended to cast aside general principles of legal liability or to intrude upon the State's sovereign prerogative to organize its internal affairs, *i.e.,* which officials have which duties and to whom they report, as it sees fit.  U.S. Const. Art. IV, § 4; U.S. Const. Amend. X; *Coyle v. Smith*, 221 U.S. 559 (1911); *Bond v. United States*, 564 U.S. ____, 131 S.Ct. 2355, 2364 ("The allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States.") (2011).

While USDOJ seems to find an *implicit* directive that any enforcement litigation be aimed at the State level, there is no *explicit* statement of that sort.  *See e.g.,* 42 U.S.C. §1973ff-4(a) (authorizing enforcement actions without identifying the defendant).  Nor is there a reason to believe that its absence is an oversight.  Congress recognized it was dealing with sovereigns, and so, later in the same statute, it only "*recommends* that the State office designated under paragraph (1) be responsible for carrying out the State's duties under this Act. . . . ." 42 U.S.C. § 1973ff-1(c) (emphasis added).

Accordingly, while it is undisputed that UOCAVA ballots requested in advance of January 28, 2012 were not transmitted by that same date, it does not necessarily follow that the correct defendants are before this Court such that any relief can issue.

absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). "The burden of persuasion in all of the four requirements is at all times upon the plaintiff." *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir. 1983) (internal quotation marks and citation omitted). The United States has not met its burden.[2]

### *Secretary of State's Intended Action with Respect to Primary Election*

9. The United States has not shown that judicial relief is necessary to protect the rights of UOCAVA voters. Judicial relief is not necessary because the Secretary of State "intend[s] to do everything in [her] power to ensure that UOCAVA voters can vote and that their vote is counted." Affidavit of Secretary Chapman, attached hereto as Exhibit A.

10. As for the March 13 primary election, the Secretary of State has taken steps that will provide UOCAVA voters, who requested a ballot before the 45-day deadline, with 45 days for their ballot to be received. *See* Doc. 10; Exhibit A.

11. First, as she is authorized to do, the Secretary of State extended the deadline by eight days. Exhibit A at ¶ 21. This cures to the extent possible any technical violation for the vast majority of ballots. As shown in the State Defendant's second response to the Court's order, docs. 12, 12-1, most ballots that were transmitted late were transmitted fewer than 8 days late, *i.e.,* by February 5, and they were obviously sent as soon as the counties received the ballots and were able to transmit them.

12. Of those UOCAVA ballots requested by January 28 and transmitted later than February 5, virtually all were transmitted on February 6 or 7. Of those transmitted after February

---

[2] While this response focuses on the argument that relief is not necessary because UOCAVA voters will be protected by the State and the Secretary of State, in considering the other factors prerequisite to granting injunctive relief this Court will no doubt be mindful that this litigation is between sovereigns who share a responsibility to protect the public interest.

7, it appears that Mobile County transmitted 28 ballots electronically on February 8, Geneva County transmitted 5 ballots electronically on February 15, and the date from Lee County is not clear (a handful may have been mailed after February 7, per doc. 12-1 at 19, or they may in fact have been mailed by the 7th, per doc. 12-1 at 6).  Those transmitted electronically were, of course, immediately available to the voter.  Given that the 45-day window was presumably to cover mailing of ballots both to and from the absentee voter, half of that time is "corrected" by virtue of the electronic transmission of a ballot.

13. Similarly, not every UOCAVA ballot is going halfway around the world.  For those UOCAVA voters who are voting from a base in the United States, return by U.S. Mails should take far less than 22 days (45 days = 22 for ballot to reach the UOCAVA voter + 1 day to vote + 22 for completed ballot to reach local election official).  *See e.g.,* 42 U.S.C. § 1973ff-6(1)(A) ("[A] member of a uniformed service on active duty who, by reason of such active duty, is *absent from the place of residence* where the member is otherwise qualified to vote . . ." is protected by UOCAVA.).

14. And, thanks to the Secretary's initiative to protect UOCAVA voters, and the State's strong interest in doing the same, UOCAVA voters have the option to return their completed ballot *via* commercial ground or air carrier, *e.g.,* UPS and FedEx, rather than solely by U.S. Mail.  Exhibit A at ¶ 17 (discussing Act No. 2011-169).

15. Thus, while there was a technical violation of the statute, no actual harm is likely to befall a UOCAVA voter as he or she will still have ample time to complete and return the ballot.  Accordingly, it is far more reasonable for officials to monitor the situation and address problems as needed (see below) rather than have this Court apply a "one size misfits all"

approach that would lead to a delay of the reporting of election results, as the United States requests.

