## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | 2:12-cv-179-MHT-WC |
| | ) | |
| v. | ) | |
| | ) | |
| THE STATE OF ALABAMA and | ) | |
| BETH CHAPMAN, | ) | |
| SECRETARY OF STATE | ) | |
| OF ALABAMA, in her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## UNITED STATES' OPPOSITION TO
## DEFEDANTS' MOTION TO DISSOLVE INJUNCTION

The United States respectfully opposes the Defendants' Motion to Dissolve Injunction. State Defs. Third Response to Ct. Op. & Order, Mar. 3, 2012, at 13, ECF No. 14 [hereinafter "Defs. Third Response"]. The Defendants' recent violations of the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), 42 U.S.C. §§ 1973ff to 1973ff-7, as amended by the Military and Overseas Voter Empowerment Act, Pub. L. No. 111-84, Subtitle H, §§ 575-589, 123 Stat. 2190, 2318-2335 (2009), are profound. Every county in the State that received timely requests for UOCAVA ballots failed to transmit them at least 45 days *in advance* of the election as required. Some missed the deadline by as many as 16 to 18 days. One County still may not have transmitted ballots. And the Defendants' pre-litigation survey demonstrates they knew at the time they extended the State's ballot receipt deadline by eight days that the extension was insufficient to afford many of its overseas and military voters ("UOCAVA voters") even a 45-day *window* to receive, cast and return their ballots. Defendants' UOCAVA

violations have been pervasive, systemic, and worsening since 2010. Indeed, in the time since the MOVE Act amended UOCAVA to require ballot transmission at least 45 days prior to Federal elections, Alabama has not yet complied with that deadline. The United States' proposed remedial order is designed to ensure that these violations are remedied to the extent possible and, as importantly, to ensure that they are not repeated yet again. The undisputed pattern of UOCAVA violations to date leads to the conclusion that Court supervision is necessary to ensure that Alabama's UOCAVA voters are not disenfranchised in the 2012 federal elections and that they will enjoy the full protections of UOCAVA in all future Federal elections. Accordingly, Defendants' Motion to Dissolve Injunction should be denied.

## I. ARGUMENT

### A. The Proper Defendants Are Before This Court and Any State Laws or Procedures That Conflict With UOCAVA Must Yield.

While conceding that UOCAVA has been violated, State Defs. Prelim. Resp. to Ct. Op. & Order, Feb. 29. 2012, at 2, ECF No.10; Defs. Third Response, at 2, the Defendants nonetheless suggest that Congress may not have intended the State of Alabama and/or its chief election official, the Secretary of State, to be proper parties here. They also suggest that UOCAVA improperly "intrude[s] upon the State's sovereign prerogative to organize its internal affairs." Defs. Third Response, at 3 n.1.

UOCAVA compliance is a state responsibility. 42 U.S.C. § 1973ff-1(a)(8)(A) ("*Each state shall* ... transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter ... not later than 45 days before the election…"); 42 U.S.C. §§ 1973ff-1 & 1973ff-6(6); Op. & Order, Feb. 28, 2012, at 6-7, ECF No. 8 ("Alabama is responsible for complying with UOCAVA and ensuring that all validly requested absentee ballots are sent to UOCAVA voters in accordance with its terms, [i]ncluding UOCAVA's 45-day advance transmission

