IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
UNITED STATES OF AMERICA,    )
                             )
    Plaintiff,               )
                             )        CIVIL ACTION NO.
    v.                       )         2:12cv179-MHT
                             )            (WO)
THE STATE OF ALABAMA and     )
BETH CHAPMAN, in her         )
official capacity as         )
Secretary of State of        )
Alabama,                     )
                             )
    Defendants.              )
```

OPINION

On February 24, 2012, plaintiff United States of

America ("the United States") filed this lawsuit against

defendants State of Alabama and Alabama Secretary of

State Beth Chapman (collectively "Alabama" or "the

State").  Relying on the Uniformed and Overseas Citizens

Absentee Voting Act of 1986 ("UOCAVA"), 42 U.S.C.

§ 1973ff et seq., as amended by the Military and Overseas

Voter Empowerment Act, Pub. L. No. 111-84, Subtitle H, §§

575-589, 123 Stat. 2190, 2318-2335 (2009) ("MOVE Act"),

the United States seeks to enforce the right of absent

uniformed services and overseas voters ("UOCAVA voters") to vote by absentee ballot in the State of Alabama's federal primary election scheduled for March 13, 2012. The jurisdiction of this court is invoked pursuant to 42 U.S.C. § 1973ff-4(a) and 28 U.S.C. § 1345.  On March 7, 2012, the court issued a preliminary injunction requiring the State to take a number of steps to comply with UOCAVA; this is why.

### I.

On February 28, 2012, following a hearing, the court granted the United States' motion for a temporary restraining order and preliminary injunction.  The court required the State to compile and submit evidence related to UOCAVA ballot transmission at the county level and that the parties meet and confer and then submit a report on how to proceed.  United States v. State of Alabama, 2012 WL 642312 (M.D. Ala. 2012).  As stated, on March 7, 2012, the court issued another preliminary injunction,

this time requiring the State to take a number of steps to comply with UOCAVA.   The court promised that an opinion explaining the basis for the March 7 injunction would follow on March 9, but the court extended that deadline to March 12.   This is promised opinion.


## II.

The court considers four factors in determining whether to issue a preliminary injunction: (1) whether there is a substantial likelihood of success on the merits; (2) whether irreparable injury will result unless the injunction is issued; (3) whether the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; and (4) whether granting the injunction is in the public interest. Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l, 238 F.3d 1300, 1308 (11th Cir. 2001); Siegel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam).[1]

---

1.   The parties agreed that an evidentiary hearing was not necessary to resolve the pending motion.

3

There is a substantial likelihood that the United States will prevail on the merits.  UOCAVA guarantees military and overseas voters the right "to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office."  42 U.S.C. § 1973ff-1.  In 2009, the MOVE Act amended UOCAVA to require that States transmit absentee ballots to UOCAVA voters at least 45 days before an election for federal office to provide voters sufficient time to receive, mark, and return absentee ballots.  42 U.S.C. § 1973ff-1(a)(8)(A).

Alabama's contention that it is not its responsibility to ensure compliance with UOCAVA, especially where local county officials transmit ballots and administer an election, is meritless.  Subject to an exception not applicable here, the statutory language is explicit: "Each State shall-- ... transmit a validly requested absentee ballot to an absent uniformed services

voter or overseas voter ... not later than 45 days before the election." 42 U.S.C. § 1973ff-1(a)(8). Indeed, the heading to this section is "State responsibilities." Id. at § 1973ff-1.

Moreover, this explicit statutory directive that Alabama bears full responsibility is reinforced by the rest of the statute. For instance, the statute further provides that, "Each State shall-- ... in addition to any other method of transmitting blank absentee ballots in the State, establish procedures for transmitting by mail and electronically blank absentee ballots" to UOCAVA voters, id. at § 1973ff-1(a)(7); "Each State shall-- ... if the State declares or otherwise holds a runoff election for Federal office, establish a written plan that provides absentee ballots are made available to" UOCAVA voters, id. at § 1973ff-1(a)(9); "Each State shall designate a single office which shall be responsible for providing information regarding voter registration procedures," id. at § 1973ff-1(b); and, if a voter

5

requests a ballot but does not "designate a preference" for the type of ballot, "the State shall transmit the voter registration application or absentee ballot application by any delivery method allowable in accordance with applicable State law." Id. at § 1973ff-1(e)(5).[2]   The statute also provides for a hardship exemption, but at the state, not local, level: "If the chief State election official determines that the State is unable to meet the requirement [to transmit ballots not later than 45 days before the election] with respect to an election for Federal office due to an undue hardship ..., the chief State election official shall request that the Presidential designee grant a waiver to the State of the application of such subsection." Id. at

_____

2.   Subsection (b) of § 1973ff-1 (which requires that a single state office be designated for providing information regarding voter-registration and absentee-ballot procedures) "recommends" that the state office designated for informational purposes also "be responsible for carrying out the State's duties under [UOCAVA]."   42 U.S.C. § 1973ff-1(b).   Thus, even in making this "recommendation," the text of the statute is clear that the duties under UOCAVA are the "State's duties."

