# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 2:12-cv-00179-MHT-WC |
| | ) | |
| STATE OF ALABAMA and | ) | |
| HONORABLE JIM BENNETT, | ) | |
| Secretary of State, in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## STATE DEFENDANTS' MEMORANDUM IN
## SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

The State of Alabama and the Honorable Jim Bennett, Secretary of State, are entitled to summary judgment as to the United States' claim concerning federal runoff elections. Alternatively, the claim should be dismissed as nonjusticiable.

## I.      Introduction.

In February 2012, the United States brought suit pursuant to the Uniformed and Overseas Citizen Absentee Voting Act of 1986, 42 U.S.C. §§ 1973ff *et seq*., as amended by the Military and Overseas Voter Empowerment Act of 2009. Among other things, the United States alleged that Alabama's election calendar did not allow enough time to transmit ballots to UOCAVA voters for the 2012 federal

primary runoff election, should one be required, and that Alabama failed to promulgate a written plan "that provides absentee ballots are made available to [UOCAVA] voters in [a] manner that gives them sufficient time to vote in runoff elections," 42 U.S.C. § 1973ff-1(a)(9). Doc. 1 at ¶¶ 13-19, 33-35. The Complaint seeks, *inter alia*, injunctive relief concerning future federal runoff elections. Doc. 1 at 8-9.

In Alabama, a primary runoff election, also known as a second primary election, is only held following a primary election where no candidate received a majority of the votes cast in a particular race. Ala. Code § 17-13-18.[1] Accordingly, they are held only when needed. There was no federal primary runoff election in 2012, and no one can be sure at this point whether a federal primary runoff election will occur next year, when regularly scheduled Congressional elections are held again.

Nonetheless, the United States believes that Alabama is in violation of UOCAVA's general 45-day requirement, *see* 42 U.S.C. §§ 1973ff-1(a)(8)(A), because, by statute, Alabama schedules her primary runoff elections for six weeks (42 days) after her primary elections, Ala. Code § 17-13-3; Ala. Code § 17-13-18.

---

[1] The text refers to, and this memorandum concerns, a regularly scheduled primary runoff election conducted pursuant to Ala. Code § 17-13-3 and Ala. Code § 17-13-18. Special elections, such as the one to fill a vacancy in Alabama's 1st Congressional District, the subject of this Court's July order, doc. 71, are not governed by this timetable but are instead set by the Governor, Ala. Code § 17-15-2; *see also* U.S. Const. Art. I § 2, cl. 4; U.S. Const. Amend. XVII; Ala. Code § 17-15-1 *et seq*.

The United States is in error.  UOCAVA's general 45-day requirement does not apply to federal runoff elections.  Those are governed by a more specific provision which makes clear that "sufficient time" is required. 42 U.S.C. §§ 1973ff-1(a)(9). Given the genesis of Alabama's current schedule—namely prior litigation with the United States—Alabama's schedule, on its face, provides sufficient time.

Alternatively, the claim should be dismissed as nonjusticiable.  It was not ripe when the Complaint was filed, and, if the litigation were re-filed today, the claim still would not be ripe.  Because federal primary runoff elections are only held when needed, a challenge to the procedures for conducting those elections only ripens once the primary results are in and it is clear that a runoff is needed.  At that point, the United States could come to this Court to seek relief.   Additionally, there are no pressing reasons for this Court to decide the issue now; the Alabama Legislature might act to change the law before it is again enforced, and the issue presented here is pending before the Eleventh Circuit Court of Appeals in a case arising in Georgia.   Hence, the federal runoff election claim is not ripe for adjudication.

## II.    The summary judgment standard.

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### III.    For federal runoff elections, "sufficient time" is the standard, and Alabama's election schedule meets that standard.

UOCAVA has a general standard for ballot transmission that provides that "validly requested absentee ballot[s]" must be transmitted to UOCAVA voters "at least 45 days before an election for Federal office," when they have been requested by that time.  42 U.S.C. §§ 1973ff-1(a)(8)(A).[2]  The phrase "an election for Federal office," is used here to reinforce UOCAVA's applicability to federal, rather than State or local, elections.   It is not used to define *which* federal elections the provision applies to, and, in fact, it does not apply to federal runoff elections.

Federal runoff elections are governed by the specific subsection that follows. Subsection (a)(9) requires States that hold federal runoff elections to "establish a written plan that provides absentee ballots are made available to [UOCAVA] voters in [a] manner that gives them *sufficient time* to vote in the runoff election . . . ."  42 U.S.C. § 1973ff-1(a)(9) (emphasis added).   "Sufficient time" is an alternative standard to the 45-day requirement.   Declining to enforce that alternative standard fails to give effect to subsection (a)(9) and creates an absurdity in the requirement for a written plan for the runoff election alone.  On the other hand, recognizing that "sufficient time" is an alternative standard for federal runoff

---

[2]        A highlighted copy of UOCAVA is attached as Exhibit A.

elections gives effect to that provision, and respects the canon that specific statutes control over general ones. Reading subsection (a)(9)'s "sufficient time" standard as a more flexible alternative to the rigid 45-day requirement also respects Congress' reasonable policy choice.

Alabama's election schedule provides "sufficient time" for UOCAVA voters to vote in federal runoff elections. It was enacted in response to litigation brought by the United States. *U.S. v. Alabama*, Civil Action No. 2:06-cv-00225-MEF-CSC (M.D. Ala.). That litigation was resolved when the United States noticed its dismissal of the case, representing to this Court that the new schedule provided sufficient time for UOCAVA voters to vote in Alabama's federal primary runoff elections. It was sufficient then, and it is sufficient now.

### a. For federal runoff elections, UOCAVA requires that validly requested ballots be transmitted in "sufficient time" to allow UOCAVA voters to vote.

