IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:12-cv-179-MHT-WC |
| v. | ) | |
| | ) | |
| THE STATE OF ALABAMA and | ) | |
| JIM BENNETT, SECRETARY OF STATE | ) | |
| OF ALABAMA, in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION FOR SUMMARY JUDGMENT, DECLARATORY JUDGMENT AND PERMANENT INJUNCTIVE RELIEF**

**BACKGROUND** ............................................................................................... 1

   I.     FEDERAL STATUTORY BACKGROUND ................................................. 1

   II.    STATE STATUTORY BACKGROUND ...................................................... 3

       A. Primary Elections ................................................................................ 3

       B. Primary Runoff Elections .................................................................. 4

       C. General Elections ............................................................................... 4

   III.   PROCEDURAL HISTORY ........................................................................ 5

**FACTS** ................................................................................................................ 8

   I.     ALLOCATION OF UOCAVA RESPONSIBILITIES IN ALABAMA ................. 8

   II.    ALABAMA TRANSMITTED TIMELY-REQUESTED UOCAVA BALLOTS AFTER UOCAVA'S 45-DAY ADVANCE TRANSMISSION DEADLINE IN EACH OF THE  THREE FEDERAL ELECTIONS HELD SINCE UOCAVA WAS AMENDED IN 2009 ............................... 9

       A. November 2, 2010 Federal General Election ................................... 9

       B. March 13, 2012 Federal Primary Election ..................................... 14

       C. November 6, 2012 Federal General Election ................................. 19

   III.   ALABAMA'S ATTEMPTED LEGISLATIVE FIX .................................... 22

**SUMMARY JUDGMENT LEGAL STANDARD** ................................................ 23

   I.     THE UNITED STATES IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE UNDISPUTED FACTS DEMONSTRATE THAT ALABAMA HAS REPEATEDLY VIOLATED UOCAVA AND THAT ITS PRIMARY RUNOFF CALENDAR CONFLICTS WITH UOCAVA ..... 23

       A. Alabama Violated UOCAVA's 45-day Advanced Transmission Requirement in the 2010 and 2012 Federal Elections ................................................................................. 24

       B. Alabama's Primary Runoff Calendar Conflicts with UOCAVA's 45-Day Advance Transmission Requirement .............................................................................. 24

**INJUNCTIVE RELIEF LEGAL STANDARD AND ARGUMENT** ......................... 31

   I.     THE UNITED STATES IS ENTITLED TO INJUNCTIVE RELIEF BECAUSE IT HAS MET EACH FACTOR NECESSARY FOR RELIEF AND, MOST IMPORTANTLY, ALABAMA'S UOCAVA VIOLATIONS ARE LIKELY TO CONTINUE ABSENT RELIEF FROM THIS COURT. ............... 32

       A. The United States Has Demonstrated Success on the Merits of its Claims ...................... 34

       B. There is No Adequate Remedy at Law ........................................... 34

       C. Irreparable Harm Will Result Absent Injunctive Relief .................. 38

       D. Permanent Injunctive Relief is in the Public Interest ...................... 42

   II.    UNITED STATES' PROPOSAL FOR A COMPLETE REMEDY ...................... 43

**CONCLUSION** ................................................................................................ **46**

This action arises from Defendants' repeated failure to transmit timely-requested absentee ballots to qualified military and overseas voters from Alabama at least 45 days prior to Federal elections, as required by the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 42 U.S.C. § 1973ff *et seq.*  Defendants violated UOCAVA's 45-day advance transmission deadline in each of the last three regularly scheduled Federal elections—the November 2, 2010 general election, the March 13, 2012 primary election, and the November 6, 2012 general election.  In addition, Alabama's primary runoff statute—Ala. Code § 17-13-3(a)—violates UOCAVA on its face by providing fewer than 45 days between regularly scheduled Federal primary and Federal primary runoff elections.  The facts establishing the Defendants' UOCAVA violations are undisputed.  Accordingly, summary judgment is appropriate. Moreover, because permanent injunctive relief is warranted, this Court should order Defendants to propose a remedial plan that will ensure Alabama's compliance with UOCAVA in all future Federal elections.

## BACKGROUND

## I.   FEDERAL STATUTORY BACKGROUND

Since 1986, UOCAVA has guaranteed active duty members of the military (and their spouses and dependents) and United States citizens residing overseas (collectively "UOCAVA voters") the right "to vote by absentee ballot in general, special, primary, and runoff elections for Federal office . . . ." 42 U.S.C. § 1973ff-1(a)(1).  In 2009, Congress reaffirmed its commitment to ensuring that UOCAVA voters have sufficient time to receive, mark, and return their ballots by passing the Military and Overseas Voter Empowerment Act, Pub. L. No. 111-84, 123 Stat. 2190, 2318-35 (2009) ("MOVE Act").  The MOVE Act's commands were simple and straightforward.  It amended UOCAVA to require states to transmit absentee ballots to

UOCAVA voters at least 45 days before any election for Federal office.  42 U.S.C. § 1973ff-1(a)(8) ("Each state shall . . . transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter . . . not later than 45 days before the election . . . ."); 42 U.S.C. § 1973ff-1(g)(1)(A) ("the purpose [of the 45-day requirement] is to allow absent uniformed services voters and overseas voters enough time to vote").

The MOVE Act's 45-day advance transmission deadline became effective for the 2010 Federal general election, and all successive elections for Federal office, including run-off elections.  42 U.S.C. § 1973ff-1 note (2006 & Supp. V 2011) ("Effective Date of 2009 Amendments"); *United States v. Georgia*, No. 1:12-cv-2230, 2013 WL 3421982, at *11 (N.D. Ga. Apr. 30, 2013) ("The forty-five day deadline and transmittal period established in [UOCAVA], as amended, specifically 42 U.S.C. § 1973ff-1(a)(8)(A), applies to all Federal runoff elections.").  The MOVE Act also provides that UOCAVA voters may choose to receive their absentee ballot by mail or by electronic transmission.  42 U.S.C. § 1973ff-1(a)(6)(C).

Each state must ensure UOCAVA compliance statewide.  42 U.S.C. § 1973ff-1(a)(8) ("*Each State shall* . . . . transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter ... not later than 45 days before the election . . . ." (emphasis added));  *United States v. Alabama*, 857 F. Supp. 2d 1236, 1238-39 (M.D. Ala. 2012) (holding that § 1973ff-1(a)(8) provides an "explicit statutory directive that Alabama bears full responsibility" for UOCAVA compliance); *United States v. New York*, No. 1:10-cv-1214, 2012 WL 254263, at *1 (N.D.N.Y. Jan. 27, 2012) ("New York is responsible for complying with UOCAVA and ensuring that validly-requested absentee ballots are sent to UOCAVA voters in accordance with its terms."); *United States v. Cunningham,* No. 3:08-cv-00709, 2009 WL 3350028, at *8 (E.D. Va. Oct. 15, 2009) ("[T]he Commonwealth of Virginia has an obligation

under the Supremacy Clause to protect the federally-guaranteed civil right of UOCAVA voters to vote by absentee ballot in federal elections."). UOCAVA empowers the Attorney General to sue to enforce its provisions and to seek declaratory and injunctive relief.  42 U.S.C. §1973ff-4(a).

## II.     STATE STATUTORY BACKGROUND

Title 17 of the Code of Alabama governs Alabama elections.  Ala. Code § 17-1-1 *et seq*. Alabama's election calendar contains numerous deadlines tied to the State's primary, primary runoff, and general election dates.  Many of these state law deadlines affect the State's ability to meet UOCAVA's 45-day deadline.

### A.  <u>Primary Elections</u>

Primary elections are held by political parties to nominate a candidate or candidates for public or party office.  *Id*. § 17-13-1.  Alabama primary elections occur on the first Tuesday in June during non-presidential years, and on the second Tuesday in March during presidential years.  *Id*. § 17-13-3.  Candidates may file a declaration of candidacy for "federal, state, circuit, or district office" with their state party chair up to 60 days prior to the election date.  *Id*. § 17-13-5.  By the 55th day prior to the primary election, the state party chair must certify the names of candidates for State and Federal elections to the Secretary of State.  *Id*.  By the 50th day prior to the primary election, the Secretary of State must certify to every county's probate judge the names of opposed candidates for state and Federal office.  *Id*.

Forty days prior to the primary, "the officer charged with the printing and distribution of the official ballots and election supplies [usually the county's Probate Judge] shall deliver to the absentee election manager of each county in which the election is held    . . . a sufficient number

3

of absentee ballots, envelopes, and other necessary supplies."[1]  *Id*. § 17-11-12.  The "notification deadline" for refusing nomination in a primary election is currently set at "20 days before the date of the election."  *Id*. § 17-6-21(a) ("[N]o person's name shall be printed upon the ballots" who notifies the probate judge by the 20th day before the primary election that he or she is refusing the nomination.).  Thus, if a candidate has not accepted a party nomination by the 45th day before the election, the probate judge must either delay printing of the ballots or risk having to reprint ballots should the candidate withdraw after the 45th day before the election.  There is no deadline by which state or county party committees must fill vacancies in candidate nominations.

### B.  Primary Runoff Elections

Under Alabama law, a primary runoff election is held where no candidate has received the majority of votes cast in the primary election.  *Id*. § 17-13-18(b).  For state, Federal, and municipal offices, the runoff election is held "on the sixth Tuesday following the primary election," *i.e.*, 42 days following the primary election.  *Id.*  Like the primary election, the "notification deadline" for refusing nomination in a primary runoff is "20 days before the date of the election."  *Id*. § 17-6-21(b).  Thus, as with the primary election, candidates have until the 20th day before a primary runoff election to refuse the nomination, and "no person's name shall be printed upon the ballots" who so notifies the probate judge by the 20th day before the primary runoff election of his or her refusal of that nomination.  *Id*. § 17-6-21(a).

### C.  General Elections

Alabama holds general elections for Federal office on the first Tuesday following the first Monday in November.  2 U.S.C. § 7; 3 U.S.C. § 1; Ala. Code § 17-14-3.  The Secretary of State

---

[1] As explained below, the absentee election manager ("AEM") is the local election official in charge of transmitting absentee ballots.  Ala. Code § 17-11- 2.

must certify to the probate judges the names of candidates qualified to appear on the general election ballot no later than 45 days after the primary runoff election.  Ala. Code § 17-9-3(b).  If, following the primary and primary runoff elections, a dispute arises over who is the proper party nominee for office, Alabama law provides no specific deadline by which those contests must be resolved.  *See id.* §§ 17-13-70 to 89.  Instead, in election disputes where the party executive committee has not reached a decision as of the 40th day before the general election, that refusal to act is treated as judgment against the contestant, and a certification of final candidates is made by the state party chair to the Secretary of State "within five days" (*i.e.*, potentially up to the 35th day prior to the general election).  *Id.* § 17-13-86.  The Secretary of State must then provide certifications to the probate judge "within 6 days" of the contest resolution (*i.e.*, potentially up to the 34th day prior to the general election).  *Id.*

The "notification deadline" for refusing a nomination in a general election is 45 days before the date of the election, and "no person's name shall be printed upon the ballots" who notifies the probate judge by the 45th day before the election that he or she refuses the nomination.  *Id.* § 17-6-21.  As with primary elections, the deadline for county probate judges to provide election materials to the AEM is 40 days prior to the general election.  *Id.* § 17-11-12.