16.  If one of the ballots requested before January 28, 2012 but transmitted after February 5, 2012 comes in *after* March 21, 2012 (the extended receipt deadline), it will still be counted if it is received within 45 days of its transmission and is otherwise valid.  Should it become necessary, the Secretary will ensure that such ballots are counted by amending the certification of the election results.  Exhibit A at ¶ 24 ("If, based on continuing monitoring, I determine that the 8-day extension is not sufficient to ensure that all UOCAVA ballots" requested before and "transmitted after the 45-day deadline are counted, I am empowered to take the further remedial step of amending the ballot certification if said ballots are not received before the certification deadline.  If necessary for any" such "UOCAVA vote to be counted, if received within 45 days after transmittal, I will take this step of amending the certification.").

17.  Moreover, Secretary Chapman will notify UOCAVA voters that she intends to amend the certification in order to count otherwise valid UOCAVA votes received after March 21, 2012 but within 45 days of transmission.

18.  Throughout this process, the Secretary of State's Office will monitor absentee voting, assessing constantly (through discussions with local election officials) when ballots are received and how many are outstanding.  When appropriate, the Secretary will encourage local election officials to take additional action or to contact individual absentee voters (as she did in 2010).  Where appropriate, as events develop, she may in her judgment take additional action if consistent with State law.

19. It is a fluid process and it is impossible to know in advance what situations may arise. A fluid process requires a fluid response, not a court order, and Secretary Chapman will exercise her judgment and authority as she continues to strive to protect voters.

### *Secretary of State's Intended Action with Respect to Potential Runoff Election*

20. As for the federal primary runoff election, if one is needed, the Secretary will take steps to ensure that UOCAVA voters are protected. That is true whether a strict 45-day limit applies, as the United States appears to contend, or whether a more flexible standard applies to runoff elections.

21. Generally speaking, UOCAVA requires that "a validly requested absentee ballot" be transmitted to a UOCAVA voter "not later than 45 days before the election" when the ballot request has been "received at least 45 days before an election for Federal office." 42 U.S.C. § 1973ff-1(a)(8)(A). If the voter requests an absentee ballot within the final 44 days leading up to a federal election, then the ballot is to be transmitted "in accordance with State law." 42 U.S.C. § 1973ff-1(a)(8)(B)(i). "[I]f practicable and *as determined appropriate by the State*," the ballot should be sent "in a manner that expedites the transmission." 42 U.S.C. § 1973ff-1(a)(8)(B)(ii) (emphasis added).

22. Specifically, with respect to any primary runoff, UOCAVA provides that "if the State declares or otherwise holds a runoff election for federal office," then the State must "establish a written plan that provides absentee ballots are made available to [UOCAVA] voters in [a] manner that gives them *sufficient time* to vote in the runoff election." 42 U.S.C. § 1973ff-1(a)(9) (emphasis added). The State Defendants read Subsection (a)(9) as Congressional

recognition that primary runoff elections are not traditionally held more than 45 days after the primary elections.[3]

23.     Ignoring Subsection (a)(9)'s specific focus on runoff elections and its inclusion of the language "*sufficient time*," the United States apparently contends that Subsection (a)(8)'s more general 45-day provision applies.  This reading is inconsistent with the principle of statutory interpretation that "[g]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment.  Specific terms prevail over the general in the same or another statute which otherwise might be controlling." *D. Ginsberg & Sons v. Popkin*, 285 U.S. 204, 208 (1932) (internal citations omitted); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general . . . .").

24.     Moreover, the United States' contrary reading is not logical.  The United States reads Subsection (a)(8) to require that UOCAVA ballots be transmitted 45 days in advance of all federal elections—the general election, the primary election, and any primary runoff election.  But that would mean that Subsection (a)(9) then imposes an additional duty to "establish a written plan" with respect to the runoff election that is not needed for either the general election

---

[3]     As explained in the State Defendants' preliminary response, doc. 10, Alabama's primary runoff elections used to be held three or four weeks after the primary elections until legislation was enacted in response to litigation brought by the United States, *United States v. Alabama*, Case No. 2:06-cv-00225-MEF-CSC.  Act No. 2006-354 provided UOCAVA voters an enhanced opportunity to participate in the primary runoff election by pushing back the primary runoff until six weeks after the primary.  It further afforded UOCAVA voters an extra week to return their ballots, providing that UOCAVA runoff election ballots would be timely if "postmarked as of the day of the second primary election [a.k.a., runoff election] and received by mail no later than noon seven days after the second primary election." Act No. 2006-354; *see also* Ala. Code § 17-9-51; Ala. Code § 17-11-18.  Ballots of non-UOCAVA voters must be postmarked by the day before the election and received by noon on the day of the election.

or the primary election. It is not at all clear why a plan would be needed for the runoff election, or what it would say other than that the ballots should be transmitted 45 days in advance of the election. Such a reading, then, would render Subsection (a)(9) superfluous. This Court should be, as the Supreme Court is, "'hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.'" *United States v. Jicarilla Apache Nation*, 564 U.S. ____, 131 S.Ct. 2313 (2011) (*quoting Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 837 (1988)).