deadline."); *United States v. New York*, No. 1:10-cv-1214, 2012 WL 254263, at *1 (N.D.N.Y. Jan. 27, 2012) ("New York is responsible for complying with UOCAVA and ensuring that validly-requested absentee ballots are sent to UOCAVA voters in accordance with its terms."); *United States v. Cunningham*, No. 08-cv-709, 2009 WL 3350028, at *10 (E.D. Va. Oct. 15, 2009) ("The Commonwealth of Virginia, a party to this action, is directed by UOCAVA [to] ensure its compliance by the local election boards. Therefore, the local electoral officials are not so vitally interested in this action that a valid judgment cannot be rendered, completely and finally determining the controversy without their presence as parties."). Moreover, to the extent that Alabama law or its election procedures prevent compliance with UOCAVA, Alabama law and procedures must yield. *Rine v. Imagitas, Inc.*, 590 F.3d 1215, 1224 (11th Cir. 2009) ("Under the Supremacy Clause, any state law that conflicts with federal law is preempted. . . . Thus, even a legitimate state function is prohibited if it conflicts with the [federal law]."); *Bush v. Hillsborough Cnty. Canvassing Bd.*, 123 F. Supp. 2d 1305, 1314 (N.D. Fla. 2000) (noting that any state law that conflicts with UOCAVA is preempted and invalid); *Cunningham*, 2009 WL 3350028, at *10 ("[T]he Commonwealth of Virginia has an obligation under the Supremacy Clause to protect the federally-guaranteed civil right of UOCAVA voters to vote by absentee ballot in federal elections. To the extent that protecting that right conflicts with Virginia law, Virginia law must give way."); *see Ballenger v. Sikorsky Aircraft Corp.*, No. 2:09cv72, 2011 WL 5245209, at *1 (M.D. Ala. Nov. 3, 2011) (Thompson, J.) ("Under the Supremacy Clause, federal law trumps state law."). Accordingly, when as here, there is a complete breakdown in state processes such that every county with valid and timely UOCAVA ballot requests failed to transmit ballots as UOCAVA requires, the State and its chief elections official are properly joined in a lawsuit to remediate those failures and institute any appropriate remedy.[1]

---

[1] *See* Military and Overseas Voter Empowerment (MOVE) Act of 2009, 156 Cong. Rec. S4513, S4517 (daily ed.

Moreover, Congress has plenary authority to regulate the time, place, and manner of Federal elections under Article 1, section 4 of the Constitution. *Foster v. Love*, 522 U.S. 67, 69 (1997) ("[I]t is well settled that the Elections Clause grants Congress the power to override state regulations by establishing uniform rules for federal elections, binding on the States."); *Ass'n of Cmty. Orgs. For Reform Now v. Miller*, 120 F.3d 833, 836 (6th Cir. 1997) ("[U]nlike the Commerce Clause . . . Article I section 4 specifically grants Congress the authority to force states to alter their regulations regarding federal elections."); *Voting Rights Coalition v. Wilson*, 60 F.3d 1411, 1413 (9th Cir. 1995) ("[T]he Supreme Court has read the grant of power to Congress in Article I, section 4 as quite broad."); *Ass'n of Cmty. Orgs. For Reform Now v. Edgar*, 56 F.3d 791, 794 (7th Cir. 1995) ("Congress can . . . regulate federal elections *and* force the state to bear the expense of the regulation." (emphasis in original)). Congress's insistence that members of the armed forces and citizens residing overseas have the opportunity to participate fully in Federal elections is at the very heart of that Constitutional authority. Accordingly, any barrier erected by Alabama, its chief elections official, or any conflicting State law or procedure must yield.

> **B.** <u>**The State's Offer to Self-Monitor UOCAVA Compliance Is Insufficient.**</u>

From the time that Congress amended UOCAVA to institute a 45-day advance transmission deadline, Alabama has steadfastly refused to cooperate with the United States and share information with respect to its procedures for ensuring UOCAVA compliance. It has repeatedly coupled its refusals with assurances as to its UOCAVA compliance. *See, e.g.,* Letter from Jean Brown, Chief Legal Advisor to Ala. Sec'y of State, to T. Russell Nobile, Trial Attorney, Voting Section, U.S. Dep't of Justice, at 2 (Feb. 21, 2012), ECF No. 5-14 ("The

---

May 27, 2010) ("Compliance with MOVE's mandates . . . ultimately remains a State responsibility, and States will continue to be the main entity against which the provisions of MOVE and UOCAVA will be enforced should enforcement by the Department of Justice become necessary.").

Secretary will monitor the progress and take further corrective action if she deems it necessary and appropriate.") [hereinafter "Brown Letter"].  As the undisputed record demonstrates, those assurances were, unfortunately, not reliable.

Indeed, although an emergency rule was needed in the 2010 Federal general election to help prevent disenfranchisement of UOCAVA voters after Alabama failed to ensure numerous counties transmitted UOCAVA ballots by the federal deadline, Defendants failed to take the necessary corrective measures to ensure they were not in the same position in the 2012 cycle.  In fact, the State's ineffective monitoring and remedial efforts in advance of the 2012 Federal primary election have resulted in violations that are even more widespread.  And because Alabama merely offers to do what it says it has been doing all along – monitoring and ad hoc after-the-fact corrective action – those violations are likely to continue absent entry of an order establishing remedial procedures for the remainder of this federal election cycle.  Finally, a framework for ensuring permanent, long-term relief to protect UOCAVA voters in future elections is needed.  Given the pervasive and on-going nature of the State's UOCAVA "monitoring" failures, and its defiance of Federal efforts to help ensure that UOCAVA voters are not disenfranchised, judicial oversight is unfortunate but necessary.