§ 1973ff-1(g)(1) (emphasis added).  Finally, as evidenced by how compliance with UOCAVA is to be reported, the statute imposes obligations on the States, as States, even when they delegate some duties (as they are free to do) to local government officials: "Not later than 90 days after the date of each regularly scheduled general election for Federal office, each State and unit of local government which administered the election shall (through the State, in the case of a unit of local government) submit a report to the Election Assistance Commission ... on the combined number of absentee ballots transmitted to absent uniformed services voters and overseas voters for the election and the combined number of such ballots which were returned by such voters and cast in the election, and shall make such report available to the general public."  Id. at 1973ff-1(c).

That Alabama bears full responsibility for compliance with UOCAVA is further confirmed by the statute's legislative history and in the caselaw.  In a section

meant to clarify the "delegation of State responsibilities to local jurisdictions," the legislative history explains: "[W]hile the MOVE Act contains a number of mandates on the States ..., States remain free to delegate those responsibilities to local officials. Compliance with MOVE's mandates, however, ultimately remains a State responsibility, and States will continue to be the main entity against which the provisions of MOVE and UOCAVA will be enforced should enforcement by the Department of Justice become necessary." Military and Overseas Empowerment (MOVE) Act of 2009, 156 Cong. Rec. S4513, S4517 (daily ed. May 27, 2010). Similarly, every case addressing obligations under UOCAVA has focused on the obligations of States, as States, not local government units. See, e.g., United States v. New York, 2012 WL 254263, at *1 (N.D.N.Y. Jan. 27, 2012) (Sharpe, C.J.) ("New York is responsible for complying with UOCAVA and ensuring that validly-requested absentee ballots are sent to UOCAVA voters in accordance with its

8

terms."); <u>United States v. Cunningham</u>, 2009 WL 3350028, at *7 (E.D. Va. Oct. 15, 2009) (Williams, J.) (rejecting the argument that local election officials are necessary parties to the litigation because the "Commonwealth of Virginia ... is directed by UOCAVA [to] ensure its compliance by the local election boards"); <u>see also, e.g.,</u> <u>Doe v. Miller</u>, 2010 WL 4340804 (D. Nev. Oct. 27, 2010) (Navarro, J.) (considering the State of Nevada's obligations where a single county missed the deadline required by UOCAVA).

For the 2012 federal primary, Alabama's election is March 13, which means that validly requested ballots were required to be sent by January 28, 2012. It is undisputed that the State has not complied with UOCAVA's mandate; numerous Alabama counties failed to transmit UOCAVA absentee ballots at least 45 days prior to the federal primary election. Specifically, the undisputed evidence indicates that 47 Alabama counties received valid UOCAVA ballot requests, and that <u>all</u> 47 of these

counties failed to transmit the ballots by the January 28 deadline.

The Alabama Secretary of State Chapman exercised her authority to extend the UOCAVA ballot deadline by eight days, and a notice to that effect was placed upon her website.  In pertinent part, this notice provided:

> "The Secretary of State has received information indicating that transmission of some UOCAVA ballots for the March 13, 2012 primary election has been delayed. Your ballot may be one of these. As a remedial action, the Secretary of State has extended the statewide deadline for receiving all UOCAVA ballots by eight (8) days to March 21, 2012, to ensure that all military and overseas voters have a full and fair opportunity to have their votes counted."

Chapman Affidavit 8 (Doc. No. 14-1, at 9).

It is also undisputed that the eight-day extension does not fully cover the UOCAVA violation here because at least 16 counties, representing at least 260 ballots, sent UOCAVA absentee ballots after February 5, more than

10

eight days late.[3]  Indeed, some timely requested ballots were sent as late as February 15, 18 days after the transmission deadline and ten days more than the eight-day extension.  The eight-day extension, therefore, did not provide these voters with the statutorily mandated 45-day window.