Subsection (a)(9) of 42 U.S.C. § 1973ff-1 specifically provides that "Each State shall-- . . . (9) if the State declares or otherwise holds a runoff election for Federal office, establish a written plan that provides absentee ballots are made available to [UOCAVA] voters in [a] manner that gives them *sufficient time* to vote in the runoff election . . . ." 42 U.S.C. § 1973ff-1(a)(9) (emphasis added). There is no mention of the 45-day requirement that has been at the heart of this case. Instead, Congress said "sufficient time" and required the States, when they hold a

runoff election, to have a written plan for ensuring that "sufficient time" will be provided. *Id.*

Despite the clarity of subsection (a)(9), the United States took the position in litigation arising in Georgia that UOCAVA's general 45-day provision (subsection (a)(8)(A)) applies to runoff elections, and that subsection (a)(9) is simply an additional requirement with which the States can and must comply while still providing 45-day transmissions.   *U.S. v. Georgia*, Civil Action No. 1:12-CV-02230-SCJ (N.D. Ga., closed), *on appeal.*   The Georgia court agreed.   ____ F.Supp.2d ____, 2013 WL 3421982, *4-*7 (N.D. Ga. 2013), and that decision is now on appeal, *U.S. v. Georgia*, Case No. 13-14065 (11th Cir., pending).  Alabama and Secretary Bennett disagree.

### 1.  *United States v. Georgia* and "an election"

The general 45-day provision provides: "Each State shall-- . . . (8) transmit a validly requested absent ballot to [a UOCAVA] voter—(A) . . . in the case in which the request is received at least 45 days before *an election* for Federal office, not later than 45 days before the election . . . ."  42 U.S.C. § 1973ff-1(a)(8)(A) (emphasis added).

At the United States' urging, the Georgia court focused on the emphasized language, holding that "an election" is "any election" and that includes a runoff election.   *Georgia*, 2013 WL 3421982 at *5-*6.   In the course of doing so, it

looked at another subsection where "an election" was used to refer to any of the four kinds of federal elections (*i.e.,* primary, runoff, general and special), as made clear *via* cross-reference, and determined the phrase should be consistent. *Id.* at *5-*6. The Court saw the written plan requirement as an additional responsibility of the States, and reasoned that "the logistical complexities of preparing for runoff elections, which are not held as a matter of course during every election season" make "the usefulness of a written plan . . . apparent." *Id.* at *7.

The Georgia court's reasoning was wrong. It makes no sense to focus on the indefinite article "an" while minimizing the substantive and specific reference to "sufficient time." Even assuming that a federal primary runoff election is a federal election and is usually encompassed within a general reference to "an election," that is the beginning, not the end, of the analysis.

In context, Congress' repeated references throughout UOCAVA to "an election for Federal office" and variations of that phrase were all making clear that UOCAVA applies to federal elections as opposed to State and local elections.[3]

---

[3]   Congress lacks authority to impose a UOCAVA-like requirement for State and local elections. And while it was careful not to try to regulate State and local elections, Congress did attempt to legislate beyond its authority. For instance, because the Elections Clause only refers to Congressional elections, Congress lacks the authority to impose UOCAVA requirements on presidential elections. U.S. Const. Art. I, § 4, cl. 1. *Cf. Arizona v. Inter Tribal Council of Arizona*, 570 U.S. ___, ____, 113 S.Ct. 2247, 2268 n. 2 (2013) (Thomas, J., dissenting) ("Constitutional avoidance is especially appropriate in this area because the [National Voter Registration Act] purports to regulate presidential elections, an area over which the Constitution gives Congress no authority whatsoever."); 42 U.S.C. § 1973ff-6(3) (defining "Federal office" to include "the office of President or Vice President" when UOCAVA repeatedly references its application to elections for federal office); *see also* 42 U.S.C. § 1973ff-2(c)(2) (explaining that

*See e.g.,* 42 U.S.C. § 1973ff-1(e)(4) (requiring "an online repository of State contact information with respect to elections for Federal office"). By use of that phrase, Congress was not specifically delineating which federal elections were governed. When it wanted to specify *which* federal elections were governed, it did so expressly. For example, in 42 U.S.C. § 1973ff(b)(3), Congress said "in general elections for Federal office." And in 42 U.S.C. § 1973ff-1(a)(1), Congress said "in general, special, primary, and runoff elections for Federal office." In referring to "an election for Federal office," Congress was not engaging a term of art to be defined and rigorously applied throughout the statute. It was "[using] the words . . . as they are commonly and ordinarily understood," *Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1212 (11th Cir. 2010), and it was doing so for the simple purpose of distinguishing non-federal elections.

Even if one wanted to define "an election," however, it would be no easy task. "Judge Harold Leventhal used to describe the use of legislative history as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends." *Conroy v. Aniskoff*, 507 U.S. 511, 519, 113 S.Ct. 1562, 1567 (1993) (Scalia, J., concurring in judgment). Picking through UOCAVA to decide what "an election" means is a similar exercise. Here are our friends in the

---

votes for a Presidential ticket on Federal write-in absentee ballots are to be counted as votes for the relevant electors).

text of UOCAVA (some of whom are also the Georgia court's friends, viewed differently):

- When Congress meant "*any election for Federal office*," it said it.  *See* 42 U.S.C. § 1973ff-1(a)(2); 42 U.S.C. § 1973ff-3; *see also* 42 U.S.C. § 1973ff-2b(a)(2) ("each election for Federal office").

- Congress also knew how to list out "*general, special, primary, and runoff elections for Federal office*," when it wanted to be clear that a provision applied to each.  *See* 42 U.S.C. § 1973ff-1(a)(1), (a)(6)(A), & (a)(7); 42 U.S.C. § 1973ff-2(a)(1); *see also* 42 U.S.C. § 1973ff-2(e), (g)(1) & (g)(2) ("general, special, primary or runoff election for Federal office").

- Congress used the "*any*" descriptor in the very same section that is under consideration here.  *Compare* 42 U.S.C. § 1973ff-1(a)(8) ("an election" in the 45-day provision) *with* 42 U.S.C. § 1973ff-1(a)(2) ("*any election for Federal office*").  And it used the list of elections on three occasions in the section, including the subsection just before the 45-day provision.  *Compare* 42 U.S.C. § 1973ff-1(a)(8) ("an election" in the 45-day provision) *with* 42 U.S.C. § 1973ff-1(a)(1) & (a)(6)(A) & (a)(7) ("*general, special, primary, and runoff elections for Federal office*").  Accordingly, Congress knew how to do both, and, in subsection (a)(8), it did neither.