## III.   PROCEDURAL HISTORY

The United States filed this action on February 24, 2012, alleging that: 1) the Defendants violated UOCAVA by failing to transmit absentee ballots to UOCAVA voters at least 45 days prior to the March 13, 2012 Federal primary election; and 2) Alabama's primary runoff statute, Ala. Code § 17-13-3(a), violates UOCAVA by requiring runoff elections to be held only 42 days after the initial primary election.  Based on substantial evidence of widespread late transmission of ballots to UOCAVA voters for the March 2012 Federal primary election, the United States

5

moved for a temporary restraining order and preliminary injunction on February 27, 2012. ECF No. 5. The United States also sought relief for a potential April 24, 2012 Federal primary runoff election. *Id.*

On February 28, 2012, this Court issued a temporary restraining order, finding that: 1) Alabama was responsible for ensuring statewide compliance with UOCAVA's 45-day advance transmission deadline; 2) there was substantial evidence that Alabama had failed to transmit all timely-requested UOCAVA ballots by the 45th day before the March 13, 2012 Federal primary election; 3) substantial evidence demonstrated that Alabama officials had refused to cooperate with the United States in determining the scope and severity of the State's UOCAVA violations or to forge an appropriate remedy for the resulting harm; 4) Alabama's voluntary extension of the ballot receipt deadline was an insufficient remedy; and 5) Alabama was poised to violate UOCAVA with respect to the April 24, 2012 Federal primary runoff election, if such a runoff election were to be held. ECF No. 8.

This Court further determined that a complete remedy could not yet be fashioned because insufficient evidence existed as to the scope and severity of the harm to UOCAVA voters. Accordingly, the Court also required: 1) Defendants to report the status of all UOCAVA ballot activity, county by county throughout Alabama, for the March 13, 2012 Federal primary election; 2) the parties to meet and confer about next steps related to UOCAVA compliance and relief; and 3) the parties to provide the Court with joint or separate recommendations for providing UOCAVA voters with complete relief for the March 13, 2012 Federal primary election and April 24, 2012 Federal primary runoff election. *Id*.

Between February 29 and March 3, 2012, Defendants filed court-mandated reports documenting the number and date of late UOCAVA ballot transmittals by county. ECF Nos. 10-

13.  Defendants' reports showed that ballots were transmitted late from every county where UOCAVA voters had made timely requests, and that at least 15, and as many as 22, counties had transmitted ballots more than eight days after the 45-day transmission deadline.  ECF Nos. 10-13.  In a motion for a preliminary injunction filed on March 3, 2012, the United States urged that these systemic violations warranted additional, immediate relief.  ECF No. 15.

On March 7, 2012, this Court issued a preliminary injunction.  ECF No. 21.  For the March 13, 2012 primary election, the preliminary injunction extended the postmark deadline for UOCAVA ballots to the day of the election, further extended the deadline for UOCAVA ballot receipt, provided changes in certification and counting requirements, and instituted certain publicity and notification requirements.  ECF No. 21.[2]

The March 7, 2012 preliminary injunction also imposed monitoring and reporting requirements on Defendants for the remaining 2012 Federal elections in Alabama.  Defendants were required to gather information about UOCAVA activity by county, including whether each county had enough supplies and the technical capacity to comply with UOCAVA, the number of UOCAVA ballots requested, the dates UOCAVA ballot transmissions began and ended, and the method of transmission of all UOCAVA ballots.  ECF No. 21.  Defendants were required to report this information to the Court and counsel for the United States and to certify its accuracy.

Notwithstanding these Court-ordered measures, Defendants again failed to transmit all requested UOCAVA ballots at least 45 days before the November 6, 2012 Federal general

---

[2] Given the possibility that Alabama could hold a Federal primary runoff election on April 24, 2012, the March 7, 2012 preliminary injunction order also required Defendants to transmit blank Federal write-in absentee ballots, candidate lists, instructions for completing and returning these write-in ballots, and the official ballot, when available, to all UOCAVA voters in Congressional districts in which a Federal primary runoff might be required; to provide all UOCAVA voters in those Congressional districts with explanations about why they were receiving blank Federal write-in ballots; and to provide all UOCAVA voters in the affected Congressional districts with information about where to download an official ballot and a toll-free number at which these UOCAVA voters could have questions answered.  ECF No. 21.  Given the results of the March 13, 2012 primary, there was no need to hold a Federal primary runoff election.

election.  Ballots were sent after the 45-day deadline to qualified UOCAVA voters from 22 of

Alabama's 67 counties.  ECF No. 43.  As a result, among other remedial measures, the Secretary

of State adopted an emergency rule providing for a 10-day extension of the deadline for receipt

of UOCAVA ballots in the affected counties.  ECF No. 46.[3]

On November 5, 2013, Defendants filed a Motion for Partial Summary Judgment in this

case, in which they argue that UOCAVA's 45-day deadline does not apply to Federal runoff

elections.  ECF No. 81.

**FACTS**

## I.   ALLOCATION OF UOCAVA RESPONSIBILITIES IN ALABAMA

The Secretary of State is Alabama's chief elections official.  United States' Statement of

Undisputed Facts ("SUF") 32.  As such, the Secretary of State and his staff oversee and manage

all elections occurring in the State, including Federal elections.  *Id.*

Alabama law assigns certain election-related tasks to local election officials, including

responsibilities related to absentee voting and UOCAVA ballots.  Probate judges are the chief

election officials in each of Alabama's 67 counties.  SUF 33.  The probate judge's election-

related duties include certifying and approving ballots, proofing ballots, and ordering supplies.

SUF 33.  Probate judges also deliver finalized ballots to AEMs for transmission to absentee

voters.  SUF 33.

---

[3] Additionally, on July 26, 2013, Defendants moved without opposition for an order permitting them to adopt procedures necessary to fill a vacancy in Alabama's First Congressional District through a September 24, 2013 special primary election; if necessary, a November 5, 2013 special primary runoff election; and a December 17, 2013 special general election.  The United States filed a separate Notice to advise the Court of its view that given the exigency of the State's interest in filling the vacancy, and the one-time nature of the relief presented, the relief requested was appropriate under the singular circumstances presented.  As noted at the time, the United States waived none of the positions that it asserts here through its non-opposition to Alabama's special election motion and the relief sought therein.  ECF No. 70.  On July 26, 2013, the court granted Defendants' motion.  ECF No. 74.

Every county in Alabama also has an AEM.[4]  SUF <u>34</u>.  Each county's circuit clerk is the designated AEM for that county, unless he or she declines.  SUF <u>34</u>.  If the circuit clerk declines to serve as the AEM, or if the circuit clerk is a candidate in the election with opposition, county appointing boards must appoint an AEM.  SUF <u>34</u>.  All circuit clerks and their staff are employees of the State of Alabama paid by the State using State funds.  SUF <u>36</u>.

Alabama AEMs oversee the absentee voting process for all Alabama absentee voters, a subset of whom are UOCAVA voters.  AEMs' UOCAVA-related duties include processing UOCAVA ballot applications; entering information on UOCAVA voters in the State's electronic voter information system, known as PowerProfile; preparing and transmitting absentee ballots; and delivering completed absentee ballots to election officials on election day.  SUF <u>37</u>.  No State law requires AEMs to receive UOCAVA-related training.  SUF <u>38</u>.

While Alabama law does not provide the Secretary of State with the authority to hire, fire, or discipline AEMs, AEMs and other local election officials routinely comply with requests for election-related information as well as directives, rules, and orders from the Secretary of State's office.  SUF <u>40, 41</u>.

## II.   ALABAMA TRANSMITTED TIMELY-REQUESTED UOCAVA BALLOTS AFTER UOCAVA'S 45-DAY ADVANCE TRANSMISSION DEADLINE IN EACH OF THE  THREE FEDERAL ELECTIONS HELD SINCE UOCAVA WAS AMENDED IN 2009

### A.   <u>November 2, 2010 Federal General Election</u>

The 45th day before the November 2, 2010 Federal general election was September 18, 2010.  SUF <u>1</u>.  By that date, over 4,000 UOCAVA voters from at least 53 Alabama counties had timely requested mail transmission of their absentee ballots.  SUF <u>2, 4</u>.  At least 18 of those

---

[4] Jefferson County has two AEMs—one for its Birmingham Division and one for its Bessemer Division. In Jefferson County, the Circuit Clerk is the default AEM for the Birmingham Division and the Deputy Circuit Clerk is the default AEM for the Bessemer Division.  SUF <u>35</u>.

counties transmitted as many as 1,779 of those ballots after September 18, 2010.  SUF 3, 4.

Approximately 80 UOCAVA voters from 27 Alabama counties timely requested electronic

transmission of their absentee ballots for the November 2, 2010 election.  SUF 5, 7.

Electronically-transmitted ballots were sent late to UOCAVA voters in at least 12 of those 27

counties.[5]  SUF 6, 7.  Some mailed UOCAVA ballots were sent as late as eight days after the

deadline, and at least one electronic ballot was transmitted 17 days after the 45-day deadline.

SUF 8, 9.

### 1.    *Ballot Transmission Processes*

The 2010 Federal general election was the first election for which UOCAVA voters

could request transmission of their ballot either by mail or by electronic delivery.  42 U.S.C. §

1973ff-1(a)(6)(C).  For mail ballots, Alabama counties individually contracted with a private

vendor, Electronic Systems & Software ("ES&S"), for ballot supplies, including the absentee

ballots used by UOCAVA voters.  SUF 42.  To receive their supplies, county probate judges

provided ballot information to ES&S, which then provided ballot proofs to the probate judge for

approval.  SUF 43.  Once they were approved, ES&S printed the final ballots and delivered them

to the probate judge.  SUF 44.  ES&S believed that delivering ballot supplies to counties on the

45th day before a Federal election would enable Alabama to meet the UOCAVA transmission

deadline.  SUF 45.

For the November 2, 2010 Federal general election, Alabama selected a company called

Scytl to develop its electronic absentee ballot transmission system.  SUF 46.  The contract with

---

[5] Altogether, only 84 UOCAVA voters requested that their ballot be provided to them electronically for this election. SUF 7.  Alabama did not begin publicizing the option to receive ballots electronically until August 24, 2010—25 days before the September 18, 2010 advance transmission deadline—when the Secretary of State issued an emergency rule allowing for electronic transmission of ballots containing Federal offices only.  SUF 56 .

Scytl did not set a deadline in advance of the 45th day before the election by which the electronic ballot transmission system was to become operable.  SUF 47.

In 2010, one of the first steps in the absentee ballot process was for AEMs to enter UOCAVA absentee applications into the PowerProfile, Alabama's statewide voter registration system.  SUF 48.  During this process, AEMs identified which absentee voters were UOCAVA voters.  SUF 48.  For UOCAVA voters requesting electronic transmission of their ballots, the AEM would enter that voter's application information into a separate "election profile" within PowerProfile.  SUF 49.  At that point, the AEMs' role in the electronic transmission process was largely complete.  SUF 49-51.  The Secretary of State's office would then transfer data from PowerProfile to Scytl.  SUF 50.  Scytl then uploaded UOCAVA ballots to a secure website that allowed Alabama's UOCAVA voters to download and print their ballots.  SUF 51.  Once ballots were available on the secure website, Scytl was to email UOCAVA voters and provide them with a link to Scytl's website from which those voters could then download their ballots.  SUF 51.  AEMs were to be copied on those emails.  SUF 52.