25.     As a practical matter, in Alabama the only way to comply with a requirement that runoff ballots would be sent 45 days in advance of the runoff election—if such a requirement did exist—would be for the Legislature to pass, and the Governor to sign, new legislation further moving the runoff election. No "written plan" from the Secretary of State or any other State or local official would do the job.

26.     If Congress had wanted the State to move its runoff election—and assuming *arguendo* that it has the authority to require the same—it should have said so in the clearest of terms. Requiring "a written plan that provides absentee ballots are made available to [UOCAVA] voters in [a] manner that gives them *sufficient time* to vote in the runoff election" is not a clear directive to push back the runoff election to more than[4] 45 days after the primary election. 42 U.S.C. § 1973ff-1(a)(9).

27.     That the State Defendants do not believe that they are legally required to provide UOCAVA ballots 45 days in advance of any primary runoff election for federal office, should one be needed, is not the end of the matter. The State and the Secretary of State are committed

---

[4]     The primary election results would need to be certified, and the primary runoff ballots would then need to be printed and delivered to Absentee Election Managers for transmission to UOCAVA voters. Accordingly, some amount of time in addition to the 45 days would be required to separate the primary from its runoff under the United States' view.

to enabling UOCAVA voters in participate in Alabama's elections—federal, State, and county. *See* Exhibit A, generally.

28. With respect to a potential federal runoff election, there are four candidates vying for the Republican nomination for U.S. Congressional District 1 and for U.S. Congressional District 6. Hence, in each of these Districts, it is possible that a federal runoff election will be needed. (It is also possible that there will be runoffs in non-federal races.)

29. The State Defendants expect the United States to ask for an order requiring that a Federal Write-In Absentee ballot (FWAB) be sent to every UOCAVA voter in Congressional Districts 1 and 6 by March 10, 2012, which is 45 days before April 24, 2012 (the date on which a primary runoff will be held if one if needed). The Secretary strongly disagrees that a court order is required. Nonetheless, and because she recognizes that sending the FWABs will be beneficial to voters, the Secretary voluntarily "intend[s] to instruct local election officials to transmit Federal Write-In Absentee Ballots to all persons who requested primary ballots and who live in a Congressional district with the potential for a primary run-off election. [She] intend[s] to instruct them to transmit those ballots, with appropriate instructions, on or before March 10, 2012." Exhibit A at ¶ 28. Because the Secretary is willing to take this step without a court order, no order is needed or appropriate.[5]

---

[5] The Secretary's full affidavit demonstrates continuing and good-faith efforts to protect UOCAVA voters, including with respect to the 2012 elections. Exhibit A. An order enjoining the Secretary of State could not give her any additional incentive—as she already has every incentive to protect UOCAVA voters—and it would not give her any additional power over local election officials (whose proper role it would be to send the ballots, and who have the information on who their UOCAVA voters are); such an order would do no more than further exacerbate the federalism issues here.

30. Additionally, "[i]n the event of a runoff, [the Secretary's] office will monitor UOCAVA ballot applications and transmittals and [the Secretary] will exercise [her] judgment to determine if further action is needed to protect UOCAVA voters." Exhibit A at ¶ 29.

### *Disagreements with Relief Requested by the United States*

31. The United States suggests that the best way to protect UOCAVA voters is by a further blanket extension of the receipt deadline. However, the 8-day extension currently in place already bumps up against the deadline to certify the results of the election. *See* Ala. Code § 17-13-17. If the receipt deadline is extended further, then deadlines for canvassing and initial certification—which are largely done by the political parties, not State officials, *id.*—would also have to be extended. That is not something within the Secretary's authority, and the political parties are not party to this action. In any event, extending those certification dates would delay printing ballots for any runoff election and jeopardize deadlines applicable to runoffs. In contrast, the course of action the Secretary intends to follow—the 8-day extension, plus amending the certification if necessary—is less disruptive of a potential runoff (for federal, State or county offices), while still giving all UOCAVA voters 45 days after transmittal for their ballot to be received.

32. The United States also asks that the State Defendants be required to report certain data to them after the primary election and after the federal runoff election, if one is held. The statute does not entitle them to such reports. While the State makes a report of certain information after a general election, 42 U.S.C. § 1973ff-1(c), no such report is required after a primary election or runoff election. Moreover, the information sought is not in the hands of the Secretary of State, but in those of local election officials. While the State Defendants gathered information from local officials that was reported in the Second Response, doc. 12, they did so

11

with reservation of objections and in the spirit of cooperation. For further inquiries, the United States may seek this information directly from the local election officials.