Moreover, it is unclear that Defendants' assurances that all UOCAVA ballots that are returned after the deadline will be counted comport with State law.  The Defendants avow that all ballots received after the State's ballot receipt deadline will be counted because the Secretary of State will recertify the election results.  Defs. Third Response, at 6.  Yet, the Defendants do not explain how local election officials can, commensurate with State law, properly count ballots that are by definition received after the ballot receipt deadline and thus, by definition, too late to be counted.  Nor do the Defendants explain the mechanisms that will be used to ensure that all

5

local election officials carry out State dictates for counting ballots received after the State law receipt deadline -- nor why those same dictates could not have been used to ensure UOCAVA compliance in the first place.

The Secretary of State's promise to "monitor" this situation is simply inadequate here. Defendants' UOCAVA compliance efforts over the past two years have failed to prevent violations. Further, the remedial efforts the Defendants now assert they will take are solely the result of this litigation. Absent this suit, it seems unlikely the State would have undertaken any efforts to remediate its UOCAVA violations beyond its eight-day extension of the State's ballot receipt deadline--an effort that was wholly insufficient given that Defendants knew that ballots were transmitted as many as 18 days late. Additional voluntary self-monitoring is inappropriate given this evidence and Defendants' consistent defiance of Federal law.

The relief sought by the United States is both narrowly tailored and designed to ensure UOCAVA voters' right to sufficient time to receive, mark, and return their ballots in time to be counted. As detailed in the United States' March 3, 2012 filing, for the March 13, 2012 Federal primary election the United States seeks primarily to (1) extend Alabama's ballot receipt deadline to give all UOCAVA voters at least 45 days to receive, mark, and return their ballots, as Congress intended, and (2) provide adequate advance notice to voters of that deadline extension, and if necessary a vehicle for expeditious receipt and return of their ballots. These two simple steps have been approved by courts to remedy similar UOCAVA violations in numerous other cases, and they impose little burden on Defendants. *See, e.g.*, *United States v. New York*, No. 10-CV-1214 (N.D.N.Y. Oct. 19, 2010) (consent decree extending ballot receipt deadline by 22 days to remedy late UOCAVA ballot transmissions), ECF No. 15-2; *United States v. New Mexico*, No. 10-cv-968 (D.N.M. Oct. 14, 2010) (consent decree extending ballot receipt deadline by 4 days),

ECF No. 15-6; *United States v. Illinois*, No. 10-cv-6800 (N.D. Ill. Oct. 22, 2010) (consent decree extending ballot receipt deadline by 17 days), ECF No. 15-7 *; United States v. Wisconsin*, No. 10-CV-518 (W.D. Wis. Sept. 14, 2010; consent decree entered Sept. 15, 2010) (ordering 17-day extension of ballot receipt deadline), ECF No. 15-5; *Cunningham*, 2009 WL 3350028 at *10 n.3. Moreover, the proposed order filed by the United States on March 3, 2012 structures the extension of the ballot receipt deadline so as to minimize interference with Defendants' scheduled certification of election results. This provision has also been used to resolve similar cases. *See, e.g.*, *United States v. Tennessee*, No. 08-cv-85 (M.D. Tenn. Jan. 30, 2008) (consent decree), ECF No. 15-8; *United States v. Connecticut*, 06-cv-1192 (D. Conn. Aug. 2, 2006) (stipulated agreement), ECF No. 15-9. The United States respectfully submits that the additional reporting and monitoring requirements sought by the United States are appropriate given the systemic compliance failures at issue here.