As to irreparable harm, the State disputes whether any voters will be disenfranchised and thus harmed by its UOCAVA violations.  Secretary Chapman says that she "intends to do everything in her power to ensure that UOCAVA voters can vote and that their vote is counted."  State Br. 4 (Doc. No. 14, at 4) (internal quotes and alterations omitted).  Specifically, Secretary Chapman says that ballots received beyond the eight-day extension will be counted if received within 45 days of their transmission and are otherwise valid and that she is prepared to delay or amend the vote's certification if

---

3.  The record is unclear as to the number of ballots, if any, sent after February 5 in seven additional counties.

this step proves necessary.  Thus, Secretary Chapman's planned remedy is to keep the eight-day extension in place but be willing to accept otherwise valid ballots received after the extended March 21 deadline.

For a number of reasons, when viewed in light of the State's response thus far, this plan and well-meaning intent are not enough.  First, the remedy already adopted by the State (the eight-day extension and potential amended certification for ballots returning late) is insufficient on its face to ensure enfranchisement of UOCAVA voters.  Alabama has not sought to provide UOCAVA voters with the full 45-day ex ante window required by law; its remedy relies upon an ex post, ad-hoc acceptance of ballots received after March 21.  That is, instead of providing a further extension and then notice on Secretary Chapman's website (and circulated elsewhere) that ballots transmitted even beyond the eight-day mark will be accepted, the State is content to have these ballots sent late and under the expectation that they

12

must be returned in less than 45 days (on March 21). This sort of ex post remedy is plainly inadequate: It does nothing to put voters on notice that their ballots will be counted even if received after the eight-day-extension period has passed. Without such a notice, a military voter has no idea that his or her late-arriving ballot is even worth submitting, with the effect that this voter will likely simply not vote. Thus, the Secretary's remedy would likely result in voter suppression. As Secretary Chapman recognized in her initial notice, an extended deadline and notice thereof are necessary "to ensure that all military and overseas voters have a full and fair opportunity to have their votes counted." Chapman Affidavit 8 (Doc. No. 14-1, at 9). There is no reason why voters whose timely requested ballots were sent after February 5 are not entitled to the same "full and fair opportunity" as other UOCAVA voters.

Moreover, the State's denial of its ongoing obligation to ensure statewide UOCAVA compliance is a compelling reason to find that an injunction is appropriate, especially given the State's non-compliance and its inadequate remedy. The unequivocal and mandatory language of the § 1973ff-1(a) ("Each State shall") places a clear burden on the State to ensure UOCAVA ballots are sent lawfully. That it denies such a responsibility, which has been acknowledged in every other case under the statute, suggests Secretary Chapman's intentions, however well-meaning, are inadequate. As made clear above, the statute imposes upon the State, as State, an affirmative obligation to ensure that UOCAVA ballots are sent, even if through local jurisdictions, in compliance with its strictures.

The effect of the State's failure to act affirmatively, as opposed to responsively, to ensure that UOCAVA is followed is evident by its track record: Alabama failed to comply with UOCAVA for the 2010 federal

14

general election as well.  In 2010, the State adopted the eight-day extension repeated here.   This pattern is troubling, as the UOCAVA violations here appear far worse now than those in 2010: All 47 counties that received timely UOCAVA ballot requests were out of compliance, and some ballots were sent even 18 days late.  In addition, the fact that the eight-day extension is identical to the remedy adopted when the State failed to comply with UOCAVA in 2010 is further evidence that the State has inadequately protected the rights of UOCAVA voters.  The eight-day extension will not cover voters who validly requested their ballots but whose ballots were transmitted after February 5, which is at least 260 voters.  The State even admits that it knew of these violations before this litigation began, but it did nothing to guarantee voters whose ballots were sent more than 10 days late were fully enfranchised.  Accordingly, far from the tailoring required to remedy undisputed noncompliance, the State's rubber-stamp is under-inclusive and unresponsive to the facts of 2012 election.

15

Such an approach may be consistent with, and the result of, Alabama's view that it is not obligated, as the State, to ensure UOCAVA compliance, but, as explained, that view has no basis in the law.

In short, the court concludes that it is likely irreparable harm will result because the State has adopted an obviously inadequate remedy; has denied that it is even obligated to comply with UOCAVA; and, in the face of an undisputed statutory violation in 2010, failed to take any affirmative steps to prevent further future violations of federal voting law, which resulted in more extensive, systemic violations for the 2012 federal primary.