- "Elections for federal office" was not consistently and carefully used, and so there is no reason to believe than "an election for Federal office" had to be. Specifically, Congress instructed the Secretary of Defense ("The Presidential designee") to "carry out section 1973ff-2a of this title with respect to the collection and delivery of marked absentee ballots of [UOCAVA] voters in *elections for Federal office.*" 42 U.S.C. § 1973ff(b)(8).  But the referenced section, § 1973ff-2a, says four times that it concerns only regularly scheduled general elections for Federal office.  42 U.S.C. § 1973ff-2a(a), (b)(1), (b)(3)(A), & (c).  Hence, in § 1973ff(b)(8), "elections for Federal office" did not include primary, special, or runoff elections.[4]

Congress was writing to be understood on the simple point that UOCAVA applied only to federal elections and not to State and local elections.  It was not writing to withstand an in-depth analysis of an extraordinarily popular indefinite article.  *Cf. Wachovia Bank, N.A. v. U.S.*, 455 F.3d 1261, 1267 (11th Cir. 2006)

---

[4]     Section 1973ff-2a(a) provides: "The Presidential designee shall establish procedures for collecting marked absentee ballots of absent overseas uniformed services voters in regularly scheduled general elections for Federal office, *including absentee ballots prepared by States and the Federal write-in absentee ballot prescribed under section 1973ff-2 of this title,* and for delivering such marked absentee ballots to the appropriate election officials."  42 U.S.C. § 1973ff-2a(a) (emphasis added).  To the extent, if any, that the italicized phrase concerns ballots for elections other than the general election, then Congress' use of "elections for Federal office" in § 1973ff(b)(8)—discussed in the bullet—would be correct, but the remainder of § 1973ff-2a would be incorrect in its repeated reference to regularly scheduled general elections for Federal office.  *See* 42 U.S.C. § 1973ff-2a(b)(1), (b)(3)(A), & (c).  In that case, Congress' careless draftsmanship would itself undermine too great a reliance on an in-depth analysis of use of the common phrase "an election" in the statute.  *See also* 42 U.S.C. § 1973ff-1(e)(4) (assigning responsibility to a federal agency in a statute entitled "State responsibilities").

("Courts should avoid slicing a single word from a sentence, mounting it on a definitional slide, and putting it under a microscope in an attempt to discern the meaning of an entire statutory provision.").

> ### 2. Reading subsections (a)(8)(A) and (a)(9) to give effect to both, avoid absurd results, and allow the specific provision to control over the general

Stepping back from the trees to view the forest, it is plain that the general 45-day provision would apply to federal runoff elections *if* that were the only provision in issue.  It does not apply, however, because: **(A)** A statute should be read "to give full effect to each of its provisions." *Harrison*, 593 F.3d at 1212 (internal citation omitted).  **(B)** "[A] statute should, if at all possible, be read so as to avoid an unjust or absurd conclusion."  *Durr v. Shinseki*, 638 F.3d 1342, 1349 (11th Cir. 2011) (internal citations and quotation marks omitted).  And, **(C)** "when presented with a potential overlap between the broadly sweeping terms of a statute of general application that appear to apply to an entire class, and the narrow but specific terms of a statute that apply to only a subgroup of that class, we avoid conflict between the two by reading the specific as an exception to the general." *ConArt, Inc. v. Hellmuth, Obata Kassabaum, Inc.,* 504 F.3d 1208, 1210 (11th Cir. 2007).

Subsection (a)(9) provides that "if the State declares or otherwise holds a runoff election for Federal office, [the State must] establish a written plan that

provides absentee ballots are made available to [UOCAVA] voters in [a] manner that gives them *sufficient time* to vote in the runoff election."  42 U.S.C. § 1973ff-1(a)(9) (emphasis added).  As explained below, to apply the 45-day standard to federal runoff elections fails to give effect to subsection (a)(9)'s reference to "sufficient time," creates an absurd requirement for a written plan, and allows the general 45-day standard to govern when a specific standard requires only "sufficient time."

**(A)   Giving effect.**  Subsection (a)(9) makes no reference to the 45-day requirement, instead utilizing an alternative phrase, "sufficient time."  It did so to invoke an alternative standard.  *Cf. Russello v. U.S.*, 464 U.S. 16, 23, 104 S.Ct. 296, 300 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks and citation omitted; alteration by the Court).

If the 45-day transmission requirement applies to federal runoff elections, then there is no reason for the reference to "sufficient time" to exist.   Congress should have said the States are to "establish a written plan that provides absentee ballots are made available to UOCAVA voters 45 days before a runoff election,

when they have been requested by that time."   Of course, that raises the issue, discussed below, of why one would need a plan to do that.

A better construction of the statute does not render "sufficient time" insignificant. "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant. . . . We are reluctant to treat statutory terms as surplusage in any setting . . . ." *TRW, Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 449 (2001) (internal citations and quotation marks omitted).

"Well-established and soundly based rules of statutory construction require [this Court] to consider the provisions of [subsection (a)(9)], and its language, in context. The Supreme Court has described statutory construction as a holistic endeavor." *Wachovia Bank*, 455 F.3d at 1266 (internal citation and quotation marks omitted).  Looking to the "entire statutory context" reveals that the phrase "sufficient time" is used elsewhere in UOCAVA as an alternative to the general standard. *Harrison*, 593 F.3d at 1212 (internal citation omitted)

In addition to subsection (a)(9), the phrase "sufficient time" appears three times in subsection (g), which authorizes waivers of the 45-day rule "due to an undue hardship."  42 U.S.C. § 1973ff-1(g).  The use of the phrase "sufficient time" in subsection (g) makes clear that it is an alternative to the 45-day standard.

13

A request for a waiver of the 45-day rule must include four factors.  42 U.S.C. § 1973ff-1(g)(1).  The fourth factor is:

> (D) *a comprehensive plan* to ensure that [UOCAVA voters] are able to receive absentee ballots which they have requested and submit marked absentee ballots to the appropriate State election official in time to have that ballot counted in the election for Federal office, which includes—
>
>> (i) the steps the State will undertake to ensure that [UOCAVA voters] have time to receive, mark, and submit their ballots in time to have those ballots counted in the election;
>>
>> (ii) why the plan provides [UOCAVA voters] *sufficient time* to vote as a substitute for the requirements under such subsection [*i.e.,* 45-day requirement]; and
>>
>> (iii) the underlying factual information which explains how the plan provides such *sufficient time* to vote as a substitute for such requirements [*i.e.,* the 45-day requirement].