After the Secretary of State's office transferred voting data to Scytl, AEMs could log into a computer system that Scytl maintained called DIASPORA.  SUF 53.  With a password supplied by Scytl, an AEM could check the DIASPORA system to see if UOCAVA voters who had requested to receive their ballots electronically had been properly queued in the system to receive their ballot.  SUF 53.  An AEM could also see how many attempts a voter had made to log into Scytl's system to download their ballot and whether those download attempts had been successful.  SUF 54.  AEMs needed a password to access DIASPORA.  SUF 55.

### 2.      Pre-Election Training

Prior to the 2010 Federal general election, the Secretary of State's office sponsored voluntary UOCAVA training sessions for AEMs in Huntsville, Montgomery, and Mobile, on September 8, 9, and 10, 2010.  SUF <u>57</u>.   The Secretary of State's office did not notify AEMs about this UOCAVA training until September 1, 2010.  SUF <u>58</u>.  While these trainings did cover the electronic ballot transmission system, no attendees received hands-on training on the steps necessary to process electronic ballot requests.  SUF <u>59, 60</u>.  Alabama's Director of Elections, Ed Packard, testified that it "would not have surprised" him if some AEMs were still confused about how to use the system even after attending a regional training session.  SUF <u>61</u>.  In addition, a Scytl representative informed the Secretary of State's office after the training that the representative would "have liked more time before the election to make sure folks are fully comfortable and knowledgeable" about the electronic transmission system.  SUF <u>62</u>.  Scytl recommended that AEMs receive additional training on using the electronic ballot transmission system after the November 2, 2010 election.  SUF <u>62</u>.  The Secretary of State's office took no discernible action in response to these concerns.  SUF <u>63</u>.  The Secretary of State's office also never affirmatively surveyed AEMs during or after the 2010 election cycle to seek feedback on the effectiveness of the regional training sessions.  SUF <u>65</u>.

### 3.      Secretary of State's Pre-Transmission Oversight

For the 2010 Federal general election, the Secretary of State's office promulgated no written policies or procedures to monitor statewide UOCAVA compliance.  SUF <u>66-69</u>.  Nor did the Secretary of State's staff "proactively seek out whether [AEMs] had a problem" with transmitting UOCAVA ballots; instead, it waited for the AEMs to initiate contact if problems arose.  SUF <u>67</u>.  For example, prior to the 45-day deadline for the November 2010 Federal

general election, the Secretary of State's office did not systematically contact county election officials to see if they faced obstacles to finalizing their ballots in time to meet UOCAVA's 45-day advance transmission deadline.  SUF 70, 71.  Nor did the Secretary of State's office know, as of September 18, 2010, which counties had sufficient supplies to transmit ballots by mail in order to meet that deadline and which counties did not have sufficient supplies.  SUF 74-76.

### 4. *Ballot Transmission Problems*

As detailed above, Alabama transmitted a significant number of paper and electronic UOCAVA ballots late for the 2010 general election.  SUF 3, 4, 6-9.  A primary reason mailed ballots were transmitted late was that a number of jurisdictions lacked the basic supplies needed to send ballots—*e.g*., ballots and ballot envelopes—as of the September 18, 2010 transmission deadline.  SUF 77.  Several AEMs reported that their county probate judge did not timely approve ballot styles, or provide other materials necessary for ballot transmission.  SUF 78.  At least one county election official supplied ballots late because he was unaware of UOCAVA's 45-day ballot transmission deadline and instead believed the transmission deadline was 40 days prior to the election (provided in State election law).  SUF 79.

With regard to electronic transmission, as of 6:00 pm on Friday, September 17, 2010—46 days before the November 2, 2010 Federal general election—Scytl was still testing its system and addressing ballot layout problems.  SUF 80.  Scytl also did not provide AEMs with their DIASPORA passwords until 3 to 5 days *after* the 45-day deadline, which prevented AEMs from logging into the system to determine if their county's UOCAVA voters were properly queued for electronic ballot transmission.  SUF 82, 83.[6]

---

[6] Four jurisdictions cited Scytl's failure to provide them with their passwords as the reason for their county's transmission delay.  SUF 87.  Five jurisdictions blamed the delay on problems with the State's PowerProfile system, such as issues with PowerProfile's election profiles.  SUF 86.

### 5.      *Secretary of State's Post-Transmission Oversight*

For the 2010 Federal general election, the Secretary of State's office maintained no policy or practice of asking all AEMs to report to the Secretary of State, on the 45th day before the election or by the following business day, whether their county had timely transmitted UOCAVA ballots.  SUF <u>88</u>.  On September 22, 2010, four days after UOCAVA's 45-day deadline, and after numerous contacts from the Department of Justice[7], the Secretary of State's office began to contact Alabama jurisdictions to determine if they had timely transmitted UOCAVA ballots.  SUF <u>89, 90</u>.  For multiple counties, the Secretary of State's office never learned why late transmittals occurred.  SUF <u> 92, 94, 95</u>.

On September 29, 2010, the Secretary of State issued an emergency rule extending the deadline for AEMs to receive Federal ballots from UOCAVA voters to noon on the eighth day following the election.  SUF <u>91</u>.  The Secretary of State's office maintained no policy or practice to determine whether any late-transmitted UOCAVA ballots were returned too late to be counted.  SUF <u>94</u>.  Some timely requested UOCAVA ballots were not transmitted until 17 days after the UOCAVA deadline, yet the Secretary of State's office made no effort to determine the number of late transmitted ballots returned too late to be counted for the November 2010 Federal general election.  SUF <u>94</u>.

### B.      <u>March 13, 2012 Federal Primary Election</u>

The 45th day before the March 13, 2012 Federal primary election was January 28, 2012. SUF <u>10</u>.  Not one of the 46 Alabama counties that received timely UOCAVA ballot requests from military and overseas absentee voters had completed transmitting their UOCAVA ballots as of the 45-day deadline.  SUF <u>11, 12</u>.  By that date, 548 Alabama UOCAVA voters had requested

---

[7] Alabama refused to provide any information to the United States in response to its UOCAVA-related inquires leading up to the November 2010 election.  SUF <u>89</u>.

a mailed absentee ballot for the March 13, 2012 Federal primary election.  SUF 13.  Just one of

those 548 paper absentee ballots was mailed on time.  SUF 13.  Likewise, while 189 UOCAVA

voters had requested electronic transmission of an absentee ballot as of January 28, 2012, just 10

of those 189 absentee ballots were timely transmitted.  SUF 14.

### 1.     Ballot Transmission Processes

For mailed ballots, Alabama counties once again contracted with ES&S for absentee

ballot supplies.  SUF  96.  The process for receiving supplies for mail ballots mirrored the

process for the 2010 election cycle.  SUF 43, 44, 97.  For electronic transmission, Alabama

contracted with a joint venture made up of Scytl and ES&S to transmit ballots electronically to

UOCAVA voters for the 2012 Federal primary and Federal general elections.  SUF 100.  The

contract did not require the electronic ballot transmission system to be operable by a specific

date prior to the 45-day deadline.  SUF 102.  ES&S's Senior Vice President of Government

Affairs and an ES&S customer service manager testified that they understood that the deadline

for the system to be operable for the 2012 Federal primary election was the 45th day itself.  SUF

103.

Alabama's electronic ballot transmission system for 2012 worked similarly to the system

used in 2010.  SUF 51, 52, 104, 105.  Prior to the 2012 primary election, AEMs entered requests

for electronic transmission of UOCAVA ballots into Alabama's PowerProfile voter database,

and checked a box indicating that the voter was a military/overseas voter.  SUF 104, 105.  If the

AEM inadvertently forgot to check the "electronic transmission" box, the system defaulted to

mail delivery without alerting the AEM.  SUF 110.  In addition, PowerProfile did not alert

AEMs to data entry errors, such as entering an invalidly formatted email address.  SUF 111.

Once the voter's data was entered in PowerProfile, it was then transferred from PowerProfile to BallotSafe, Scytl's 2012 program that determined the style of ballot that UOCAVA voters would receive.  SUF <u>101, 106</u>.  Ballots were uploaded to a secure website maintained by Scytl, and an email was sent to voters providing a URL to download ballots and the mailing supplies necessary to return them.  SUF <u>107</u>.  AEMs were to be copied on those emails.  SUF <u>108</u>.  AEMs also could use a password to log into BallotSafe to see which UOCAVA voters' files were loaded to receive electronic ballots, and whether the voter had actually downloaded those ballots.  SUF <u>109</u>.

### 2.    *Pre-Election Training*

For the 2012 Federal primary election, the Secretary of State's office invited AEMs to training in Montgomery, Alabama on January 20, 2012, eight days before the 45-day deadline. SUF <u>112, 116</u>.  Multiple AEMs reported that the training was confusing, and did not provide sufficient hands-on experience.  SUF <u>114</u>.  In addition, numerous circuit clerks were running with opposition for re-election and, by law, could not serve as AEMs.  SUF <u>115</u>.  Alabama's Director of Elections, Ed Packard, testified that, as a result, county appointing boards were forced to appoint interim AEMs, and could do so days before the 45-day UOCAVA deadline, making it difficult to plan comprehensive training well in advance of the deadline.  SUF <u>115, 116</u>.  Mr. Packard testified that it "would have been beneficial to do more training with" such appointed AEMs.  SUF <u>115, 116</u>.

### 3.    *Secretary of State's Pre-Transmission Oversight*

The Secretary of State's office promulgated no written policies or procedures to monitor statewide UOCAVA compliance in the time leading up to the March 2012 Federal primary

election.  SUF <u>118-120</u>.  In addition, Alabama made few, if any, changes to its UOCAVA

compliance practices for this election.[8]  SUF <u>117</u>.

### 4.     Ballot Transmission Problems

Nearly all of the UOCAVA ballots requested as of the 45th day before Alabama's March

2012 primary election were transmitted after the statutory deadline.  SUF <u>12-14</u>.  The late

transmissions resulted, at least in part, from delays in the ballot production process, which were

caused by party certification amendments and changes to local ballots by county probate judges.[9]

SUF <u>122, 124</u>.   The Secretary of State's office provided the original candidate certifications to

ES&S on January 20, 2012.  SUF <u>126</u>.  Alabama law, however, allowed the State's political

parties to continue amending their party certifications after that date.  SUF <u>127</u>.  The Alabama

Democratic and Republican Parties submitted four amendments to their certifications in the days

leading to the 45-day UOCAVA deadline, with the latest amendment occurring on January 27,

2012.  SUF <u>128</u>.  Some of these amended certifications changed the candidates appearing on the

ballot in every county in the state.  SUF <u>129</u>.   In addition, some probate judges continued to add

special elections that necessitated changes to their ballots.  SUF <u>130</u>.  These party amendments

and other changes significantly delayed finalizing the ballots needed for both electronic and mail

transmission.  SUF <u>132</u>.  Multiple counties reported that, as of the 45-day UOCAVA deadline,

they had not yet received paper ballots for mail transmission.  SUF <u>121</u>.   More than a dozen

counties had yet to approve their ballot proofs as of the 45-day deadline.  SUF <u>131.</u>  In addition,

---

[8] Alabama's Director of Elections testified that his responsibilities with respect to UOCAVA ballots for the March 2012 Federal primary election were not changed in any way in response to the UOCAVA violations that occurred during the November 2010 general election.  He explained that the responsibilities of the Secretary of State's office "didn't change.  I mean, we did what we did before."  SUF <u>117</u>.