33. The largest area of disagreement is probably on whether the Court must enter an order for UOCAVA voters to be protected. The burden is on the United States to show that it is entitled to injunctive relief. *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir. 1983). It must therefore show, among other things, that the State officials will not act without a court order. Plaintiff may seek to rely solely on the fact that ballots went out after the 45-day deadline, but the State Defendants have shown that this was because of issues outside their control, such as delays and changes in the political parties' certification of candidates and redistricting issues, and not because of actions that the State Defendants failed to take. The United States may rely also on allegations that events in 2010, where some ballots were transmitted late. Yet, the Secretary's response in 2010—extending the receipt deadline, just as done here, Exhibit A at ¶ 15—was apparently sufficient. *See* Doc. 10-1, USDOJ's 2010 UOCAVA report to Congress, which does not list Alabama among States sued for violating UOCAVA in 2010.[6] And, in any event, neither point responds to the reality that the State and the Secretary of State are already acting to protect UOCAVA voters and will continue to do so. *See* Exhibit A, generally.

34. To get injunctive relief, the United States must show that without a Court order, there will be irreparable harm. Plaintiff has not met its burden because the course of action the Secretary of State has implemented will adequately protect UOCAVA voters.

---

[6] As set out in the both the State's preliminary response, doc. 10 at 9-10, and Secretary Chapman's affidavit, Exhibit A at ¶ 19, there were a number of reasons why strict compliance with the 45-day deadline proved impossible this year. The Court is not faced with a recalcitrant defendant or one who does not share Congress' ultimate goal of protecting UOCAVA voters.

### III. MOTION TO DISSOLVE THE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

35. For these same reasons, the Court's temporary restraining order and preliminary injunction should be dissolved. *See also* Docs. 10 and 12, adopted and incorporated herein by reference.

36. In its order granting the United States' Motion for Temporary Restraining Order and Preliminary Injunction (doc. 8), this Court stated as follows:

> Because time is of the essence and thus defendants Alabama and Chapman may not have had an adequate opportunity to respond (both as to the law and the evidence) to the pending motion for temporary restraining order and for preliminary injunctive relief, the court will, upon timely request from defendants Alabama and Chapman, reconsider the relief afforded in this order.

Doc. 8 at 11.

37. As discussed above, the United States has not shown that it (as movant) will be irreparably harmed without a court order, or that any voter will be irreparably harmed.[7] The State Defendants have shown that through an extension of the receipt deadline and the flexible ability to amend certification of results, valid UOCAVA ballots requested prior to January 28, 2012 will be counted if received within 45 days of transmission. No one is actually harmed.

38. For these reasons, the United States was not entitled to the injunctive relief granted to it previously.

### IV. CONCLUSION

39. No relief from the Court is necessary to protect UOCAVA voters. The Secretary of State already had a plan that protected their rights, and in consultation with the attorneys for the United States has added to the plan. A Court order is not necessary to require her to act on

---

[7] As noted earlier, the State of Alabama and the United States share a responsibility to protect the public interest.

behalf of UOCAVA voters, and, in fact, the Court should dissolve its earlier temporary restraining order and preliminary injunction.

40.     There is no risk of harm here to a single UOCAVA voter.  In the past, the Secretary of State has taken all actions necessary to ensure that the franchise was not lost to a UOCAVA voters and she has demonstrated her intention to do so again this year.  While the evidence shows that some Alabama local election officials were guilty of technical infractions of federal law, the Secretary has taken appropriate steps to ensure that UOCAVA voters will not be harmed.

WHEREFORE, the State Defendants maintain that the United States has not shown an entitlement to equitable relief and that such relief is not necessary to protect the rights of UOCAVA voters.  For the same reasons, the State Defendants move the Court to dissolve its temporary restraining order and preliminary injunction.

Respectfully submitted,

LUTHER STRANGE (ASB-0036-G42L)
*Attorney General*

BY:

s/ James W. Davis
James W. Davis  (ASB-4063-I58J)
Misty S. Fairbanks  (ASB-1813-T71F)
*Assistant Attorneys General*

**OFFICE OF THE ATTORNEY GENERAL**
501 Washington Avenue
Montgomery, Alabama 36130
Telephone:   (334) 242-7300
Facsimile:   (334) 353-8440
jimdavis@ago.state.al.us
mfairbanks@ago.state.al.us

***Attorneys for the State Defendants***

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on the 3rd day of March, 2012, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record: Stephen M. Doyle, T. Russell Nobile, T. Christian Herren, Jr., Richard Dellheim, and Risa Berkower.

                                         s/ James W. Davis
                                         Of Counsel