> **C.** **UOCAVA's 45-Day Advance Transmission Requirement Applies to All UOCAVA Voters, Regardless of Where They are Located and the Manner in Which Their Ballots Are Transmitted.**

Defendants suggest that, because some military voters are stationed stateside and that some UOCAVA voters may access ballots electronically, such voters have no need for UOCAVA's 45-day advance ballot transmission deadline, referring to the violations as "technical." Defs. Third Response, at 5. This argument should be rejected. Congress's mandate was clear that the 45-day advance transmission requirement applies to *all* qualified UOCAVA voters, wherever they happen to be, and however they choose to access their ballots. Indeed, Defendants decline to provide any evidence demonstrating that the State's UOCAVA voters, many of whom serve in the military and are stationed abroad, including forward operating areas, have no need for UOCAVA's 45-day advance transmission protection. *See* Military and

Overseas Voter Empowerment (MOVE) Act of 2009, 156 Cong. Rec. S4513, S4518 (May 27, 2010) (discussing development of 45-day mailing requirement based upon evidence before Congress).  That there may be some UOCAVA voters stationed stateside or some who can access ballots electronically is of no legal import and, moreover, of little comfort to those UOCAVA voters stationed abroad who have elected to receive communications via the mail, as well as those UOCAVA voters with only limited or periodic access to electronic means of ballot delivery.  Nor is it sufficient to offer UOCAVA voters the opportunity to bear the expense of returning their ballot via commercial ground or air carrier to remediate Alabama's late transmission of ballots.  Defs. Third Resp., at 5.  Accordingly, while the court cannot now afford relief for the March 13 Federal primary election that will ensure UOCAVA's full protections -- transmission of ballots 45 days before the election -- the United States by its requested ballot receipt deadline extension seeks to ensure all UOCAVA voters at least  a 45-day window for roundtrip ballot transit.

      **D.**     **UOCAVA's 45-Day Advance Transmission Deadline Applies to Runoff Elections.**

Defendants argue that UOCAVA's 45-day advance transmission requirement does not apply to runoff elections.  They are incorrect.  Subsection (a)(8) of UOCAVA states:

> Each State shall . . . transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter … at least 45 days before **an** election for Federal office, not later than 45 days before the election; and (B) in the case in which the request is received less than 45 days before an election for Federal office – (i) in accordance with State law; and (ii) if practicable and as determined appropriate by the State, in a manner that expedites the transmission of such absentee ballot.

42 U.S.C. § 1973ff-1(a)(8) (emphasis added).  Subsection (a)(9) states:

> Each State shall . . . if the State declares or otherwise holds a runoff election for Federal office, establish a written plan that provides absentee ballots are made available to absent

8

>  uniformed services voters and overseas voters in [a] manner that gives them sufficient time to vote in the runoff election.

42 U.S.C. § 1973ff-1(a)(9).

As a matter of plain language, "*an* election for federal office" in Subsection (a)(8) is most easily read to mean *any* election for Federal office. Black's Law Dictionary at 1 (6th ed. 1990) (the indefinite article "a" is "often used in the sense of 'any'"); *cf. Lee v. Weisman*, 505 U.S. 577, 614 n.2 (1992) (Souter, J., concurring) (in the text of the First Amendment, "the indefinite article [an] before the word 'establishment' is better seen as evidence that the Clause forbids any kind of establishment"); *United States v. Belfast*, 611 F.3d 783, 815 (11th Cir. 2010) ("the word 'any' in the phrase we interpret here could be replaced by an ordinary indefinite article—'a crime'—and the meaning of the statute would be exactly the same"). Indeed, elsewhere in UOCAVA Congress used the phrase "an election for federal office" to cover all Federal elections, including runoffs. *See, e.g.*, 42 U.S.C. § 1973ff-1(f). The "normal rule of statutory construction" is that "identical words used in different parts of the same act are intended to have the same meaning." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (citation omitted). Accordingly, the statute's plain language includes all Federal elections, including runoffs.

Nothing in Subsection (a)(9) contradicts (a)(8). And while Alabama seeks to limit UOCAVA's scope (and thus the State's liability) by arguing that Subsection (a)(9)'s specific rule regarding runoff elections trumps Subsection (a)(8)'s more general rule, Defs. Third Resp., at 8, that argument must fail. While it is ordinarily true that, when construing statutes, the specific governs the general, that axiom only applies when two statutory provisions actually *conflict. See Nat'l Cable & Tel. Ass'n v. Gulf Power Co.*, 534 U.S. 327, 335-36 (2002) ("It is true that specific statutory language should control more general language when there is a conflict between the two. Here, however, there is no conflict. The specific controls but only within its self-described

9

scope."); *see also Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228 (1957) (emphasizing, before applying the canon, that both statutes at issue were clear and both applied in terms to patent infringement actions, but that they created different rules for determining the proper venue for such an action).