The other factors necessary for preliminary-injunctive relief to issue are satisfied as well. The court again finds that the potential harm caused to UOCAVA voters far outweighs the burden placed upon the State, which has a legally mandated obligation to vindicate the fundamental right of its military and overseas constituents to vote in federal elections. As

16

to the public interest, it should go without saying that
issuing an injunction that will require ex ante relief to
prevent disenfranchisement benefits the public. Indeed,
the justification for enforcement of the MOVE Act is
evidenced in the need for its passage: The Act was
enacted "in response to the widespread disenfranchisement
of uniformed services and overseas voters during the
November 2008 general elections." Doe v. Walker, 746 F.
Supp. 2d 667, 670 (D. Md. 2010) (Titus, J.). As cannot
be doubted, "'[f]or our citizens overseas, voting by
absentee ballot may be the only practical means to
exercise [the right to vote]. For the members of our
military, the absentee ballot is a cherished mechanism to
voice their political opinion.'" Cunningham, 2009 WL
3350028, at *4 (quoting Bush v. Hillsborough County
Canvassing Bd., 123 F. Supp.2d 1305, 1307 (N.D. Fla.
2000)). Indeed, "[n]othing is more critical to a vibrant
democratic society than citizen participation in the act
of voting. It is unconscionable to send men and women
overseas to preserve our democracy while simultaneously

17

disenfranchising them while they are gone." <u>United
States v. New York</u>, 2012 WL 254263, at *1.  Thus,
ensuring that these voters, many of whom risk their lives
at the request of their government, have the opportunity
to vote is certainly in the public interest.  Finally,
the court does not enjoin the State's election scheme
lightly, or without considering the role comity plays
here.  At the same time, deference to state
decision-making does not require the court to sit by idly
and watch violations of the law persist.  In some cases,
and this is one, if "federally-guaranteed voting rights
are to be protected, the court must act."  <u>Id</u>.


                              III.

     The court is also well-aware that injunctive relief
must be tailored to the circumstances the court
confronts; a one-size-fits-all approach is inappropriate.
<u>See</u> <u>Osmose, Inc. v. Viance, LLC</u>, 612 F.3d 1298 (11th Cir.
2010 ("'The law requires that courts closely tailor
injunctions to the harm that they address.'" (quoting

                              18

ALPO Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958,
972 (D.C. Cir. 1990)).  For that reason, and given the
important interests at stake--both on the side of the
voting rights of UOCAVA voters and the State's interest
in administering its own election scheme--the court finds
it appropriate to set out, in some detail, why it finds
each  provision of the injunction issued here to be
necessary.  The relief falls into six large categories:
(1) an extension of the ballot-receipt deadline; (2)
guidance on how to resolve conflicts if multiple ballots
are returned; (3) notice provisions; (4) a post-election
report; (5) ballot-transmission requirements for the
possibility of a run-off election; and (5) relief for
other federal elections in 2012.

1.  The court extended the ballot-receipt deadline
for UOCAVA ballots to March 31, 2012, to afford relief to
the UOCAVA voters who received their ballots after
February 5, and as late as February 18.  This extension,
which is based upon the information filed pursuant to the
court's initial injunction, gives these voters the same

19

relief provided with the eight-day extension Secretary Chapman already adopted.   Importantly, this relief is deferential to state law in two ways.   First, the court did not take the further step of requiring UOCAVA ballots sent after February 5 be accepted even if they were sent after the date of the election, which is not permitted by state law.   1975 Ala. Code § 17-11-18.   Given the extent of the violations and the timing of the court's order (less than a week before the election), such relief might have been appropriate to ensure, beyond a doubt whatsoever, no UOCAVA ballot went uncounted as a result of the State's late ballot transmission.   Taking a lesser course and the one proposed by the United States, the court extended the postmark date by one day, from the "date prior to the day of the election," to the day of the election itself, which is what state law already does for UOCAVA ballots in runoff elections.   Id.   Second, the court allowed the State to certify, provisionally, election results in any election where the number of outstanding UOCAVA ballots cannot mathematically alter

20

the outcome. This will allow the State to move quickly if it needs to hold a runoff election and as it goes through the process of certifying and sending out the runoff ballots.

2. In the event that local election officials receive more than one ballot from a single qualified voter, the State is required to ensure that any conflicts are resolved by counting the "official State ballot." The parties agree that the likelihood of this provision coming into play is low, but agree that the meaning of an "official State ballot" is understood and that this directive provides an noncontroversial method for resolving any instance where a voter, though intending to vote once, sends in two ballots.