42 U.S.C. § 1973ff-1(g)(1)(D) (emphasis added).  A waiver is to be granted if certain requirements are met, including that "[t]he *comprehensive plan* . . . provides [UOCAVA voters] *sufficient time* to receive absentee ballots they have requested and submit marked absentee ballots to the appropriate State election official in time to have that ballot counted in the election for Federal office."  42 U.S.C. § 1973ff-1(g)(2)(A).

Thus, waivers of the 45-day requirement are available when certain conditions are met, including the development of a "comprehensive plan" to provide "sufficient time" in lieu of 45 days.  42 U.S.C. § 1973ff-1(g).  In this

subsection, then, "sufficient time" is an alternative to the 45-day standard and use of that alternative is accompanied by a requirement for a plan. *Id.*

This understanding compels a similar interpretation of subsection (a)(9)'s runoff provision: that is, for federal runoff elections, "sufficient time," rather than 45 days, is the standard, and a "written plan" is required to promote compliance with that standard. *Cf. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 630 (1988) ("Statutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme-because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.") (internal citations omitted).

Congress used the phrase "sufficient time" deliberately in the waiver provision. The first of the four factors required in a request for waiver is "a recognition that the purpose of such subsection [namely, (a)(8)(A)—the 45-day requirement] is to allow [UOCAVA voters] *enough time* to vote in an election for Federal office." 42 U.S.C. § 1973ff-1(g)(1)(A) (emphasis added). Congress did not say that the purpose is to allow 45 days, and it did not say that the purpose is to allow "sufficient time," which could have led to a circular argument that "sufficient time" is 45 days. Congress said "enough time." Generally, 45 days is

"enough time."  For runoff elections and in circumstances justifying a waiver, "sufficient time" is also "enough time."  42 U.S.C. § 1973ff-1(a)(9) & (g).

Focusing on the language "sufficient time" in subsection (a)(9), it is clear that "sufficient time" is an alternative standard to the 45-day requirement.  Failing to enforce the "sufficient time" standard makes Congress' use of that language "superfluous, void, or insignificant," a result which ought to be avoided.  *TRW*, 534 U.S. at 31, 122 S.Ct. at 449 (internal citations and quotation marks omitted).

**(B)    Avoiding absurdity.**    This conclusion is further supported by subsection (a)(9)'s requirement for a written plan.  If the States are required to transmit ballots to UOCAVA voters 45 days in advance of a runoff if they have been validly requested by that date, then what possible use does having a written plan to provide  "sufficient time" serve?  Is not the plan simply to transmit the ballots by the 45-day deadline, just like with every other federal election?

"[T]he legislature is presumed to act with sensible and reasonable purpose, [and so] a statute should, if at all possible, be read so as to avoid an unjust or absurd conclusion."  *Durr v. Shinseki*, 638 F.3d 1342, 1349 (11th Cir. 2011) (internal citations and quotation marks omitted).

The Georgia court thought that "the logistical complexities of preparing for runoff elections, which are not held as a matter of course during every election season" make "the usefulness of a written plan . . . apparent."  *Georgia*, 2013 WL

3421982 at *7.   But in Alabama, runoff elections *are* held as a matter of course, and there is nothing unique about runoff elections that would justify a written plan *unless* the transmission standard is "sufficient time."

In Alabama, runoff elections are statutorily scheduled.  Ala. Code § 17-13-3; Ala. Code § 17-13-18.  And they are commonplace, at least in elections for State offices.  Exhibit C, Aff. of Ed Packard, at ¶ 3.  Alabama has held *statewide* runoff elections for each of the past four regular election cycles (*i.e.,* 2012, 2010, 2008, and 2006), including for Governor, Attorney General, and seats on both the appellate courts and the Public Service Commission.  *Id.* at ¶¶ 4-8.[5]

Any federal runoff elections would have been held simultaneously with these state runoff elections.  Exhibit C, Aff. of Ed Packard, at ¶ 2; Ala. Code § 17-13-2; Ala. Code § 17-13-3; Ala. Code § 17-13-18.  And, other than UOCAVA's application, they would have required no different treatment.  *Id.* at ¶ 10.

It is the testimony of Alabama's Elections Director that "If UOCAVA's 45-day requirement applies to runoff elections, and if Alabama's election calendar were adjusted to account for that requirement, then a federal primary runoff election would not be unlike any other regularly scheduled federal primary election or federal general election in terms of election mechanics, and there would be no administrative or logistical reason to have a written plan concerning UOCAVA

---

[5]     Additional runoff elections were held on a less-than statewide scale.  Exhibit C, Aff. of Ed Packard, at ¶ 9.

compliance and specific to the runoff election." Exhibit C, Aff. of Ed Packard, at ¶ 11. In other words, to require a plan to provide 45 days for runoffs, but not for any other election, serves no purpose: it is absurd.

If the Georgia court were right that there was something more complex about runoffs that justified the plan requirement, or that rarity does so, then such a requirement would have more logically applied to *special* elections (such as the one to replace Jo Bonner in Alabama's 1st Congressional District). Special elections are held when a vacancy needs to be filled outside the normal election schedule. The Constitution provides for the Governor to call for special elections to fill vacancies in Congress, U.S. Const. Art. I § 2, cl. 4, U.S. Const. Amend. XVII, and Alabama, at least, gives the Governor unfettered discretion in selecting the election dates, Ala. Code § 17-15-1 *et seq*. A written plan might inform that discretion by setting guidelines or even windows of time between elections (*i.e.,* the primary, runoff, and general) to account for the rights of UOCAVA voters, while recognizing constitutional ballot access issues, the need to fill the vacancy so that citizens do not go unrepresented longer than necessary, and other important factors. Yet Congress saw no need for a written plan in that context.

Mere "complexity" or infrequency cannot be the reason for a runoff written plan requirement, when Congress decided not to require a written plan for special elections. And Congress has demonstrated that when it singles out an election for

more protective treatment, it singles out the general election, not the runoff. [6]

Accordingly, the most logical conclusion is that the plan is required for federal runoffs because the 45-day requirement is not applicable, and Congress wants to promote planning for the more flexible standard of "sufficient time."

**(C)   Elevating specificity.**   Given that the reference to "sufficient time" and the requirement for a written plan make clear that subsection (a)(9) sets a different standard for federal runoff elections, all that is left is to ask how that subsection interacts with subsection (a)(8)(A)'s general 45-day requirement.   The answer is clear.