[9] Alabama also has alleged that certain counties were delayed in their transmission of UOCAVA ballots because of the preclearance process under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. Those claims are unsupported by the actual timeline for redistricting and preclearance in the counties that Alabama has cited.  SUF <u>147-157</u>.

counties that lacked finalized ballots could not have the ballots loaded in BallotSafe for electronic transmission.  SUF 133.

Even after the ballots were finalized, problems remained with the electronic transmission process.  As late as February 13, 2012 (16 days after the January 28, 2012 UOCAVA deadline), some AEMs were receiving reports that UOCAVA voters had no ballot available for download upon logging onto Scytl's website.  SUF 134.  Moreover, AEMs did not receive BallotSafe passwords until after the 45-day deadline, which prevented them from logging into the system to determine if their voters were properly queued for transmission.  SUF 135.  AEMs also did not begin receiving copies of the emails sent to UOCAVA voters until several days after the 45-day deadline, which delayed AEMs from knowing if all electronic ballots had been properly transmitted.  SUF 136.

### 5.    Secretary of State's Post-Transmission Oversight

The Secretary of State's office did not begin to contact Alabama counties to determine the extent of UOCAVA noncompliance until February 7, 2012, one week after the UOCAVA deadline.  SUF 142, 143.  The Secretary of State's office claims that it chose not to contact Alabama counties prior to the 45-day deadline because doing so "would distract the AEMs from getting the ballots out at the earliest possible time."  SUF 144.  On February 7, 2012, the Secretary of State issued an emergency rule extending the time for AEMs to receive voted UOCAVA ballots from noon on Election Day to noon on March 21, 2012, 8 days after the primary election.  SUF 145.  Defendants, however, subsequently informed this Court that some

timely requested ballots had been transmitted as late as February 15, 2012—18 days after the

UOCAVA deadline.  ECF Nos. 10, 15.[10]

### C.   November 6, 2012 Federal General Election

The 45th day before the November 6, 2012 Federal general election was September 22,

2012.  SUF 15.  As of that date, UOCAVA voters from 59 Alabama counties had requested

electronic transmission of an absentee ballot for the November 6, 2012 Federal general election.

SUF 18.  At least 17 of those 59 counties failed to transmit all UOCAVA electronic ballots by

September 22, 2012.  SUF 19.  Sixty counties received UOCAVA requests for mail ballots by

September 22 and, of those counties, five transmitted ballots after the 45-day advance

transmission deadline.  SUF 16, 17.  Overall, some electronic ballots were transmitted as many

as 10 days late, while some mail ballots were transmitted two days after the UOCAVA deadline.

SUF 20, 21.

#### 1.   Ballot Transmission Processes

For paper ballots, Alabama's counties again contracted with ES&S for printed ballot

supplies.  SUF 158.  The process for receiving supplies remained the same as for the two prior

Federal elections.  *Id.*  For electronic transmissions, the State remained under the Scytl/ES&S

contract.  SUF 159.[11]

#### 2.   Pre-Election Training

Prior to the November 6, 2012 Federal general election, the Secretary of State's office

held a one-day training for AEMs in Montgomery, Alabama.  SUF 161.  The Secretary of State's

---

[10] Because Defendants' eight-day extension would not have given all UOCAVA voters a full 45 days to receive and
return their ballots, this Court entered a preliminary injunction on March 7, 2012 that included a number of remedial
measures intended to ensure that late-transmitted UOCAVA ballots were counted.  ECF No. 21.
[11] The Director of Elections testified that there was an "expectation" that the system would be operational on
September 21, 2012, one day before the 45-day deadline.  SUF 172.

office gave AEMs a choice of attending training on either August 23rd or 24th and provided a DVD recording of the training session.  SUF 161, 162.  Multiple AEMs felt that the training was inadequate and that hands-on training regarding the electronic transmission process was needed. SUF 163, 164.

### 3.  *Secretary of State Pre-Transmission Oversight*

For the 2012 Federal general election, as required by this Court's order, the Secretary of State's office gathered information about UOCAVA activity by county, including whether each county had sufficient supplies and the technical capacity to comply with UOCAVA, the number of UOCAVA ballots requested, the dates UOCAVA ballot transmissions began and ended, and the method of transmission.  ECF No. 21.

### 4.  *Problems with Ballot Transmission*

The State's electronic ballot transmission system experienced significant infrastructure and reliability problems in the days leading up to the 45-day deadline for the November 6, 2012 Federal general election. SUF 169-172.  As a result, the system did not become operational until approximately 11:00 pm on the evening of September 22, 2012, the 45th day before the election. SUF 173.  Even after the 45-day deadline had passed, multiple programming and data errors remained.[12]  SUF 175, 178, 184.  For example, on September 24, 2012, two days after the 45-day deadline, AEMs began receiving reports that UOCAVA voters were logging into Scytl's website but not finding a ballot available for download.  SUF 175.  In other instances, the late transmittals of UOCAVA ballots resulted from AEM's data entry errors.[13]  SUF 179, 182.  In

---

[12] Alabama's PowerProfile voter registration database could not detect simple data entry errors in email addresses, such as the lack of a "@" symbol or a missing "dot" symbol in ".com."  SUF 182.  Additionally, multiple AEMs have indicated that they properly entered all voter information into PowerProfile by UOCAVA 45-day deadline, but that their ballots were still not transmitted.  SUF 180.

[13] In several cases, AEMs entered voter email addresses incorrectly or failed to check the box in PowerProfile indicating that the voter had requested electronic transmission.  These errors resulted in ballots not being

addition, because the electronic absentee ballot transmission system did not become operational until one hour before the UOCAVA deadline expired, AEMs had virtually no opportunity to log into the system prior to the deadline to determine if their UOCAVA voters' ballots were properly queued for transmission.  SUF <u>173, 174, 181, 183</u>.  Finally, some AEMs did not know whether all UOCAVA electronic ballots had been properly transmitted because they did not timely receive copies of the emails sent to UOCAVA voters.  SUF <u>186</u>.[14]

In addition to the late electronic transmittals, five counties transmitted paper ballots after the 45-day deadline.  SUF <u>17</u>.  One of those counties explained that it did not receive ballot supplies from ES&S until the Monday after the 45-day UOCAVA deadline had passed, despite the fact that ES&S had received timely ballot proofs from all counties.  SUF <u>168</u>.

### 5.  *Post-Transmission Oversight*

As ordered by this Court, the Secretary of State's office surveyed Alabama's counties regarding UOCAVA compliance.  ECF No. 21.

Upon learning that ballots were transmitted late, the Secretary of State issued an emergency rule extending the time for AEMs to receive returned UOCAVA ballots from noon on election day to noon on November 16, 2013, 10 days after the election.  SUF <u>188</u>.  The Secretary of State's office took no actions to gain a comprehensive understanding of the number

---

electronically transmitted.  SUF <u>179, 182</u>.  Because the State's PowerProfile system was not designed to alert AEMs if they had entered an invalid email address or to remind or require them to check a method of ballot delivery, the AEMs were not aware of data entry errors or the subsequent electronic ballot transmission failures they triggered until after the 45-day deadline had passed.  SUF <u>183</u>.  Multiple AEMs indicated that had the system been designed to alert them to errors, they likely would have identified their mistakes prior to the 45-day deadline.  SUF <u>183, 186</u>.

[14] At least two AEMs indicated that even after the 45-day deadline had passed, the system did not alert them that some UOCAVA voters had not received their electronic ballots.  SUF <u>186</u>.

of UOCAVA ballots returned by voters too late to be counted for the November 2012 Federal general election.[15]  SUF 189.

## III.   ALABAMA'S ATTEMPTED LEGISLATIVE FIX

During Alabama's 2013 legislative session, the Secretary of State's office supported legislation, House Bill 516, intended to remedy some of the State's statutory barriers to UOCAVA compliance.  SUF 211.  Specifically, the legislation sought to move numerous pre-election deadlines related to ballot production so that they would fall farther in advance of the UOCAVA 45-day deadline.[16]  SUF 213-219.  The Secretary of State's office believed that these changes would allow more time to finalize ballots prior to the UOCAVA 45-day deadline, and avoid problems that occurred during the 2012 primary, when the political parties continued to amend their party certifications up until UOCAVA's 45-day deadline.  SUF 212.  HB 516's language did not include changes to the State's primary runoff date.  SUF 220.  Although HB 516 passed the Alabama House of Representatives, the Alabama Senate did not vote on the Bill and it was not enacted.  SUF 221.

---

[15] The Secretary of State's office did gather a limited amount of information about total ballots returned but not counted for purposes of reporting that data to the U.S. Election Assistance Commission.  However, Alabama reported that "more than half of its counties did not report data on the number of counted UOCAVA ballots . . . ."  SUF 189.

[16] *E.g.*, HB 516, 2013 Leg., Reg. Sess. (Ala. 2013) § 17-13-5(a) (moving the deadline to submit a declaration of intent to seek office from 60 days before the primary to 116 days before the primary); *id.* § 17-13-5(b) (moving the deadline for the party chairs to certify candidates from 55 days before the primary to 82 days before the primary); *id.* § 17-6-21(b) (creating a deadline for amendments to certifications of 76 days prior to the primary or general election); *id.* § 17-6-21(c) (moving the notification deadline for candidate not wishing to accept nomination in the primary election from 20 days before the election to 76 days before the election, and from 45 days before the general election to 76 days before the general election); *id.* § 17-13-23 (creating a deadline for filling a nomination vacancy of 76 days before the primary); *id.* § 17-13-5(b) (moving the deadline for the Secretary of State to certify candidates to the probate judges from 50 days before the primary to 74 days before the primary); *id.* § 17-11-12 (moving the deadline for probate judges to supply ballot supplies to AEMs for primary and general elections from 40 days before the election to 55 days before the election); *id.* § 17-6-21(c) (moving the deadline for candidate withdrawals from 20 days before the primary to 76 days before the primary); *id.* § 17-13-86 (creating a deadline for resolving election contests of 90 days before the election, and requiring party certification 76 days before the general election).

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also* Fed. R. Civ. P. 56(c); *Greenberg v. BellSouth Telecomms., Inc.,* 498 F.3d 1258, 1263 (11th Cir. 2007). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The relevant substantive law determines the facts material to the litigation's outcome. *See Anderson*, 477 U.S. at 250. Material facts must be viewed in a light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When the moving party has met the burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. at 586. The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250; *see also* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. To withstand a summary judgment motion, the nonmoving party must offer "concrete evidence" from which the Court could rule in its favor. *Anderson*, 477 U.S. at 256.