Beyond the lack of conflict, nothing in Subsection (a)(9) alters Subsection (a)(8)'s plain text as pertaining to "any" election for Federal office. Indeed, states can, without conflict, comply with both subsections—the requirement to timely transmit ballots, consistent with Subsection (a)(8), and the requirement to develop a written plan, consistent with Subsection (a)(9), that will give overseas and absentee uniformed services voters an adequate opportunity to vote in the runoff election. Nothing in the language of the two provisions precludes a State from satisfying the requirements of both.[2]

Regardless, the Court need not decide that question here because the Defendants' written plan for runoff elections is wholly insufficient to satisfy UOCAVA even under the strained interpretation of the statute Defendants advance. *See* Brown Letter. For example, under that plan, as a practical matter State-certified ballots cannot be transmitted to voters more than 32 days prior to the runoff. *Id*. While at the 11th hour, in response to this Court's prior order, the Defendants have now "voluntarily" agreed to implement additional measures to help protect UOCAVA voters should there be a runoff primary election in 2012, these measures – while

---

[2] This conclusion is consistent with the "canon that provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor." *Henderson v. Shinseki*, 131 S. Ct. 1197, 1206 (2011) (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 220-21 n.9 (1991)); *see also, e.g.*, *Fishgold v. Sullivan Drydock & Repair Corp*., 328 U.S. 275, 285 (1946) ("This legislation [the Selective Training and Service Act of 1940] is to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need."). And while some overseas voters who benefit from this statutory scheme are not members of the Armed Services, the large numbers of uniformed voters who are the direct and intended beneficiaries of the MOVE Act, and the great importance of voting rights in our system of government, suggests this canon informs the proper construction of Subsection (a)(8), consistent with the traditional recognition of Congress's "solicitude" toward the men and women who serve in uniform. *See Henderson*, 131 S. Ct. at 1206. This canon of construction also dovetails with the purpose of UOCAVA and the broader legislative scheme of which it is a part: to ensure that overseas voters, and military members in particular, have an opportunity to vote in, and have their ballots counted in, federal elections.

welcome – do not suffice.  For instance, while Defendant Chapman now avows to "instruct" Alabama's counties to transmit Federal Write-in Absentee Ballots ("FWABs") to qualified UOCAVA voters from Congressional districts in which a runoff Federal primary election will occur in 2012, Defs. Third Resp., Chapman Aff., ECF No. 14-1 at ¶ 28, that measure alone is inadequate.  As detailed in the United States' proposed order, more is required, such as providing UOCAVA voters with specific information as to the dates official ballots will be available, appropriate internet addresses where voters may download ballots, the provision of an international toll-free phone number for voters to address questions and to resolve any confusion flowing from the Defendants' UOCAVA failures, and appropriate and uniform procedures for ensuring that, if officials receive two ballots from the same voter, the official ballot will be counted.  U.S. Prop. Prel. Inj. Ord., Mar. 3, 2-12, ECF No. 15-1.  Moreover, Defendants' last minute "voluntary" agreement to take certain additional measures for this Federal runoff primary election (should one occur) highlights the fact that its runoff election plan as written lacks any such measures and is, therefore, patently inadequate for use in future Federal runoff elections.

   **E.** **Pre- and Post-Election Reporting Are Necessary to Gauge the Success of Remedial Efforts and to Ensure UOCAVA Compliance in the Other 2012 Federal Elections.**

  Consistent with their longstanding refusal to provide any information voluntarily as to their UOCAVA efforts, the Defendants argue that no such reporting should be required here. Their arguments must fail.  Given the comprehensive UOCAVA failures currently before the Court, that this is the second such occurrence over two Federal elections, and the Defendants' unwavering refusal to provide any information regarding their UOCAVA compliance efforts, meaningful Court-ordered reporting requirements are essential to remediate the Defendants' current UOCAVA violations, and to ensure that such violations do not reoccur.  Indeed,

reporting requirements have been found to be a necessary aspect of any program to remediate and cure UOCAVA violations. *United States v. New York*, No. 10-CV-1214 (N.D.N.Y. Feb. 14, 2012) (order granting permanent relief), ECF No. 15-2; *United States v. New Mexico*, No. 10-cv-968 (D.N.M. Aug. 1, 2011) (supplemental consent decree), ECF No. 15-10; *United States v. Illinois*, No. 10-cv-6800 (N.D. Ill. Jan. 26, 2012) (supplemental consent decree), ECF No. 15-11.