3. The court's injunction requires broad notice be provided to inform, to the greatest extent possible, UOCAVA voters that their ballots can be received by March 31 instead of March 21, as it stood before the court's order. As explained above, merely extending the deadline, or agreeing to accept ballots after the State's

21

extended March 21 deadline, is ineffective if voters do not know that ballots sent by election date and received by March 31 will actually be counted. After extending the deadline, these notice provisions are the most crucial part of the court's injunction in that they seek to ensure the relief afforded is meaningful. Given the importance of notice and the exigency required to make the court's order effective, the notice provisions are broad: They require, to the extent possible, specific notice and, in addition, general notice both online and in the local community. Local notice, such as that in local newspapers, will, hopefully, reach not just the UOCAVA voter but their at-home community, with the hope that a family member or friend, who may have direct contact with the voter, will inform the voter that his or her ballot will be received and counted up until March 31. Such broad, mandatory notice might not have been necessary if there were more time between the court's order and the election; in such a case, an order giving the State wider latitude to determine what sorts of

22

notice to issue might be appropriate.  In this case,
however, there is no time for more passive (though
perhaps effective under other circumstances) notice.

     4.   The State must provide a post-election county-by-
county report, much like the one it was able to assemble
in less than 48 hours of the court's first injunction
regarding the number of UOCAVA absentee ballots received
and counted.  The report will also indicate the number
received after the March 31 extended deadline and include
the number that were not counted for other reasons.  In
determining the propriety of an injunction and whether
one should issue at all, information is key.  This report
will provide both the court and the litigants with
information on how many UOCAVA voters were ultimately
affected by the State's failure to comply with its
transmission requirements, and it will provide evidence
of the effectiveness of the injunctive relief already in
place, and of extending the receipt deadline in
particular.  Indeed, another section of UOCAVA, which
requires similar reports for general elections, indicates

23

this remedial step is a necessary part of how Congress contemplated the statute would work.  42 U.S.C. § 1973ff-1(c).

5.  Because of the possibility of a runoff election and because the transmission date is before the State will actually know whether there will be a runoff and before the names of the candidates can be confirmed, the court has required the State to send blank federal write-in ballots to UOCAVA voters in districts where the State anticipates a runoff election being held.  There appear to be two districts.  The court also has ordered that official, certified ballots be sent once they have been produced.  Notably, the State indicated its willingness to comply with this provision of the order before it was issued.  The March 10 date was selected because it is 45 days before any runoff election would be held and strikes a compromise between the parties who disagree whether the 45-day requirement applies to runoff elections at all and whether the State's "written plan" for the run-off election satisfies the statute regardless.  <u>Compare</u> 42

24

U.S.C. § 1973ff-1(a)(8) (requiring 45 days for "an election"), with id. at § 1973ff-1(a)(9) (requiring States to establish a "written plan" for runoffs that gives UOCAVA voters "sufficient time to vote in the runoff election").   Thus, the solution created by the injunction guarantees UOCAVA compliance for any potential runoff election and that voters are enfranchised rather than having allowing litigation itself to delay ballot transmission.

6.   Finally, the court has ordered relief for the remaining 2012 federal elections.   Counsel for the State of Alabama are required to meet and confer with counsel for the United States twice in the two weeks  leading up to the elections and must take a number of proactive steps to determine the level of statewide compliance before any such election.   In particular, the State must survey Alabama counties 55 days prior to each federal election, report that information to the court and the United States 48 days before the election, certify that ballots have been sent 45 days in advance,  compile these

25

data, and further report 29 days before the election as to whether all validly requested ballots were sent.

The court finds this prophylactic remedy, which has been employed in other cases, necessary for many of the same reasons an injunction had to issue in the first place: The State denies its legal obligation to ensure UOCAVA compliance; the State has violated the statute in two consecutive elections; the extent of these violations has been widespread, systemic, and worsening; and the State has failed to establish mechanisms to avoid UOCAVA voter disenfranchisement. See also, e.g., United States v. New York, 10cv1214 (N.D.N.Y. Feb. 14) (ordering identical preventative measures for other 2012 federal elections), available at (Doc. No. 15-1, at 3-4).

DONE, this the 12th day of March, 2012.

    /s/ Myron H. Thompson    
UNITED STATES DISTRICT JUDGE