While the general 45-day requirement would apply to federal runoff elections in the absence of subsection (a)(9), the existence of the more specific and conflicting  provision in subsection (a)(9) means that it must control with respect to federal runoff elections.  "In these circumstances the law is settled that [h]owever inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another part of the same enactment. . . . Specific terms prevail over the general in the same or another statute which otherwise might be controlling." *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222,

---

[6]       With 1986's enactment of UOCAVA, Congress created federal write-in absentee ballots (FWABs) and required the States to accept them only in general elections.  UOCAVA, Pub. L. No. 99-410, §§ 102-103, Aug. 28. 1986, 100 Stat. 924.  Today, the Secretary of Defense is to "establish procedures for collecting marked absentee ballots of [UOCAVA] voters in regularly scheduled general elections for Federal office," but not for any other elections.  42 U.S.C. § 1973ff-2a(a).  And the States are required to report certain data on the general election alone. 42 U.S.C. § 1973ff-1(c).

228-29, 77 S.Ct. 787, 791-92 (1957) (internal citations and quotation marks omitted; ellipsis by the Court).[7]

This is what Congress intended.   Section 579 of Public Law 111-84, contained the relevant MOVE Act amendments.  Pub. L. 111-84, § 579, Oct. 28, 2009, 123 Stat. 2322 to 2324, attached hereto as Exhibit B.   It was divided into three parts.   The first, subsection (a), was entitled "IN GENERAL," and it established both the 45-day requirement of subsection (a)(8)(A) and the opportunity for a waiver of that requirement in subsection (g).   The second, subsection (b), was entitled "RUNOFF ELECTIONS" and it established the alternative "sufficient time" standard and the requirement for a written plan through subsection (a)(9).   The third subsection was an effective date. Accordingly, one can view the Section 579 of the legislation as establishing the general rule and then immediately establishing the exception for runoff elections. (And, obviously, the argument just made concerning reading subsection (a)(9)'s use of the phrase "sufficient time" and requirement for a plan consistently with

---

[7]      *See also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384, 112 S.Ct. 2031, 2037 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general . . . ."); *Nguyen v. United States*, 556 F.3d 1244, 1253 (11th Cir. 2009) ("The canon is that a specific statutory provision trumps a general one."); *ConArt, Inc. v. Hellmuth, Obata Kassabaum, Inc.,* 504 F.3d 1208, 1210 (11th Cir. 2007) ("Instead, when presented with a potential overlap between the broadly sweeping terms of a statute of general application that appear to apply to an entire class, and the narrow but specific terms of a statute that apply to only a subgroup of that class, we avoid conflict between the two by reading the specific as an exception to the general."); *Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 948 (11th Cir. 2001) ("In making this determination, we rely on the long-standing principle that, if two statutes conflict, the more recent or more specific statute controls.").

subsection (g)'s waiver provisions is strengthened by the fact that the provisions were added to UOCAVA together as a single section of the Public Law.)

### 3.  Beyond the language of UOCAVA.

In considering the subsections (a)(8)(A) and (a)(9), one should also keep in mind that Congress was on notice that some jurisdictions hold runoff elections too soon after the elections they follow to allow for a standard 45-day transmission requirement.  For one thing, these are the elections that the Members themselves run in.    And, for another, Congress has passed legislation providing for quick runoffs.

Section 1712 of Title 48 concerns the election of delegates to the United States Congress for Guam and the Virgin Islands.[8]  It provides that "If no candidate receives [a majority of the votes cast], on the fourteenth day following such election a runoff election shall be held between the candidates receiving the highest and second highest number of votes cast for the office of Delegate."  48 U.S.C. § 1712.  Congress provided similarly for the elections of the Governor and Lieutenant Governor in these jurisdictions, though those elections are not federal elections.   48 U.S.C. § 1422 (Guam)[9]; 48 U.S.C. § 1591 (Virgin Islands).

---

[8]      UOCAVA applies to Guam and the Virgin Islands as they are within the definition of the term "State" for purposes of the Act. 42 U.S.C. § 1973ff-6(6).

[9]      This statute was at issue in *Gutierrez v. Ada*, 528 U.S. 250, 120 S.Ct. 740 (2000).

Perhaps Congress was also aware that there are good reasons why runoffs should not be held a long time after the elections they follow.  One study shows that while there is almost always a drop in turnout between the primary and the runoff elections, the drop is greater when the wait for the runoff is longer.  The *Summary of Facts and Findings* from that study included:

*Near-Universal Decline in Turnout:*

❖ Of 171 regularly scheduled primary runoffs in U.S. House and U.S. Senate from 1994 to 2012, all but six of them resulted in a turnout decrease between the initial primary and the runoff, meaning that 96.5% of runoff elections had fewer people voting in the second round than in the first. The average decline in turnout was 35.3% and the median decline was 33.2%.

*Primary-Runoff Time Gap a Key Factor:*

❖ The longer the wait between the initial primary and the runoff, the higher the decrease in voter turnout between elections. Primary elections with a gap of more than thirty days had an average decline in voter participation of 36.9%, while those with a gap of twenty days or less had an average decline of 27.4%.

Fair Vote Research Report, Federal Primary Election Runoffs and Voter Turnout Decline, 1994-2012 (July 2013), *available at* http://www.fairvote.org/assets/Uploads/Federal-Primary-Election-Runoff-Turnout3.pdf, *last visited* Sept. 26, 2013.  Obviously, a longer wait for a runoff also has implications for candidates competing for voter attention and campaign donations.

If this Court holds that the 45-day rule applies to federal runoff elections, the gap will be substantial (assuming the federal runoff election is simply rescheduled). In the Georgia case, the Court's remedy was to require that the State hold any federal runoffs nine (9) weeks – 63 days – after the election prompting the runoff. *U.S. v. Georgia*, Civil Action No. 1:12-cv-2230-SCJ (N.D. Ga.), doc. 38 at 6-7; *id.* doc. 44 at 3 (amending the earlier order because of a holiday conflict but retaining the 9 week timeframe). If the study results are accurate predictors, voter interest in federal runoffs will likely wane and voter turnout will likely suffer.