## ARGUMENT

**I.    THE UNITED STATES IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE UNDISPUTED FACTS DEMONSTRATE THAT ALABAMA HAS REPEATEDLY VIOLATED UOCAVA AND THAT ITS PRIMARY RUNOFF CALENDAR CONFLICTS WITH UOCAVA**

It has been nearly four years since Congress required states to transmit absentee ballots requested by UOCAVA military and overseas voters as of the 45th day before a Federal election to those voters no later than 45 days before that election. Yet, in each of the past three regularly scheduled Federal elections—which is every regularly-scheduled Federal election since

23

Congress passed the MOVE Act—Alabama has violated UOCAVA's 45-day advance transmission deadline.  The State has also failed to conform the date of its Federal primary runoff election to UOCAVA's requirements.  The material facts establishing the Defendants' UOCAVA violations are undisputed.  The United States is therefore entitled to summary judgment.

### A.      Alabama Violated UOCAVA's 45-day Advanced Transmission Requirement in the 2010 and 2012 Federal Elections

In the 2010 general election, approximately 1,800 UOCAVA ballots requested by UOCAVA voters in advance of the 45th day before the election were transmitted late.  SUF 4, 7. For the 2012 primary election, only 11 out of 739 advance-requested UOCAVA ballots were transmitted on time.  SUF 13, 14.  Indeed, every county in the State that had timely UOCAVA ballot requests missed the 45-day advance transmission deadline.  SUF 12.   Even after this Court ordered monitoring and reporting measures for the 2012 general election, electronically-transmitted ballots were sent late to voters from 17 counties, while five counties sent ballots late by mail.  SUF 17, 19.  The State's repeated late transmissions are beyond dispute.

This Court has already rejected Defendants' attempt to avoid responsibility for these failures by blaming its UOCAVA violations on those local election officials to whom it has delegated UOCAVA responsibilities.  *See Alabama*, 857 F. Supp. 2d at 1238 ("Alabama's contention that it is not its responsibility to ensure compliance with UOCAVA, especially where local county officials transmit ballots and administer an election, is meritless.").  Thus, this Court should grant summary judgment.

### B.      Alabama's Primary Runoff Calendar Conflicts with UOCAVA's 45-Day Advance Transmission Requirement

Alabama's primary runoff calendar violates UOCAVA.  Primary runoff elections are held only 42 days after the original primary election.  *See* Ala. Code § 17-13-3(a).  It is thus categorically impossible to comply with both Alabama law and UOCAVA's 45-day transmission requirement, 42 U.S.C. § 1973ff-1(a)(8), for Federal primary runoffs.  Indeed, because of the tasks that necessarily to occur between the primary and runoff election—such as election certification and ballot printing—the transmission of UOCAVA ballots actually would likely occur at least a week or more after the 45th day before the runoff election.   Defendants' argument that UOCAVA's 45-day deadline does not apply to runoff elections, *see* Ds.' Third Resp. to the Ct.'s Op. and Order, at 8-9, ECF No. 14, conflicts with UOCAVA's text and Congress's intent.  It should be rejected.

1. ***The plain text of Subsection (a)(8) makes UOCAVA's 45-day deadline applicable to runoff elections***

When interpreting a statute, the "starting point" is the language of the statute itself.  *See Amer. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982).  Courts should "assume Congress used the words in a statute as they are commonly and ordinarily understood, and . . . read the statute to give full effect to each of its provisions."  *Harrison v. Benchmark Electronics Huntsville, Inc.*, 593 F.3d 1206, 1212 (11th Cir. 2010).  Section 102(a)(8) of UOCAVA states:

> Each State shall . . . transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter … (A) . . . in the case in which the request is received at least 45 days before *an* election for Federal office, not later than 45 days before the election; and (B) in the case in which the request is received less than 45 days before *an* election for Federal office – (i) in accordance with State law; and (ii) if practicable and as determined appropriate by the State, in a manner that expedites the transmission of such absentee ballot.

42 U.S.C. § 1973ff-1(a)(8) (emphasis added).[17]

---

[17] Section 102(g) permits exceptions to UOCAVA compliance to be made in cases where a State's chief election official has demonstrated that his or her "State is unable to transmit absent uniformed services voters and overseas voters an absentee ballot in accordance [with UOCAVA]."  42 USC § 1973ff-1(g).  That exception is not at issue in this case.

By its terms, Subsection (a)(8)'s 45-day advance transmission mandate applies to "an election for Federal office."  Nothing in the language of Subsection (a)(8) limits the term "election for Federal office" only to a subset of Federal elections or otherwise carves out an exception for runoff elections.  Thus, because a Federal runoff election is inarguably "an election for Federal office," Subsection (a)(8) plainly includes runoff elections.

The meaning of the phrase "an election for Federal offense" is confirmed by examining the interplay between two other provisions of UOCAVA:  42 U.S.C. § 1973ff–1(a)(7) and § 1973ff–1(f).  "Section 1973ff–1(a)(7) addresses the transmittal of blank absentee ballots for 'general, special, primary, and runoff elections for Federal office' and requires that transmittal procedures be established in accordance with § 1973ff–1(f)."  *Georgia*, 2013 WL 3421982, at *6.  "Notably, § 1973ff–1(f)'s transmittal procedures apply to 'an election for Federal office.'"  *Georgia*, 2013 WL 3421982, at *6.  Thus, § 1973ff–1(a)(7) and its cross-reference to § 1973ff–1(f) confirm the unremarkable fact that when Congress employs the phrase "an election for Federal office" without qualification, it means all Federal elections, including Federal runoff elections.  The "normal rule of statutory construction" is that "identical words used in different parts of the same act are intended to have the same meaning."  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (citation omitted).  Accordingly, Subsection (a)(8)'s plain language encompasses all Federal elections, including runoffs.

Citing Section 102(a)(9), however, Alabama has argued that Subsection (a)(8) does not apply to Federal runoff elections.[18]  *See* State Defs.' Prelim. Resp. to the Court's Op. & Order at 4-5.  ECF No. 10  Section 102(a)(9) states:

---

[18] On November 5, 2013, Defendants filed a Motion for Partial Summary Judgment on this issue.  ECF No. 81.  The United States will respond as appropriate to the arguments made in that motion in its opposition brief.

> Each State shall . . . if the State declares or otherwise holds a runoff election for Federal office, establish a written plan that provides absentee ballots are made available to absent uniformed services voters and overseas voters in [a] manner that gives them sufficient time to vote in the runoff election.

42 U.S.C. § 1973ff-1(a)(9).

The Defendants' argument is incorrect.  Nothing in Subsection (a)(9) overrides Congress's establishment of a 45-day deadline for transmitting ballots in advance of "an election for Federal office," 42 U.S.C. § 1973ff-1(a)(8).  Moreover, if a runoff election occurs, a State can comply with both obligations:  the requirement to transmit ballots by the deadline (consistent with Subsection (a)(8)) *and* the requirement to develop a written plan that gives military and overseas voters a sufficient opportunity to vote in the election (consistent with Subsection (a)(9)).[19]

Subsection (a)(8)'s coverage of all federal elections—including runoffs—does not render Subsection (a)(9) a nullity.  Instead, Subsection (a)(9) complements Subsection (a)(8) by providing UOCAVA voters in runoff elections with additional protections beyond those that apply in all elections for federal office.  Runoff elections do not regularly occur in most jurisdictions, and when they do, they frequently are announced with comparatively short notice.  Thus, Congress reasonably could have concluded that States conducting runoff elections should have a written plan as an additional safeguard for UOCAVA voters.  Such a plan could impose additional or alternative requirements to ensure that military and overseas voters are able to vote

---

[19] The written plan that Alabama has adopted pursuant to 42 U.S.C. § 1973ff-1(a)(9) does not comply with UOCAVA's requirements insofar as it does not, even at a minimum, ensure that timely-requested ballots will be transmitted at least 45 days prior to a Federal runoff election.  Instead, Alabama's written plan merely reflects that under current state law, any Federal primary runoff will be held 42 days after the Federal primary election and instructs Alabama's Probate Judges to provide the final printed ballot to AEMs "as soon as practicable after the primary election."  See SUF 222.  Under Alabama's written plan, ballots may not be transmitted until potentially more than a week after the 45-day deadline, due to the need to have candidates certified and ballots printed under the established state law framework. See Ala. Cod § 17-11-12.  As such, the State's plan does not provide Alabama's UOCAVA voters sufficient time to vote in Federal runoff elections, as contemplated by Subsection (a)(9).

in runoff elections.  Those measures might include providing additional notice to UOCAVA

voters concerning runoff elections or special ballot preparation requirements for runoff elections

to ensure that ballots are made available by the transmission deadline.

Facing an identical issue, another Federal district court concluded that Georgia's runoff

election statute violates UOCAVA because it requires runoff elections to be held less than 45

days after the initial primary or general election.  *United States v. Georgia*, No. 1:12-cv-2230,

2013 WL 3421982 (N.D. Ga. Apr. 30, 2013), (attached as Ex. 39), *appeal pending*, 11th Cir.

Case No. 13-14065 (filed Sept. 6, 2013).[20]  The *Georgia* court held that "[t]he plain meaning of

the term 'an election'" in Subsection (a)(8) encompasses any Federal election, including runoff

elections.  *Id.* at *5.  Additionally, the court noted that Subsection (a)(8) "itself contains no

language limiting the application of the term 'an election' to elections other than runoff

elections."  *Id.* at *6.  The court further concluded that Subsection (a)(8)'s 45-day requirement

does not conflict with Subsection (a)(9).  The court found no indication that Subsection (a)(9)'s

reference to "sufficient time" was meant to "substitute for the forty-five day ballot transmittal

requirement."  *Id*. at *9.  Additionally, the court noted that Subsection (a)(9)'s requirement that

states establish written plans for runoff elections "can be reasonably read as establishing an

additional requirement" with which states must comply,  rather than a conflict between

Subsection (a)(8) and (a)(9).  *Id.* at *7.  The court granted summary judgment against the

defendants, and ordered them to propose changes to Georgia law that would ensure UOCAVA

compliance in all future Federal runoff elections.  *Id.* at *11-12.  The reasoning of the Georgia

district court is persuasive and should be adopted by this Court.

### 2. *Well-established statutory construction tools support the conclusion that Subsection (a)(8) applies to runoff elections*

---

[20]   On October 16, 2013, the district court denied the Georgia defendants' motion to stay the permanent injunction pending their appeal to the Eleventh Circuit. Ex. 65.

Several factors—UOCAVA's purposes and history, well-reasoned administrative interpretation of Section 102(a)(8), and the canon that statutory benefits to members of the military are to be liberally construed—support the conclusion that UOCAVA's 45-day advance transmission deadline applies to runoff elections.

Congress's intent in passing the MOVE Act supports applying Subsection (a)(8) to all Federal elections, including Federal runoff elections. While Congress did not specifically discuss applying Subsection (a)(8) to particular types of Federal elections, the MOVE Act's legislative history leaves no doubt that Congress intended to change an unacceptable status quo. *See, e.g.*, H. R. Rep. No 111-288, at 744 (2009) (stating that the MOVE Act generally would "require States to transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter at least 45 days before *an election* for Federal office") (emphasis added); *see also* Cong. Rec. S4518 (daily ed. May 27, 2010) (Statement of Sen. Schumer) (describing Congress's adoption of the 45-day requirement because it provides sufficient time for UOCAVA voters to request, receive, and cast their ballots in time for them to be counted).  Providing insufficient time for UOCAVA voters to be able to meaningfully participate in elections is as much a problem with runoff elections as with any other type.