      And while Defendants claim to have no ability to extract information from the Counties, that claim is belied by the facts here. Indeed, Defendant Chapman concedes she obtained statewide UOCAVA information in 2010. Defs. Third Resp., Chapman Aff., at ¶ 15. She did it again in 2012, before this lawsuit was filed. She did it again in response to the Court's Order. Nor does she explain why, on one hand, she has the power to "instruct" Counties to provide FWABs to voters (and thus asking this Court to presume that such instructions will be obeyed uniformly and strictly), but that she lacks any such authority to obtain basic information necessary to ensuring the State's UOCAVA responsibilities are fulfilled. And while the Defendants believe the United States should obtain this information on its own, that is not appropriate for several reasons. First, it is a State responsibility to ensure UOCAVA compliance; that cannot be done without gathering reliable and complete information from every county in the State. In other words, UOCAVA compliance requires states to gather complete and accurate information statewide. Second, Defendant Chapman concedes her ability to instruct counties to carry out her directives (such as dispatching FWABs), Defs. Third Resp., Chapman Aff., at ¶ 28; it is reasonable to expect that her authority also includes the ability to obtain basic information about UOCAVA compliance. Indeed, Defendant Chapman has repeatedly demonstrated that ability here.[3] In short, Defendants' ongoing refusal to provide UOCAVA-

---

[3] To the extent that State law or procedure is a barrier to the State's ability to ensure that ballots are finalized and in the hands of the counties in time to comply with UOCAVA, or to the State's ability to obtain county information

related information is unreasonable given the conceded UOCAVA violations at issue, the comprehensive scope and severity of these violations, the Defendants' ready access to relevant and accurate information, and that information's utility in evaluating the success of remedial efforts and to ensuring future UOCAVA compliance.

## II.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dissolve Injunction should be denied.

---

necessary to ensure its UOCAVA compliance, it is possible those laws or procedures should change.  Discovery may help determine the precise source of the State's apparent inability to ensure UOCAVA compliance and thus inform any further proceedings to obtain permanent relief.

Respectfully submitted,

Date:  March 5, 2012

| | |
|---|---|
| GEORGE L. BECK, JR.<br>United States Attorney<br>Middle District of Alabama | THOMAS E. PEREZ<br>Assistant Attorney General<br>Civil Rights Division |
| | |
| | _/s/ T. Russell Nobile_ |
| STEPHEN M. DOYLE<br>Assistant United States Attorney<br>131 Clayton Street<br>Montgomery, AL 36104<br>Phone: (334) 223-7280<br>Fax: (334) 223-7418 | T. CHRISTIAN HERREN JR.<br>RICHARD DELLHEIM<br>T. RUSSELL NOBILE<br>RISA BERKOWER<br>Attorneys, Voting Section<br>Civil Rights Division<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, N.W.<br>NWB - 7122<br>Washington, D.C. 20530<br>Telephone:  (202) 307-1190<br>Facsimile:   (202) 307-3961<br>t.russell.nobile@usdoj.gov |

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | 2:12-cv-179-MHT-WC |
| v. | ) | |
| | ) | |
| THE STATE OF ALABAMA and | ) | |
| BETH CHAPMAN, | ) | |
| SECRETARY OF STATE | ) | |
| OF ALABAMA, in her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**CERTIFICATE OF SERVICE**

    This is to certify that on March 5, 2012, a copy of the forgoing Motion and all accompanying documents, including exhibits and a proposed order, were filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of filing to counsel of record for the Defendants.

    Misty S. Fairbanks
    James W. Davis
    Assistant Attorney General
    Constitutional Defense Division
    Office of the Attorney General
    501 Washington Avenue
    Post Office Box 300152
    Montgomery, Alabama 36130-0152
    Telephone: 334.353.8674
    Facsimile: 334.353.8440
    mfairbanks@ago.state.al.us
    jimdavis@ago.state.al.us


Date:  March 5, 2012                                  */s/ T. Russell Nobile*
                                                                           T. RUSSELL NOBILE
                                                                           Department of Justice