In addition to the turnout issues generated by the length of the gap, one also has to wonder how turnout will be affected by the fact that Alabama's State and county runoff elections would necessarily be held when statutorily scheduled, Ala. Code § 17-13-3 & Ala. Code § 17-13-18, while any federal runoff elections would follow weeks later by Court order. At present, the federal, State, and county elections are held simultaneously. Ala. Code § 17-13-2; Ala. Code § 17-13-3; Ala. Code § 17-13-18; Ala. Code § 17-14-3; Ala. Code § 17-14-10; Ala. Code § 17-14-11. In 2014, when the next regularly scheduled federal elections are held, Alabama will elect, among others, a Governor, a Secretary of State, an Attorney General, judges at every level, and every single Member of both chambers of the Legislature. Offices up for Election 2014, *available at*

http://www.sos.state.al.us/Elections/2014/2014Offices.aspx, *last visited* October 4, 2013.[10]

Accordingly, with this context in mind, it is reasonable to conclude from the existence of subsection (a)(9) that Congress was well aware that runoffs might follow more closely on the heels of the elections they succeed than the 45-day rule would allow, and that it might well be appropriate for some of them, at least, to stay there.  Subsection (a)(9) should be viewed as a recognition of the variety of laws and policies concerning runoffs across the nation and the competing factors at issue in the scheduling and handling of those elections.  In requiring "sufficient time," rather than a rigid 45-days, Congress appropriately allowed the States some flexibility in achieving the shared goal of protecting UOCAVA voters while minimizing the disruption to established election procedures and practices. [11]

---

[10]    The Court may take judicial notice of these public records. *Massachusetts v. Westcott*, 431 U.S. 322, 323 n.2, 97 S.Ct. 1755, 1756 (1977).

[11]    In the State Defendants' view, the Tenth Amendment and general principles of federalism dictate that Congress should be abundantly clear if it wants the States to re-schedule federal elections.  We recognize that the majority in *Arizona v. Inter Tribal Council of Arizona, Inc.,* 570 U.S. ___, 133 S. Ct. 2247 (2013), rejected application of the presumption against preemption in that case. 133 S.Ct. at 2256-57.  To the extent that is a rejection of our position, we respectfully disagree and preserve the argument.

As Justice Kennedy explained in his separate opinion,

> Whether the federal statute concerns congressional regulation of elections or any other subject proper for Congress to address, a court must not lightly infer a congressional directive to negate the States' otherwise proper exercise of their sovereign power. This case illustrates the point. The separate States have a continuing, essential interest in the integrity and accuracy of the process used to select both state and federal officials. The States pay the costs of holding these elections, which for practical reasons often overlap so that the two sets of officials

### b. Alabama's federal primary runoff schedule provides "sufficient time."

The next question, then, is whether Alabama's federal primary runoff schedule allows sufficient time.  It may be that this is an intensely factual question which cannot be answered absent a federal primary runoff—something this litigation lacks.  (More on that below.)  Indeed, what is sufficient may vary by the election, depending on the location and circumstances of the UOCAVA voters applying for absentee ballots[12] and their preferred methods of ballot transmission.[13]

---

are selected at the same time, on the same ballots, by the same voters. It seems most doubtful to me to suggest that States have some lesser concern when what is involved is their own historic role in the conduct of elections. As already noted, it may be that a presumption against pre-emption is not the best formulation of this principle, but in all events the State's undoubted interest in the regulation and conduct of elections must be taken into account and ought not to be deemed by this Court to be a subject of secondary importance.

*Arizona*, 133 S. Ct. at 2261 (Kennedy, J., concurring in part and concurring in judgment); *see also id.* at 2272 ("the integrity of federal elections is a subject over which the States and the Federal Government are mutually concerned") (Alito, J., dissenting) (internal citations and quotation marks omitted); *id.* (recognizing that changes to federal elections can impact State and local elections as well, such that "we should expect Congress to speak clearly when it decides" to make a change).  Justice Alito was correct that "Under the Elections Clause, the States have the authority to specify the times, places, and manner of federal elections except to the extent that Congress chooses to provide otherwise.  And in recognition of this allocation of authority, it is appropriate to presume that the States retain this authority unless Congress has clearly manifested a contrary intent."  *Id.* at 2271 (Alito, J., dissenting).

[12]     Are they at Universities in London and Paris or in foxholes in a war zone?

[13]     MOVE amended UOCAVA to require the States to establish procedures for transmitting ballots to UOCAVA voters electronically.  42 U.S.C. § 1973ff-1(f); *see* Pub. L. 111-84, § 578, Oct. 28, 2009, 123 Stat. 2321.  Electronic transmission makes ballots available to Alabama's UOCAVA voters more quickly than traditional transmission through the U.S. Mail.  *See* Ala. Code § 17-11-5 (authorizing transmission by U.S. Mail or "by handing the absentee ballot to the voter in person or, in the case of emergency voting, his or her designee in person.")  And it is an option that many of Alabama's UOCAVA voters have embraced.  *See* doc. 43-1 (supplemental

And it may be a question best answered *definitively* after a (or each) federal runoff election has been conducted.  To the extent that the question can be answered without further factual development, however, the answer is 'yes.'  At least, that is what the United States represented to Judge Fuller in prior litigation.

MOVE added the 45-day requirement for federal elections other than runoffs and the "sufficient time" requirement for federal runoffs.  42 U.S.C. § 1973ff-a(8) – (9); *see* Pub. L. 111-84, § 579, Oct. 28, 2009, 123 Stat. 2322 to 2323.  Prior to that, the U.S. Department of Justice wrote to Alabama's Secretary of State in December 2005 describing the State's responsibilities pursuant to UOCAVA at that time:

> As you know, pursuant to UOCAVA, qualified overseas civilian and military voters who have applied for an absentee ballot by the 30th day before a federal election must be given an opportunity to vote by absentee ballot.  To effectuate this right, election officials must mail absentee ballots to such voters *sufficiently in advance of the election* to allow them a reasonable opportunity to cast a valid ballot.  The guarantees of UOCAVA apply in all general, special, primary, and run-off elections for federal office.  42 U.S.C. 1973ff-1.  Studies conducted by federal postal authorities have established that a *minimum* of 30 days is necessary for the round-trip transit of absentee ballots mailed to overseas voters.  The Federal Voting Assistance Program of the Department of Defense (FVAP) strongly recommends allowing 45 days to ensure voters have time to receive, cast and return the ballots by the applicable [S]tate deadlines.