Second, well-reasoned administrative interpretation of Subsection (a)(8) supports its application to runoff elections.  The Federal Voting Assistance Program ("FVAP"), the Department of Defense agency responsible for administering UOCAVA, has promulgated specific guidance to all chief state election officials regarding UOCAVA:

> Most importantly for this memorandum, States and localities are required to transmit absentee ballots 45 days prior to *any* election for Federal office, which includes all general, special, primary (including Presidential preference primaries) and run-off elections.

*See* Memorandum from Bob Carey, Director, Federal Voting Assistance Program, to Chief State Election Officials, App. A(I) (Feb. 7, 2012), Ex. 38.

As a preliminary matter, courts should "give the language of the statute effect" and decide the case on that basis alone. *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 912 n. 12 (11th Cir. 2007). As noted, UOCAVA's plain language settles this issue. Should this Court find the statute's text ambiguous, however, it should defer to FVAP's definitive construction of the statute. *See Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). FVAP, the agency responsible for administering UOCAVA, has issued a reasonable and straightforward interpretation of the statute. *See* 42 U.S.C. 1973ff(b) (describing FVAP's responsibilities, including ensuring state election officials know UOCAVA's "requirements"). As such, even if Subsection (a)(8)'s text were ambiguous, FVAP's construction of Subsection (a)(8) is entitled to deference. *Skidmore*, 323 U.S. at 140 (holding that weight is to be given to agency views that are persuasive and within the agency's area of expertise); *United States v. Georgia*, No. 1:12-cv-2230, 2013 WL 3421982, at *9 n.16 (N.D. Ga. Apr. 30, 2013) (noting that the Attorney General is charged with enforcing UOCAVA, and holding that the Attorney General's reliance on FVAP to conclude that the 45-day time period applies to Federal runoff elections "is reasonable in light of UOCAVA's statutory scheme.") .

Finally, applying Subsection (a)(8) to runoff elections is consistent with the canon that "provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor" and that statutory benefits for military service members are to be construed liberally. *See, e.g., Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1206 (2011) (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 220-21 n.9 (1991)); *see also, e.g., Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285 (1946) ("This legislation [the Selective

30

Training and Service Act of 1940] is to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need.").  While some overseas voters who benefit from this statutory scheme are not members of the Armed Services, that significant number of uniformed services voters are among the intended beneficiaries of the MOVE Act means that this canon should inform the proper construction of Subsection (a)(8), consistent with the traditional recognition of Congress's "solicitude" toward those who serve in uniform.  *See Henderson*, 131 S. Ct. at 1206.  Thus, this canon should be applied to Section 102(a)(8) and to UOCAVA as a whole to ensure that military members, as well as overseas citizens, have an unimpeded opportunity to vote and have their ballots counted in all Federal elections, including runoff elections.

In sum, the United States is entitled to an order granting summary judgment on its claim that Alabama's primary runoff statute, which establishes a mere 42-day window between a primary election for Federal office and any subsequent runoff election, conflicts with 42 U.S.C. § 1973ff-1(a)(8).

## INJUNCTIVE RELIEF STANDARD AND ARGUMENT

This Section proceeds in two parts.  First, it establishes the need for entry of a permanent injunction to ensure future UOCAVA compliance in Alabama.  Second, it identifies the core problems that the United States suggests final injunctive relief should address and provides a proposal affording all parties with the opportunity for input as to the contents of the final remedial order.

I.   **THE UNITED STATES IS ENTITLED TO INJUNCTIVE RELIEF BECAUSE IT HAS MET EACH FACTOR NECESSARY FOR RELIEF AND, MOST IMPORTANTLY, ALABAMA'S UOCAVA VIOLATIONS ARE LIKELY TO CONTINUE ABSENT RELIEF FROM THIS COURT**

A moving party must generally show four factors to obtain a permanent injunction. Those factors are: (1) success on the merits of its claim; (2) there is no adequate remedy at law; (3) irreparable harm will result if the court does not order injunctive relief; and (4) if the injunction is issued, it will not be adverse to the public interest.[21]  *See, e.g.*, *Thomas v. Bryant*, 614 F.3d 1288, 1317-18 (11th Cir. 2010); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1268 (11th Cir. 2006).  As this Court has recognized in a prior voting rights case, both irreparable harm and the public's interest in an injunction are presumed when the United States seeks injunctive relief in a statutory enforcement action.  *United States v. Alabama*, No. 2:06-cv-392, 2006 WL 1598839, at *2 (M.D. Ala. June 7, 2006) ("[N]o showing of irreparable harm is necessary in an action for a statutory injunction. . . because where Congress has seen fit to act in a given area by enacting a statute, irreparable injury must be presumed in a statutory enforcement action. Further, an examination of whether an injunction pursuant to a statute is in the public

---

[21] The Eleventh Circuit has applied a permanent injunction test that varies somewhat from the test applied by the United States Supreme Court in *Monsanto Co. v. Geertson Seed Farms*, in which the Court considered an additional factor—whether a remedy in equity is appropriate considering the balance of hardships between the plaintiff and defendant.  130 S. Ct. 2743, 2756 (2010) ("Before a court may grant a permanent injunction, the plaintiff must satisfy a four-factor test, demonstrating: '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'").

The balance of interests in this case favors the requested relief.  The right to vote is 'a fundamental political right.'" *United States v. Cunningham*, No. 3:08-cv-709, 2009 WL 3350028, at *4 (E.D. Va. Oct. 15, 2009) (quoting *Yick Wo v. Hopkins*, 188 U.S. 356, 370 (1886)).  The hardships that Alabama might experience by having to change its election calendar and increase its oversight of UOCAVA ballot transmission are substantially outweighed by the threatened injury to UOCAVA voters.  *United States v. Georgia*, No. 1:12-cv-2230, 2013 WL 3421982, at *10 (N.D. Ga. Apr. 30, 2013).  Moreover, to the extent that Alabama's election calendar precludes UOCAVA compliance, Alabama law must yield.  *See Hillsborough Cnty. Canvassing Bd.*, 123 F. Supp. 2d at 1314 (noting that any state law that conflicts with UOCAVA is preempted and invalid); *United States v. Cunningham*, No. 08-cv-709, 2009 WL 3350028, at *10 (E.D. Va. Oct. 15, 2009) ("[T]he Commonwealth of Virginia has an obligation under the Supremacy Clause to protect the federally-guaranteed civil right of UOCAVA voters to vote by absentee ballot in federal elections.  To the extent that protecting that right conflicts with Virginia law, Virginia law must give way.").

interest is unnecessary because Congress acts in the public's interest." (citations and internal quotation marks omitted)).

In any event, the United States meets all four of the traditional injunctive relief factors. As explained below, the United States has established the merits of its UOCAVA claims and no adequate legal remedy exists. Moreover, irreparable harm will result absent appropriate injunctive relief. Unless this Court acts, Alabama's on-going UOCAVA violations are virtually certain to continue. Those violations resulted from numerous causes, including: UOCAVA conflicts occasioned by the State's election calendar; the State's failure to oversee the local elections officials to whom it delegates UOCAVA responsibilities, including to ensure that local officials take all necessary steps to obtain adequate balloting supplies before the ballot transmission deadline; the State's ineffective training practices; and the State's failure to provide deadlines in its contracts with its electronic ballot transmission vendor to ensure timely ballot preparation and its failure ensure that its electronic ballot transmission system functioned to alert elections officials to errors that would prevent timely transmission of UOCAVA ballots. These problems have resulted in Alabama's violation of military and overseas citizens' voting rights for three straight regularly scheduled Federal elections. Absent a remedial order of this Court, Alabama's UOCAVA violations will continue to generate irreparable harm to the State's UOCAVA voters. Finally, a remedial order will advance the public's interest in ensuring that Alabama no longer deprives its military and overseas voters of the full voting opportunities guaranteed to them by Federal law. Accordingly, an order providing permanent relief is appropriate.

**A.**     **The United States Has Demonstrated Success on the Merits of its Claims**

The undisputed facts demonstrate that Alabama has repeatedly violated UOCAVA's 45-day advance transmission deadline, and that the State's primary runoff statute also violates that deadline.

**B.**     **There is No Adequate Remedy at Law**

No adequate legal remedies are available here.  *See United States v. Georgia*, No. 1:12-cv-2230, 2013 WL 3421982, at *10 (N.D. Ga. Apr. 30, 2013)  ("It is apparent that the harm visited on UOCAVA voters by Georgia's current runoff election scheme is of a type for which only an equitable remedy, in the form of an injunction requiring Georgia to take steps to come in compliance with the UOCAVA, is best suited.")

Alabama's UOCAVA violations are virtually certain to recur absent injunctive relief. This is because current Alabama law presents structural obstacles to UOCAVA compliance.  The following dates and deadlines will continue to generate UOCAVA violations until addressed:

- Date of the Primary Runoff:  Alabama's primary runoff date is 42 days following the initial primary.  Ala. Code § 17-13-18.  For Federal primary runoff elections, this timeframe conflicts irreconcilably with UOCAVA's 45-day advance transmission requirement.

- Candidate Certification Deadlines:  In primary elections, candidates may file a declaration of candidacy with their state party chair up to 60 days prior to the date of the primary election.  Ala. Code § 17-13-5.  The party then has an additional five days (*i.e.,* 55 days before the primary election) before the state chair must certify the candidates' names to the Secretary of State.  *Id.*  The Secretary of State must then certify the names of opposed candidates to the county probate judges by the 50th day before the primary election, a mere 5 days before the

UOCAVA deadline.[22]  *Id.*  Alabama's Director of Elections testified that these deadlines provide too little time to prepare primary ballots, which must be proofed, printed, and delivered to AEMs by the 46th or 47th day before the election to ensure transmission to voters by UOCAVA's 45-day deadline.[23]  SUF <u>195</u>.  He further testified that this timeline provides a very small window for county appointing boards to identify and train interim AEMs when a Circuit Clerk is on the ballot and unable to serve as the AEM.  SUF <u>115, 116</u>.

- <u>Candidate Withdrawal Notification and Re-Nomination Deadlines</u>:  Alabama law provides that "no person's name shall be printed upon the ballots" if that person notifies the probate judge in writing that, he or she declines the nomination. Ala. Code § 17-6-21(a).  The "notification deadline" for refusing nomination in a primary or primary run-off is "20 days before the date of the election."[24]  Ala. Code § 17-6-21(b).  The general election notification deadline is "45 days before the date of the election." *Id.*  Thus, if a candidate withdraws 20 days before a primary election, or 45 days before a general election, his or her name must not appear on the ballot.  In both instances, UOCAVA ballots would already have been transmitted (or be in the process of transmission).  These deadlines, and the accompanying requirement that ballots be re-printed, conflict with UOCAVA's 45-day transmission requirement.

---

[22] As previously noted, the Alabama legislature considered a bill during its 2013 legislative session, HB 516, which would have moved a number of deadlines related to ballot production.