---

45-day report for the 2012 General Election, reflecting that 1404 UOCAVA voters chose electronic ballots compared to 1656 who chose to receive their ballots *via* mail).

Letter from Wan J. Kim, Assistant Attorney Gen., Civil Rights Div., U.S. Dep't of Justice, to Nancy L. Worley, Ala. Sec'y of State (Dec. 20, 2005) (attached as Exhibit D) (first emphasis added).

The next March the United States filed suit against the State, the Governor, the Attorney General, and the Secretary of State. *U.S. v. Alabama*, Civil Action No. 2:06-cv-00225-MEF-CSC (M.D. Ala.). The Complaint argued that, "[i]n order to allow UOCAVA voters a fair opportunity to vote by absentee ballot, election officials in Alabama must mail the ballots to the voters *sufficiently in advance of the election* so that voters can receive, cast and return their absentee ballots by the deadline established under Alabama law." Exhibit E at ¶ 8 (emphasis added); *see also id.* at ¶ 11 ("sufficiently in advance"); *id.* at 5, prayer for relief ("in sufficient time"). The Complaint stated that "[b]ased on data from the United States Postal Service and the Military Postal Service Agency, the [FVAP] and the United States Election Commission recommend that States allow 45 days for the round-trip transit of an overseas ballot. At a minimum, FVAP has determined that States must provide no less than 30 days for the round-trip transit of a ballot to overseas locations." *Id.* at ¶ 9.

The litigation was resolved when Alabama enacted Act No. 2006-354. The legislation pushed back the regularly scheduled primary runoff election to six weeks (42 days) after the primary election. *See* Ala. Code § 17-13-3; Ala. Code

§ 17-13-18.  And it provided that UOCAVA ballots would be timely if received by noon seven (7) days after the primary runoff election.  Ala. Code § 17-9-51; Ala. Code § 17-11-10(c); Ala. Code § 17-11-18.  The ballots would otherwise have been due by noon on Election Day.  Ala. Code § 17-9-51; Ala. Code § 17-11-10(a); Ala. Code § 17-11-18.

After Act No. 2006-354 became law, the United States filed a motion with this Court in which it represented that the "legislative changes [made by Act No. 2006-354] afford relief to Alabama's UOCAVA voters whose rights the United States sought to protect in this suit."  Exhibit F at ¶ 3.

Not long after, the United States filed a notice of dismissal.   (Exhibit G).  That notice described the allegations in the Complaint as concerning "*insufficient time for round-trip transmission of absentee ballots to and from Alabama's [UOCAVA] voters*."  Exhibit G at 2 (emphasis added).  And it represented to Judge Fuller that: "The legislative changes [made by Act No. 2006-354] afford substantial long-term relief to Alabama's UOCAVA voters whose rights the United States sought to protect in this suit.  Based upon the changes to Alabama law, the claim set forth in the Complaint has now been satisfied."  *Id.* at 4.

If Alabama's primary runoff schedule was sufficient in 2006, as the United States represented it was, then it remains sufficient today.

**IV.   Alternatively, the United States' claim concerning federal primary runoff elections is not justiciable at this time.**

As an alternative to granting the State and Secretary Bennett summary judgment on this claim, the Court should dismiss it as not ripe for adjudication.

"The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes. This doctrine is necessary to maintain the separation of powers that is a central feature of the Constitution." *Meza v. U.S. Atty. Gen.*, 693 F.3d 1350, 1357 (11th Cir. 2012) (internal citations and quotation marks omitted) *cert. denied*, 133 S. Ct. 933 (2013).  The doctrine is jurisdictional. *See id.* at 1356.

"To determine whether a claim is ripe," a court should "assess both the *fitness* of the issues for judicial decision and the *hardship* to the parties of withholding judicial review." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1246 (11th Cir. 2010).  Here, both factors weigh in favor of leaving the runoff claim for another day.

The fitness prong concerns questions of "finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." *Harrell*, 608 F.3d at 1258.  For several reasons, the United States' runoff claim is not "fit" for review at this time.

"A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. U.S.,*

523 U.S. 296, 300, 118 S.Ct. 1257, 1259 (1998) (internal citations and quotation marks omitted); *cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136 (1992) (to have standing, a plaintiff must have an "injury in fact" that is "actual or imminent, not conjectural or hypothetical") (internal citations and quotation marks omitted).

In Alabama, a primary runoff election is only held following a primary election where no candidate received a majority of the votes cast in a particular race.  Ala. Code § 17-13-18.  Accordingly, they are held only when needed.  Because of that, a challenge to Alabama's schedule for federal primary runoff elections only ripens once the results of the primary have been ascertained and it is clear that a federal primary runoff will be needed.  Before then, there is no way to know with certainty if a federal runoff will occur.

When the Complaint in this case was filed, it was February 2012 and the State had not yet held even its primary elections.  Doc. 1.  The primaries were scheduled for March 13 and any runoffs would be held on April 24.  Doc. 1 at ¶¶ 10, 13.  As it turned out, there were no federal primary runoff elections in 2012.  *See* State Certification – Democratic Party Candidates at 5, *available at* http://www.sos.state.al.us/downloads/election/2012/runoff/StateCert-Primary_Runoff_Candidate_Certification-Democratic_Party-2012-03-26.pdf, *last visited* October 1, 2013 (showing nominees, and not runoffs, for the Congressional

races);   State Certification – Republican Party Candidates, at 3, *available at*

http://www.sos.state.al.us/downloads/election/2012/runoff/StateCert-

Primary_Runoff_Candidate_Certification-Republican_Party-2012-03-26.pdf,   *last*

*visited* October 1, 2013 (showing no Congressional races on the list of races

needing a runoff).[14]   The claim was not ripe when the litigation was brought, and

the "contingent future events. . . [did] not occur at all."   *Texas,* 523 U.S. at 300,

118 S.Ct. at 1259 (internal citations and quotation marks omitted).

Likewise, as to 2014, there is no way to know at this point whether there will

be a federal runoff election.   The deadline for filing declarations of candidacy is

not until April 2014.   Ala. Code § 17-13-5 (deadline is 60 days before the

primary); Ala. Code § 17-13-3 (primary will be held on the "first Tuesday in

June").   And that deadline can only serve to eliminate the possibility of runoff

elections (if two or fewer candidates qualify for a particular federal race).   Even

multiple candidates qualifying for a race would not guarantee a runoff.[15]   Once

again, the claim is dependent on "contingent future events that may not occur as

---

[14]   The Court may take judicial notice of these public records. *Massachusetts v. Westcott*, 431 U.S. 322, 323 n.2, 97 S.Ct. 1755, 1756 (1977).