[23] Specifically, he testified: "So by the time you do those things [candidate and party certification], you've eaten up basically -- you've got -- from the 60th day of qualifying to the 45th day to get those ballots out, you've only got 15 days to handle all these certifications, get them to the county, ES&S starts laying out the ballots, get the proofs together. They've got to give the county some time to proof it and then actually print it and get it into counties' hands not really by the 45th day, but by the 46th day or the 47th day so that they can start packaging up ballots and getting them in the mail. So, you know, we [the Secretary of State's office] have made a recommendation [to the Legislature] that those timetables be opened up. " SUF <u>195</u>.

[24] HB 516 proposed requiring party executive committees to finalize candidates for the primary and general election not later than 76 days before the election.  It further proposed that any amendments coming after the 76th day would result in the candidate being withdrawn, but the candidate's name remaining on the ballot and the canvassing board would be prohibited from certifying any votes for the withdrawn candidate.

Moreover, when candidate withdrawals occur, Alabama law does not set a deadline by which state and county party committees must fill such candidate vacancies.[25]  *See* Ala. Code § 17-13-23.  Alabama's Director of Elections testified that, although the Secretary of State's office has a policy of not allowing political parties to name candidate replacements after the ballots have been printed, "in practice that's not always been the case" because the decision to reprint is often in the hands of local election officials.  SUF <u>199</u>.  Moreover, the Secretary of State's policy "has been sort of informally challenged by the parties, saying that they ought to be able to name their replacement if there's time to reprint."  *Id.*

- Election Contest Deadlines:  When there is a dispute over who is the proper, legal party nominee for office in a general election, Alabama law does not require the dispute to be resolved until the 40th day before the election.  Even then, the party has an additional five days to certify candidates to the Secretary of State (*i.e.*, until the 35th day prior to election).  The Secretary of State is not required to provide certifications to the probate judge until the sixth day after the result of the election contest (*i.e.* the 34th day prior to the general election).[26] Ala. Code § 17-13-86.  In cases where the parties fail to resolve an election contest sufficiently in advance of UOCAVA's 45-day deadline, compliance with UOCAVA would be impossible.[27]

- Materials Distribution Deadline:  Probate judges are required to provide election materials, including absentee ballots, to AEMs "not less than 40 days prior to the election," *i.e.*,

---

[25] HB 516 proposed to set that deadline at the 76th day prior to the election.

[26] HB 516 proposed moving the deadline for rendering a decision on election contests to 90 days before the general election for county offices, and 83 days before the general election for state offices.

[27] Alabama's Director of Elections testified that the lack of a clear election contest deadline has created barriers to ballot production in the past because the State could have "the ballots flushed out, but then you have some race where the candidate is being challenged, and you don't know when the party is going to get around to that nomination."  SUF <u>203</u>.

permitting them to distribute ballots up to 5 days *after* UOCAVA's 45-day deadline.[28] Ala. Code § 17-11-12.  This too increases the likelihood of future UOCAVA violations.[29]  As Alabama's Director of Elections testified, this requirement "makes [UOCAVA compliance] more difficult in that . . .  you have one clear standard for state and local offices [40 days before the election], another standard for federal offices [45 days before the election]."  SUF 201.

While the Defendants are aware of the UOCAVA conflicts these statutes present, they have failed to resolve them.  Defendants stated in a filing with this Court that "as a practical matter," and absent new legislation, neither the Secretary of State nor any State or local official can do anything to ensure that ballots in a Federal runoff election are sent at least 45 days in advance.  ECF No. 14 at ¶ 25 at 9.  Likewise, Defendants have asserted that Alabama's election calendar, late-breaking certification amendments filed by political parties, and the difficulty that counties had in finalizing their ballots, among other factors, combined to make compliance with UOCAVA "impossible" during the March 2012 Federal primary election.  ECF No. 14 at 12 n. 6.  As the chief legal advisor in the Office of the Secretary of State testified, "there are systemic problems that currently exist with state law."[30]

Indeed, the Secretary of State's office hoped that the passage of HB 516—which would have moved a number of deadlines further back in the election calendar to allow more time for UOCAVA compliance—would remedy many of these problems.  HB 516, however, did not pass.

---

[28] HB 516 would have pushed this deadline back to the 55th day before the election.

[29] The Secretary of State promulgated emergency rules for the 2010 and 2012 Federal elections requiring probate judges to provide ballots for UOCAVA voters to AEMs by the 47th day before the 2010 Federal general election, *see* Emergency Rule 820-2-8-.03-.03ER, and by the 48th day before the 2012 Federal primary and general elections, *see* Emergency Rule 820-2-8-.03-.03ER.  These emergency rule deadlines, however, still provided a very narrow timeframe for complying with UOCAVA's 45-day deadline.

[30] Ms. Brown also testified that in her opinion "based on over 35 years of involvement in state government, the best and most practical solution [for ensuring Alabama's compliance with UOCAVA] is to change state law deadlines."  SUF 210.

Moreover, even if Alabama had enacted HB 516, that legislation would not have remedied all structural impediments to UOCAVA compliance because the bill did not change Alabama's primary runoff date.  Given these circumstances and Alabama's repeated violations, injunctive relief is necessary to override these structural obstacles to compliance with Federal law.

### C.   Irreparable Harm Will Result Absent Injunctive Relief

As previously explained, irreparable harm is presumed where, as here, the United States seeks injunctive relief in a statutory enforcement action.  *United States v. Alabama*, No. 2:06-cv-392, 2006 WL 1598839, at *2 (M.D. Ala. June 7, 2006).   But injunctive relief would be justified even if that presumption did not exist. Defendants' failure to ensure past and present UOCAVA compliance risks irreparable harm to Alabama's military and overseas voters.  *See United States v. Georgia*, 892 F. Supp. 2d 1367, 1375 (N.D. Ga. 2012) ("[A]n irreparable harm occurs when a UOCAVA voter is denied the right to receive a sufficient absentee ballot at least forty-five days before the primary runoff election.").  The right to vote is "fundamental."  *Bartlett v. Strickland*, 556 U.S. 1, 10 (2009); *see Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964).  Denial or abridgement of that right constitutes irreparable harm.  *See Dillard v. Crenshaw Cnty.*, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986).[31]  Moreover, the State's repeated denial of "its ongoing obligation to ensure statewide UOCAVA compliance is a compelling reason to find that an injunction is appropriate, especially given the State's [history of] non-compliance . . . ."  *United States v. Alabama*, 857 F. Supp. 2d at 1241; *see also Thomas*, 614 F.3d at 1318 ("the irreparable-

---

[31]   *Accord Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 882, 907 (9th Cir. 2003) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury." (quotation marks omitted)), *rev'd on other grounds*, 344 F.3d 914 (9th Cir. 2003); *Montano v. Suffolk Cnty. Legislature*, 268 F. Supp. 2d 243, 260 (E.D.N.Y. 2003) ("An abridgement or dilution of the right to vote constitutes irreparable harm."); *Cardona v. Oakland Unified Sch. Dist.*, 785 F. Supp. 837, 840 (N.D. Cal. 1992) ("Abridgment or dilution of a right so fundamental as the right to vote constitutes irreparable injury."); *see also Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (holding that an injury is irreparable "if it cannot be undone through monetary remedies").

injury requirement may be satisfied by demonstrating a history of past misconduct, which gives rise to an inference that future injury is imminent"); *Kapps v. Wing*, 404 F.3d 105, 123 (2d Cir. 2005) ("[W]here a history of legal violations is before the district court, that court has significant discretion to conclude that future violations of the same kind are likely.").  Absent an order requiring significant changes to the State's UOCAVA practices— including changes to its election calendar and its poor UOCAVA oversight, training, and electronic transmission practices—ongoing harm to the Alabama's military and overseas voters is all but inevitable.

### 1.   *Defendants Have Failed to Ensure Statewide UOCAVA Compliance*

Defendants' lack of proactive oversight and communication with the local officials to whom it delegated UOCAVA responsibilities have prevented the timely detection and remediation of problems leading to UOCAVA violations.  Until ordered to do so by this Court, the Secretary of State's office made no systematic effort to determine whether any Alabama county faced obstacles in meeting the 45-day advance transmission deadline.  For example, in 2010, the Secretary of State's office lacked any policy or practice of contacting local election officials to determine if they had the supplies necessary to transmit ballots by the UOCAVA deadline.  SUF 66, 67.  The State did not know, as of the 45-day deadline, which counties lacked materials and were therefore certain to miss that deadline.  SUF 74, 75.  The Secretary of State's chief legal advisor testified that then-Secretary of State Beth Chapman "didn't want to contact [AEMs] before the deadline [for the 2010 Federal general election] because she didn't want to distract them from getting their ballots out[.]"  SUF 73.  It is illogical at best to suggest that an affirmative program to ensure statewide UOCAVA compliance would cause, rather than possibly prevent, late ballot transmissions.

The Secretary of State's office also failed to request that counties report on their UOCAVA compliance on or immediately after the 45-day deadline. For example, in 2010, the Secretary of State's office still did not have "a clear picture of compliance" or lack thereof days after the 45-day deadline. SUF 90. For the 2012 Federal primary election, the Secretary of State's office did not begin systematically to contact Alabama counties to gauge whether all advance requested ballots had been transmitted until February 7, 2012—a full week after the 45-day deadline. SUF 143 . Here again, Defendants assert that their lack of timely oversight was purposeful, claiming they failed to contact all counties until February 7, 2012, "so as not to interrupt the counties' transmission of ballots. . . It was determined that if the telephone survey had begun earlier, this would distract the AEMs from getting the ballots out at the earliest possible time." SUF 144. This approach to UOCAVA compliance must stop. In addition, given Defendants' unwillingness to monitor voluntarily and proactively the local officials to whom the State has delegated UOCAVA responsibilities, it is reasonable to infer that further harm will result absent a Court order requiring such monitoring.[32]

### 2.  Defendants Have Failed to Train All AEMs Adequately

Alabama does not require AEMs to receive training on the absentee ballot process, generally, or their UOCAVA responsibilities specifically. SUF 38. Thus, although the Secretary of State's office has conducted UOCAVA trainings for AEMs, attendance is optional. SUF 38. Moreover, the Secretary of State's office often scheduled such trainings at the last minute. SUF 58, 112. Numerous AEMs testified that they found the trainings inadequate—including because they lacked sufficient hands-on instructions regarding the electronic ballot transmission system.

---

[32] Indeed, during discovery, Secretary Chapman continued to contest that her office bore ultimate responsibility for Statewide UOCAVA compliance or that there had been systematic problems causing late ballot transmissions. SUF 32 .

SUF 60, 61, 114, 164.  The Secretary of State's office did not attempt to gauge AEM satisfaction

with that training, and it ignored its electronic ballot transmission vendor's concerns in 2010

regarding the need for more training.  SUF 63, 65.  Director of Elections Ed Packard testified

that "based on what we've seen over the last . . . two election cycles," AEM training should be

expanded to include greater explanation of the entire absentee ballot process, "from the very

basics all the way up through electronic transmission and the special requirements for

UOCAVA."  SUF 163.[33]

### 3. Defendants Have Failed to Ensure Reliable and Timely Functioning of Its Electronic Ballot Transmission System

Multiple issues with Alabama's electronic ballot transmission system in both 2010 and

2012 made timely UOCAVA compliance in Alabama more difficult.  First, the system lacked

reasonable safeguards to protect against user error.  SUF 138, 183.  For example, PowerProfile

did not notify AEMs if they failed to mark the "electronic transmission" checkbox for a

UOCAVA voter requesting electronic ballot transmission.  SUF 179.  During the 2012 Federal

general election, multiple AEMs inadvertently failed to mark this field, resulting in numerous

late transmissions.  SUF 179.  Moreover, PowerProfile could not detect even simple data entry

errors in email addresses, such as the lack of a "@" symbol or a missing "dot" symbol in ".com."