[15]   For instance, in 2012 in the statewide race for Chief Justice, Roy Moore won the Republican primary without a runoff despite substantial competition from the incumbent, Chuck Malone, and from former-Attorney General, now-Circuit Judge, Charlie Graddick.   *See* Recertification of Results - Republican Party Primary (certified April 6, 2012), *available at* http://www.sos.state.al.us/downloads/election/2012/primary/Primary-Results-Recertification-Republican_Party.pdf, at 6, *last visited* October 15, 2013 (showing Chief Justice Moore received 50.38% of the votes cast in the Republican Primary).

anticipated, or indeed may not occur at all." *Texas,* 523 U.S. at 300, 118 S.Ct. at 1259 (internal citations and quotation marks omitted).

Even if it was a known fact that there would be a federal primary runoff election in Alabama in 2014, this claim still would not be ripe for adjudication. By the time there next is a regularly scheduled federal primary runoff election in Alabama, the law may have changed.

It is likely that the Legislature will soon address many aspects of Alabama's election calendar. As will be made clear in response to the United States' anticipated summary judgment motion, the State and the Secretary of State do not dispute that ballots were transmitted late for the 2010 general election and the 2012 federal elections. They also do not dispute that changes to the election calendar would make it easier for the State to comply with its obligations under UOCAVA (indeed, the Secretary drafted proposed legislation for consideration in the 2013 session, namely House Bill 516). If interim relief is ordered by the Court or agreed to by the parties with respect to other issues in the litigation, the State Defendants would prefer that the Legislature have the opportunity to craft its own remedy. *Cf. Upham v. Seamon*, 456 U.S. 37, 41-42, 102 S.Ct. 1518, 1521 (1982). Thus, UOCAVA-related issues are expected to be before the Legislature in its 2014 session, and the runoff issue may be among them.

If it is, the Legislature will have a number of options.  It might push the runoff election back even further.  It might eliminate federal runoff elections in their entirety, instead allowing for the winner to be elected by a plurality vote.  It might switch to ranked ballots (instant runoff ballots) of the sort being used experimentally in the special election to fill the vacancy in Alabama's 1st Congressional District.  Or it might take other action.

Because it is uncertain when there will again be a federal primary runoff election and the Alabama Legislature might change the law before a federal primary runoff election is held, "conditions for deciding the controversy are" not "ideal."  *Harrell*, 608 F.3d at 1258.  Under the hardship prong of the ripeness analysis, the question then becomes as follows: what are "the costs to the complaining party of delaying review until conditions for deciding the controversy are ideal."  *Id.*

Such costs are not evident.  There may be no federal runoff election under the challenged scheme before the Alabama Legislature acts.  Additionally, Georgia has appealed the decision discussed above, and so the legal issue is pending before the Eleventh Circuit Court of Appeals now.  *See U.S. v. Georgia*, Civil Action No. 1:12-cv-2230-SCJ (N.D. Ga.) at doc. 46.  If the Eleventh Circuit resolves the merits of the legal issue in a binding opinion, it will dispose of the issue in this case.

In the event that the necessity of a federal primary runoff election arises in Alabama before there is a legislative change or a binding decision from the Eleventh Circuit, then the United States can bring the issue to this Court at that time. There is no reason why the United States should not be required to wait until a runoff is a certainty, that is "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136 (internal citations and quotation marks omitted). Until then, the claim is not ripe. *Texas*, 523 U.S. at 300, 118 S.Ct. at 1259.

Both the likelihood of resolution by the Eleventh Circuit and the possibility of legislative action are also prudential considerations counseling in favor of delay. *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808, 123 S.Ct. 2026, 2030 (2003) ("The ripeness doctrine is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction . . . .'") (quoting *Reno v. Catholic Social Services, Inc.,* 509 U.S. 43, 57 n. 18, 113 S.Ct. 2485, 2495 n. 18 (1993)); *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005) ("When determining [whether] a claim is ripe for judicial review, we consider both constitutional and prudential concerns."). *See also Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997) ("Even when the constitutional minimum has been met, however, prudential considerations may still counsel judicial restraint.").

An additional prudential reason is that, while Alabama in 2006 adjusted its election schedules to provide sufficient time to UOCAVA voters to participate in federal primary runoff elections, it appears that other States continue to have even shorter runoff periods on the books.  S.C. Code § 7-13-40 (two weeks); Miss. Code § 23-15-191 (three weeks); A.C.A. § 7-7-202, -203 (Arkansas, three weeks).

For all of these reasons, the claim is not ripe and the Court lacks jurisdiction to hear it.

## V.    Conclusion.

For the foregoing reasons, the State of Alabama and Secretary Bennett are entitled to summary judgment as to the United States' claim concerning federal runoff elections.   In the alternative, the claim should be dismissed as nonjusticiable.


** A courtesy copy of the motion, this memorandum, and the attached exhibits will be delivered to the Court.

Respectfully submitted,

LUTHER STRANGE (ASB-0036-G42L)
*Attorney General*

BY:

s/ Misty S. Fairbanks Messick
James W. Davis  (ASB-4063-I58J)
Misty S. Fairbanks Messick  (ASB-1813-T71F)
*Assistant Attorneys General*

**OFFICE OF THE ATTORNEY GENERAL**
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone:   (334) 242-7300
Facsimile:    (334) 353-8440
jimdavis@ago.state.al.us
mmessick@ago.state.al.us

***Attorneys for the State & Secretary Bennett***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 5th day of November, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:  Victor J. Williamson, Amanda Hine, Anna Baldwin, Elizabeth M. Ryan, Erin M. Velandy, Ernest McFarland, Richard Dellheim, Spencer R. Fisher, Stephen M. Doyle, and T. Christian Herren, Jr.

s/ Misty S. Fairbanks Messick
Of Counsel