SUF 182.  Such simple and common data entry mistakes prevented the timely transmission of

electronic ballots because the system lacked any safeguard to alert the State or AEMs to such

errors.

For the 2010 Federal general election and the 2012 Federal primary election, the State

failed to ensure that AEMs had received passwords to the State's DIASPORA and BallotSafe

---

[33] Packard further testified that "a lot of the people that served as . . . absentee election managers may not be real comfortable or confident in the use of computer systems" such that more training, particularly on the electronic ballot transmission system, was warranted.  SUF 61.

systems prior to the 45-day deadline.  SUF 82, 135.  Without such passwords, AEMs could not use those programs to see if their UOCAVA voters were properly queued for on-time ballot transmission.  SUF 83, 135.  AEMs also experienced problems receiving copies of ballot transmission emails, which prevented or delayed them from knowing if their ballots had been properly sent.  SUF 136, 184.  Moreover, if a ballot transmission email was sent to an invalid email address, the system did not alert anyone —neither in the Secretary of State's office, nor the vendors, nor in the counties—of the failed transmission.  SUF 182.  Finally, because of the last minute nature of when the electronic ballot transmission system became operational for both the primary and the general election in 2012, there was little opportunity to discover and address in advance programming errors that contributed to late transmissions.  SUF 80, 81, 172, 173, 174.

### D.    Permanent Injunctive Relief is in the Public Interest

UOCAVA reflects Congress's determination that military and overseas voter participation in Federal elections is a vital national interest.  *See Bush v. Hillsborough Cnty. Canvassing Bd.*, 123 F. Supp. 2d 1305, 1307 (N.D. Fla. 2000) ("[Voting is] a sacred element of the democratic process.  For our citizens overseas, voting by absentee ballot may be the only practical means to exercise that right.  For the members of our military, the absentee ballot is a cherished mechanism to voice their political opinion. . . . [It] should be provided no matter what their location.").  The MOVE Act reaffirmed this core determination.  *See United States v. Georgia*, No. 1:12–cv–2230, 2013 WL 3421982, at *10 (N.D. Ga. Apr. 30, 2013) ("Indeed, Congress introduced the MOVE Act because our legislators were alarmed by the fact that active military members, their families, and thousands of other American citizens who were overseas could not cast a ballot while they served our country or lived overseas."); *United States v. Alabama*, 857 F. Supp. 2d at 1242 ("[T]he justification for enforcement of the MOVE Act is

evidenced in the need for its passage: The Act was enacted 'in response to the widespread disenfranchisement of uniformed services and overseas voters during the November 2008 general elections.'" (citation omitted)).

Thus, "ensuring that these voters, many of whom risk their lives at the request of their government, have the opportunity to vote is certainly in the public interest." *Id.* Permanent injunctive relief in this case will advance these vital public interests by removing the obstacles to Alabama's UOCAVA compliance that have caused repeated violations in the past and that threaten to cause further violations until addressed.[34]

## II.   UNITED STATES' PROPOSAL FOR A COMPLETE REMEDY

The United States recognizes that injunctive relief must be tailored to the circumstances that the parties confront such that "a one-size-fits-all approach is inappropriate." *Alabama*, 857 F. Supp. 2d at 1242 (citing *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298 (11th Cir. 2010) and *ALPO Petfoods, Inc. v. Ralston Purina Co*., 913 F.2d 958, 972 (D.C. Cir. 1990)).  Given the specific causes of Alabama's past UOCAVA violations, the United States' respectfully submits that the following proposal and process will yield an appropriate, complete, and timely remedy in this case.

First, in structuring a complete remedy, the United States recognizes that Alabama has important interests in administering its own elections,  *Alabama*, 857 F. Supp. 2d at 1242, and that deference is owed to State policy choices regarding how to remedy voting rights violations.

---

[34] The public has a clear interest in the enforcement of Federal statutes that protect constitutional rights, including voting rights.  *United States v. Raines*, 362 U.S. 17, 27 (1960) (reversing denial of preliminary injunction in voting rights case and holding that "there is the highest public interest in the due observance of all the constitutional guarantees, including those that bear the most directly on private rights"); *United States v. E. Baton Rouge Parish Sch. Bd.*, 594 F.2d 56, 58 (5th Cir. 1979) ("[T]he United States has an interest in enforcing Federal law that is independent of any claims of private citizens.  In the [voting rights] context the Supreme Court has characterized this as 'the highest public interest in the due observance of all constitutional guarantees.'" (quoting *Raines*, 362 U.S. at 27)); *see Herman v. S.C. Nat'l Bank*, 140 F.3d 1413, 1425 (11th Cir. 1998) (discussing *E. Baton Rouge Parish School Board*, 594 F.2d at 58).

*See Upham v. Seamon*, 456 U.S. 37, 40-42 (1982) (per curiam); *Wise v. Liscomb,* 437 U.S. 535, 540 (1978); *United States v. Dallas Cnty.*, 850 F.2d 1430, 1432 (11th Cir. 1988); *Tallahassee Branch of NAACP v. Leon Cnty.,* 827 F.2d 1436, 1438-40 (11th Cir. 1987).   As such, the United States respectfully requests that this Court provide the Defendants with an initial opportunity to present a remedial plan that will fully address critical causes of past and likely future UOCAVA non-compliance.  Those causes of non-compliance include:

(1)    The State's failure to modify the dates and deadlines in Alabama  law that compress the time available for finalizing ballots and otherwise impede the State's compliance with UOCAVA's 45-day advance transmission deadline (*see* pps. 34-37, *supra*);

(2)    Defendants' failure to institute and carry out any procedures or practices designed to provide adequate oversight of the local election officials to whom it has delegated UOCAVA responsibilities, specifically, Defendants' failure to undertake any systematic attempt to supervise Statewide UOCAVA activities during the time leading to and following UOCAVA's 45-day advance transmission deadline (*see* pps. 39, 40, *supra*);

(3)    Defendants' inadequate training of AEMs (*see* pps. 40, 41 *supra*) concerning UOCAVA-related ballot procedures and deadlines; and

(4)    Defendants' failure to ensure that: (a) the State's electronic ballot transmission system functioned fully in sufficient time prior to UOCAVA's 45-day advance transmission deadline, including the omission of a contractual deadline in advance of UOCAVA's 45-day advance transmission deadline by which the system was to be fully operational; and (b) it be designed to the extent practicable to alert

elections officials to inadvertent errors that currently prevent the transmission of

timely-requested UOCAVA ballots (*see* pps. 41, 42, *supra*).

The United States respectfully requests that this Court order the Defendants to propose a

remedial plan that, at a minimum, fully addresses each of these four issues.

Second, given the repeated nature of the UOCAVA violations here—including those

committed after the entry of this Court's preliminary injunction—the United States respectfully

requests that the reporting and monitoring procedures that this Court ordered for the 2012

Federal general election be continued during the 2014 and 2016 Federal election cycles. *See*

ECF No. 21 at ¶ 6.

With respect to Alabama's election calendar, deadlines that conflict outright with

UOCAVA—as does the date of any primary runoff election under existing state law—must be

changed.[35]  Defendants' remedial proposal must provide new deadlines, to remain in effect until

the Alabama Legislature chooses to amend state law in a manner that is compliant with

UOCAVA.[36]  Defendants' proposal must also address the problems arising from the additional

structural deadlines such as candidate certification and withdrawal identified at pages 33-36.

Defendants' proposal must either change those additional deadlines or otherwise explain what

---

[35]   In New York, the district court changed the non-presidential Federal primary date because it prevented New York from complying with UOCAVA.  The district court, however, recognized that New York was not precluded from selecting a different non-presidential Federal primary date for future elections so long as the new date fully complied with UOCAVA.  *United States* v. *New York*, 1:10-cv-1214, 2012 WL 254263 (N.D.N.Y. Jan. 27, 2012) at*2 ("[T]his decision by no means precludes New York from reconciling their differences and selecting a different date, so long as the new date fully complies with UOCAVA. The court fully recognizes that a permanent primary date is best left to New York, but has acted as it must to preserve federally protected voting rights.").

[36] The 2014 Session of the Alabama Legislature convenes on January 14, 2014.  As such, it will have little time to adopt changes to the State's election calendar in time for effective implementation for the June 3, 2014 Federal primary election, the next regularly scheduled Federal election.  The 45-day advance transmission deadline for that election is April 19, 2014.  As noted, numerous predicate deadlines relating to candidate certification and ballot preparation must occur before absentee ballots can be transmitted to UOCAVA voters.  Given these fast approaching deadlines, the United States' proposal appropriately balances the need for a remedy to be fully implemented in time for the June Federal primary election with the State's interest in allowing its Legislature sufficient time to enact permanent changes to Alabama law designed to guarantee future UOCAVA compliance.

alternative steps will prevent the violations that those deadlines now invite in the context of Alabama's current, decentralized structure for UOCAVA compliance.  The United States expresses no view as to what date Defendants should select for Federal primary runoff elections, or any other event in Alabama's election calendar, so long as all such dates allow for full compliance with Federal law.

To ensure that a complete remedy may be in place in advance of the next regularly-scheduled Federal election—the June 3, 2014 Federal primary election, for which UOCAVA ballots must be transmitted by April 19, 2014—the United States respectfully suggests that Defendants be ordered to file their remedial plan within 30 days of this Court's order.  The United States would then file its response, if any, to the Defendants' proposal within 21 days of Defendants' filing.

## **<u>CONCLUSION</u>**

For the reasons set forth above, the United States respectfully requests that this Court grant its requests for summary judgment and for declaratory and injunctive relief.

Respectfully submitted,


Date:  November 6, 2013

GEORGE L. BECK, JR.                         JOCELYN SAMUELS
United States Attorney                       Acting Assistant Attorney General
Middle District of Alabama                   Civil Rights Division



    */s/  Amanda Hine*
STEPHEN M. DOYLE                            T. CHRISTIAN HERREN, JR.
Assistant United States Attorney             RICHARD DELLHEIM
131 Clayton Street                           ERNEST A.MCFARLAND
Montgomery, AL 36104                         SPENCER R. FISHER
Phone: (334) 223-7280                        ANNA M. BALDWIN
Fax: (334) 223-7418                          AMANDA HINE
                                             Attorneys, Voting Section
                                             Civil Rights Division
                                             U.S. Department of Justice
                                             950 Pennsylvania Avenue, N.W.
                                             NWB - 7201
                                             Washington, D.C. 20530
                                             Telephone:  (202) 305-4278
                                             Facsimile:   (202) 307-3961
                                             Amanda.Hine@usdoj.gov

**CERTIFICATE OF SERVICE**

This certifies that on November 6, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

James W. Davis
Misty S. Fairbanks Messick
Office of the Attorney General
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152

*/s/Amanda Hine*
Attorney, U.S Department of Justice