# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 2:12-cv-00179-MHT-WC |
| | ) | |
| STATE OF ALABAMA and | ) | |
| HONORABLE JIM BENNETT, | ) | |
| Secretary of State, in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## STATE DEFENDANTS' RESPONSE TO THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT, DECLARATORY JUDGMENT, AND PERMANENT INJUNCTIVE RELIEF (Docs. 83, 84).

The State of Alabama and the Honorable Jim Bennett, Secretary of State, respectfully respond to the United States' Motion for Summary Judgment, Declaratory Judgment, and Permanent Injunctive Relief, doc. 83, and the memorandum in support thereof, doc. 84.

The Defendants respond in two parts. The first part deals with the general requirement (applicable to federal primary and general elections) that a State send absentee ballots to UOCAVA voters no later than 45 days before such elections. The Defendants do not dispute that Congress has imposed that requirement on the several States, or that some ballots were not sent on time in 2010 and 2012.

1

Defendants' response in part one focuses on the appropriateness of the relief Plaintiff seeks.

The second part of this response deals with an issue concerning runoff elections (which was the subject of the Defendants' Motion for Partial Summary Judgment, docs. 81, 82): Does the 45-day requirement that applies to general and primary elections also apply to runoff elections? Both parties have moved for summary judgment on this issue, which remains in dispute. There does not appear to be a genuine dispute of material fact on this point, but only a legal issue to be decided by the Court by granting one party's motion or the other.

## I.      The United States' claims with respect to federal primary elections and federal general elections.

The Defendants do not dispute two central facts related to the United States' claims: (1) For federal primary and general elections, UOCAVA requires States to transmit ballots to UOCAVA voters at least 45 days before the election, if a voter makes a valid request for such ballots on or before such time. 42 U.S.C. §§ 1973ff-1(a)(8)(A). And (2) in 2010 and 2012, some ballots were sent after that deadline to UOCAVA voters registered to vote in Alabama.

The United States asks the Court to enter a proposed order. (Doc. 83-1). Defendants will make several general points below related to the equities, and then will make specific objections to certain points in the proposed order.

2

### A.   General Statements regarding the equities

There is no allegation that the Defendants purposefully violated UOCAVA or that they hold ill will toward UOCAVA voters. Defendants agree that UOCAVA voters should have a full opportunity to participate in elections. Former Secretary of State Chapman was a leader among state voting officials in pushing for changes that would increase that participation. (Chapman Affidavit, Doc. 14-1). And presently-serving Secretary Bennett agrees. Far from being a disfavored class, the members of our armed forces are esteemed in Alabama.

None of that changes the dates on which the ballots were transmitted, however, and Defendants regret that more than anyone. Still, when it comes time to address the equitable remedy, good intentions matter, as does the fact that it takes a lot of people to carry out an election, not all of whom are under the control of the Secretary of State.

### 1.   Many actors are involved in elections, and not all of them are controlled by the Defendants.

#### a.  The Role of Local Election Officials

Alabama does not hold separate state and federal elections. Congressmen, Governors, County Commissioners, and Presidential Electors are chosen through the same ballot. *See* Ala. Code § 17-6-23 through -26. UOCAVA neither requires nor prohibits separate elections, and the United States would likely agree that a

combined election is generally advantageous to voters, so long as it is possible for States to conduct combined elections.[1]

Presently, Alabama law does not permit Defendants to print a ballot for only federal races. Local officials must therefore provide information about races and candidates to the third-party vendor that prepares ballots, and probate judges from 67 counties must approve ballot styles. Their lateness in doing so on occasion has contributed to late ballot transmission. (*See* doc. 14-1 at 8; doc. 84 at 15, 19).

And while the Defendants could, as a practical matter (and with court or statutory authorization), centralize ballot transmission for a single federal race, as they did for the special election that was the subject of an order of this Court (doc. 74), that simply is not possible in a regular election containing far more ballots and containing state and local races requiring the involvement of local officials. Instead, the practice must continue for local officials to mail absentee ballots. That only makes sense, when absentee voters apply to local officials for an absentee ballot, and when local officials are already set up to count the returned ballots.[2]

---

[1]     Federal regulations such as UOCAVA apply only to Congressional elections, not state and local elections. U.S. Const. Art. I, § 4. However, when the ballots are combined, the federal regulations affect state and local elections as a practical matter (*e.g.*, UOCAVA voters receive state and local ballots 45 days in advance just like their federal ballots, because all races are on a single ballot). But as federal regulations become more onerous and difficult to follow, we may see states separate state and federal elections. It is far easier to comply with a federal regulation in a smaller federal election than if it is also applied to all local and state races.

[2]     If any states centralize the transmission of UOCAVA ballots, Defendants are not aware of it. Defendants asked the United States whether other states delegate responsibilities, and the United States in its enforcement role should know. Alabama could have learned from other

Yet, even though every county in Alabama had paper ballots by the 45th day before the November 2012 general election, some counties still mailed ballots after that date. <u>SUF</u> 3[3] at 17-18. (In one case, the ballots were delivered to the Probate Judge who simply failed to hand the ballots over to the Absentee Election Manager ("AEM") until after the 45th day. *Id.*) Some made human errors when inputting voter information. <u>SUF</u> 179, 182.

Most local election officials are cooperative and diligent. In some cases, though, local officials will not cooperate with the Secretary of State. For example, the AEM of Jefferson County, Alabama, when it was clear that the county would miss the deadline, refused to allow state officials to assist in ballot transmission in 2010, even though state officials drove from Montgomery to Birmingham twice to offer their help. (Doc. 14-1). If a local official refuses to cooperate or provide information to the Secretary of State, the Secretary has no authority to compel the action of a local official. The situation is often resolved through persuasion, but the fact remains that the Secretary cannot be in 67 counties at once, and cannot compel a local official to mail a ballot by a particular date.

---

States' experiences. However, the United States refused to disclose that information. *See* United States' Responses to Defendants' Second Set of Discovery Requests no. 10, pp. 19-21, attached as ex.H). Instead, the United States asserted that the *fact* of whether any other State delegates some of its UOCAVA responsibilities is a "mental impression" of counsel, and further objected on grounds of relevance, even though the feasibility and practicality of possible remedies is surely relevant in an equitable action.

[3]   The State Defendants cite to material filed by the United States in support of their Motion for Summary Judgment in the same manner cited by the United States.

The Secretary of State cannot fire an elected Probate Judge, or an Absentee Election Manager. Circuit Clerks, who are elected by voters in a county, normally serve as the AEM, but where they decline to serve or are precluded from serving, their replacement is appointed by *county* appointing boards. (Doc. 84 at 18, <u>SUF 115,116</u>. While Circuit Clerks performing regular duties are paid by the State, they are compensated by the county for duties performed as AEM (with only a portion of that compensation reimbursed by the State). (*E.g.*, <u>SUF 32</u>).

So while the Defendants can inform and train local election officials – and always want to look for ways to improve in doing so – the Defendants cannot perform the duties of local election officials. Defendants cannot force them to fulfill their duties on a timely basis, or fire them if they do not. A lawsuit (such as a mandamus action) requiring a local election official to fulfill their duties in election matters will not help with UOCAVA compliance if a local official has already missed a deadline.

Defendants do not dispute that, fairly or not, UOCAVA requires the *State* to transmit ballots by a deadline, or that the responsibility remains with the State even if the State delegates some of that responsibility (as it must do, at least unless the State chooses to conduct separate federal elections). Defendants are not arguing that there should be no remedy because, as a practical matter, local officials and other third parties must be involved in the process. But a remedy in this action

would be much more complete if the United States had joined local officials in this action, and in an equitable action, it is relevant that other parties share responsibility.

### b.  Role of Third-Party Vendors

The Defendants and local election officials depend on third-party vendors to print and deliver ballots to the counties. In some cases, as in November 2010, delays in that process by the vendor contributed to late transmission. (*See* doc. 84 at 12, 15, 17, 20). (As noted elsewhere, the start of the printing process can be delayed if a Probate Judge does not timely approve the ballot, or if a political party does not timely finalize its candidate list.)

The Defendants also depend on third-party vendors to develop software for electronic ballot transmission. Local election officials can enter information for UOCAVA voters before the electronic ballot transmission system is complete, but the system cannot develop the right ballot for a voter or transmit that ballot until the system is complete. (Doc. 84 at 13).

The United States criticizes the Defendants' contracts with third-party vendors for electronic ballot transmission, particularly the deadline on which the system must be complete. First of all, no matter what the contract requires, there can always be a breach. A contract is no guarantee that the failure of a third party will not lead to a UOCAVA violation. And second, while Defendants agree that it

will be preferable in the future to require an earlier completion date, a fix is not as simple as a court order requiring that contracts provide for earlier completion.

By State law – and a quite sensible State law – contracts for services of this sort must go through a "request for proposal" process. *See* Ala. Code § 41-16-72. The Defendants will issue a request for proposal for the electronic balloting system, and interested third parties will submit proposals for evaluation. Defendants intend fully to include an earlier completion date in their request for proposal, but there is no certainty that a vendor will come forward willing to accept those terms. Defendants must be allowed some flexibility when dealing with third parties.[4]

### c.  Role of the Political Parties

Party primary elections, an essential part of the electoral process in all States, are largely the affairs of political parties which are separate from the State. Primaries are the *parties'* elections, run by the State. Therefore, the Defendants depend on the parties to inform them who their candidates are before ballots can be prepared. Late changes to the parties' certifications contributed to late ballot transmission. (*See* doc. 84 at 19). The United States criticizes the Defendants for

---

[4]     The United States correctly points out that some counties in 2010 did not receive passwords to the electronic balloting system until after the 45-day deadline. (Doc. 84 at 15). As the United States also correctly states, however, these passwords simply allow counties to see if the ballots were transmitted. (*Id.*). It was not necessary for local officials to have those passwords before ballots were transmitted. Thus, even though some counties blamed their late transmission on not receiving the passwords until after the deadline, *id.* at n.6, the late receipt of passwords could not possibly have delayed transmission.

allowing late changes from the parties (and Defendants favor requiring parties to finalize their slate sooner), but voters would not be served by a ballot listing candidates who have been disqualified.

## 2. Defendants have duties to all voters, not only UOCAVA voters

While the Defendants share a strong desire that UOCAVA voters participate in elections, they also desire that other voters have the same opportunity. In the 2012 general election, 3,061 Alabama voters received UOCAVA ballots. (Doc. 42-1). That is about 0.15 % of the 2,052,046 ballots cast in Alabama during that election.[5] Of course, if there were only a single UOCAVA voter, Defendants would agree that he or she should participate in elections, and Defendants would favor reasonable rules that make that possible. But the other 99.85% of voters would suffer if the United States demands remedies that require strapped election officials to spend most of their time and resources tending to one class of voters. Any remedy should recognize that all voters, not just UOCAVA voters, depend on election officials to carry out orderly elections.

## 3. Objections to certain characterizations by the United States

While Defendants do not dispute that UOCAVA requires the State to send federal primary and general election ballots by the 45th day, or that some such

---

[5]     *See* Alabama Statewide Election Results, available at
http://www.alabamaelectionresults.com/ (last visited Nov. 21, 2013).

ballots went out after the 45th day, they do disagree with the way some of the United States' arguments are framed.

**a.** The United States suggests that Alabama made "few, if any, changes to its UOCAVA compliance practices" for 2012, after the difficulties of the 2010 election. (Doc. 84 at 17). The implication is that Alabama has been passive, satisfied with the failures of early elections and making no effort to improve. We disagree. After the 2010 election, the Secretary of State successfully pushed for legislation in 2011 (Act 2011-619) creating the Alabama Electronic Overseas Voting Committee, giving the Secretary additional powers related to UOCAVA compliance, and seeking to improve compliance. (Doc. 14-1 at 6). The Secretary provided additional information and training before the 2012 elections. (*Id.*). The Defendants learned and adapted from the 2010 election, although without question the results in 2012 were not as desired.

And the Defendants' efforts continue. The Secretary of State pushed for legislation in 2013 that would have stretched out the election calendar and improved the chances of full compliance. (Doc. 84 at 22). The bill did not pass during the 2013 session, but the Secretary intends to support the bill again when the Legislature returns in January 2014.

**b.** The United States again implies that Alabama is in error for failing to voluntarily comply with every request for information from the Department of

Justice. (*See, e.g.,* Doc. 84 at 14 n.7). Similar arguments were made at the beginning of this lawsuit. In fact, nothing in UOCAVA requires the Defendants to provide information to the United States about UOCAVA ballots in advance of a federal election. A *post*-election report is required, but the pre-election information at issue is not something that Defendants are required to provide. Defendants have every right to decline to share information that is not legally required to be shared (particularly when the request is made by a party poised to sue, not by a party offering to cooperate and assist), and should not be punished for exercising that right.

**c.** Concerning irreparable harm, it is important to note that the United States nowhere argues that any UOCAVA voter lost the right to vote as a result of late ballot transmission. There is no allegation that a UOCAVA ballot was not counted in 2010 or 2012 because it was sent beyond the 45-day deadline.[6] The receipt-deadline extensions ordered by the Secretary were sufficient to protect voters. That is not altogether surprising, when the vast majority of UOCAVA voters in the 2012 primary (for example) were not overseas, but were military voters serving domestically and for whom mailing takes only a matter of days. (See doc. 32-1). Many overseas voters received ballots electronically, permitting instantaneous

---

[6]     Around 752 ballots were sent to UOCAVA for the 2012 primary election. (Docs. 12-1, 13-1). Only four of those were received after the deadline, doc. 32-1, and there is no way to know if that was because the voter received the ballot late or if he waited too long to mail it.

delivery (the same 45-day deadline applies to a ballot sent electronically in a matter of seconds and a ballot sent by mail to Afghanistan that may take weeks). This does not excuse the late transmission, but again, this is an equitable matter, and the situation would be more dire if ballots were going uncounted.

Although legal responsibility rests on the State, other parties must, as a practical matter, be involved in the process, and their failures had much to do with this lawsuit's existence. Defendants' goal is perfect compliance, and Defendants would want all UOCAVA voters to receive timely ballots even if there were no federal requirement. Perfect compliance, though, is impossible to guarantee. No matter what remedy the parties agree to in good faith (or may be ordered by the Court in the absence of an agreement), and no matter how good a job the Defendants do in implementing the relief, there are too many different actors with roles to play in elections for one person or agency to ensure compliance, even if a statute purports to make that one person or agency responsible. A political party or local election official can be defiant, or make a human error. A third-party vendor's system can crash. Relief can be structured to reduce the chances of a violation, and Defendants are wholly in favor of changes that will be good for UOCAVA voters, but no relief can eliminate all possibility of failure in large, state-wide elections involving many third-parties.

## B.     Specific objections to proposed order

**<u>Defendants' Proposed Relief</u>**: As a general matter, Defendants agree that they should have the opportunity to propose relief (while Defendants do not concede that a remedy against *State* officials is necessary, they agree that if there is to be a remedy, it will be more effective with Defendants' input). The timing of the requirement for Defendants' proposal should accommodate the parties' ongoing efforts to reach an agreement on those terms (we note that the parties are schedule to attend a mediation conference on December 10, 2013).

The proposed order requires the Defendants to address four specific areas in their proposed relief. However, a more flexible order is preferable. As the parties continue their discussions, there may be other areas beyond the four identified categories that Defendants wish to address, or Defendants may disagree with one or more of those categories identified by the United States. Defendants should have the freedom to propose the relief they deem appropriate. If the United States disagrees with the State's proposed relief, it can address that in its response.

**<u>Reporting requirements</u>:** The proposed order should not, at this stage, require reporting by the Defendants. Defendants do not object to all reporting requirements, but those requirements should be a subject of the parties' ongoing discussions. The parties should have the flexibility to agree to different reporting terms than those set out in the proposed order (and if the parties cannot agree,

Defendants should have the opportunity to propose different reporting requirements).

And some of the United States' proposed reporting requirements are unreasonable. They ask that Defendants report on requests for UOCAVA ballot requests received *after* the 45-day deadline (*see* ¶ 3(a)(v) of proposed order, doc. 83-1). Obviously, such ballot requests are not subject to the 45-day transmission requirement, and they have nothing to do with this litigation, which includes no allegation that Defendants have mishandled such requests. Such a reporting requirement will not do a thing to assist with compliance with the ballots that are the subject of this litigation.

Paragraph (3)(a)(ii) would require defendants to discover, from 68 AEM's, how many UOCAVA ballot applications were received by the 45th day before an election and how many UOCAVA ballot applications were transmitted by the 45th day. And the United States thinks that Defendants should discover all this *by the 45th day*. That is unreasonable. Defendants cannot discover all this information from that many sources instantaneously. Voters would be far better served if, on the day ballots are being transmitted, local election officials are free to transmit ballots, and if the Secretary of State's staff is free to assist as necessary on that day. It is only reasonable that a few days be permitted to conduct state-wide surveys.

The proposed order requires that the parties consult before every report on the format of the report. That is unnecessary and unreasonable. Defendants should be permitted to provide the required information in any practical, readable form. Should the United States have a reasonable request for a specific format, Defendants will entertain that request, but there is no need to require multiple consultations involving multiple attorneys prior to each report.

The proposed order also would require the Defendants, a sovereign State and a Constitutional Officer of that State, to certify to the accuracy of information that Defendants are filing with the court. The United States has not indicated that it has any reason to believe that Defendants will misrepresent the information they receive from local officials, and Rule 11 already requires *all* parties to be honest in their dealings with the Court. There is no need for a separate certification by only one party.

**<u>Meet and Confer Requirement</u>**: The proposed order requires the Defendants to meet with the Department of Justice 14 and 7 days prior to an election to provide a status report. There is no need for such a requirement. By that point, the United States will already have received reports detailing the transmission of UOCAVA ballots. If all ballots went out on time, the United States will know that already. If some ballots were late, the United States will know that already and will know the reason why. If specific events would make a meeting

fruitful, the parties can discuss it as those events arise, on mutually agreeable days. And perhaps through counsel. There is no purpose for requiring the Secretary of State to attend two meetings, a week apart, to discuss what has already been reported.

**Continuing Jurisdiction**: The proposed order suggests that the Court retain jurisdiction indefinitely. Instead, jurisdiction should be retained only so long as the State's reporting requirements continue. If after that time there is a violation, the United States can sue. If after that time the Legislature makes changes to the State's election laws that make the relief unnecessary, the Defendants can petition the Court for relief under Rule 60(b)(5) or (6), or file an independent action for relief under Rule 60(d)(1).

**II.       As to federal runoff elections, the United States' claim is not ripe for adjudication. Alternatively, reaching the merits, "sufficient time" is the standard, and Alabama's election schedule meets that standard.**

In Alabama, a primary runoff election, also known as a second primary election, is only held following a primary election where no candidate received a majority of the votes cast in a particular race. Ala. Code § 17-13-18.[7] There was no federal primary runoff election in 2012, and no one can be sure at this point

---

[7]       The text refers to, and this memorandum concerns, a regularly scheduled primary runoff election conducted pursuant to Ala. Code § 17-13-3 and Ala. Code § 17-13-18. Special elections, such as the one to fill a vacancy in Alabama's 1st Congressional District, the subject of this Court's July order, doc. 71, are not governed by this timetable but are instead set by the Governor, Ala. Code § 17-15-2; *see also* U.S. Const. Art. I § 2, cl. 4; U.S. Const. Amend. XVII; Ala. Code § 17-15-1 *et seq*.

whether a federal primary runoff election will occur next year, when regularly scheduled Congressional elections are held again.

A challenge to the procedures for conducting federal primary runoff elections only ripens once the primary results are in and it is clear that a primary runoff election is needed. Hence, the United States' claim is not fit for review. Additionally, there is no hardship to the parties if the Court appropriately declines to decide the issue now; the Alabama Legislature might act to change the law before it is again enforced, and the issue presented here is now pending before the Eleventh Circuit Court of Appeals in *United States v. Georgia*, Case No. 13-14065 (11th Cir., pending).

If this Court were to reach the merits of the controversy, it should hold that UOCAVA's general 45-day requirement does not apply to federal runoff elections. Those elections are governed by a more specific provision which makes clear that "sufficient time" is required. 42 U.S.C. §§ 1973ff-1(a)(9). Given the genesis of Alabama's current schedule—namely prior litigation with the United States—Alabama's schedule, on its face, provides sufficient time.

Accordingly, the United States' request for relief on this claim is due to be denied.

### a. The United States' claim concerning federal primary runoff elections is not justiciable at this time.

"The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes. This doctrine is necessary to maintain the separation of powers that is a central feature of the Constitution." *Meza v. U.S. Atty. Gen.*, 693 F.3d 1350, 1357 (11th Cir. 2012) (internal citations and quotation marks omitted) *cert. denied*, 133 S. Ct. 933 (2013). The doctrine is jurisdictional. *See id.* at 1356.

"To determine whether a claim is ripe," a court should "assess both the *fitness* of the issues for judicial decision and the *hardship* to the parties of withholding judicial review." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1258 (11th Cir. 2010). Here, both factors weigh in favor of leaving the runoff claim for another day.

The fitness prong concerns questions of "finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." *Harrell*, 608 F.3d at 1258. For several reasons, the United States' runoff claim is not fit for review at this time.

"A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. U.S.*, 523 U.S. 296, 300, 118 S.Ct. 1257, 1259 (1998) (internal citations and quotation marks omitted); *cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct.

2130, 2136 (1992) (to have standing, a plaintiff must have an "injury in fact" that is "actual or imminent, not conjectural or hypothetical") (internal citations and quotation marks omitted).

In Alabama, a primary runoff election is only held following a primary election where no candidate received a majority of the votes cast in a particular race. Ala. Code § 17-13-18. Accordingly, they are held only when needed. Because of that, a challenge to Alabama's schedule for federal primary runoff elections only ripens once the results of the primary have been ascertained and it is clear that a federal primary runoff election will be needed. Before then, there is no way to know with certainty if a federal runoff election will occur.

When the Complaint in this case was filed, it was February 2012 and the State had not yet held its primary elections. Doc. 1. The primaries were scheduled for March 13 and any primary runoff elections would be held on April 24. Doc. 1 at ¶¶ 10, 13. As it turned out, there were no federal primary runoff elections in 2012.[8] The claim was not ripe when the litigation was brought, and the "contingent

---

[8]   *See* State Certification – Democratic Party Candidates at 5, *available at* http://www.sos.state.al.us/downloads/election/2012/runoff/StateCert-Primary_Runoff_Candidate_Certification-Democratic_Party-2012-03-26.pdf, *last visited* October 1, 2013 (showing nominees, and not runoffs, for the Congressional races); State Certification – Republican Party Candidates, at 3, *available at* http://www.sos.state.al.us/downloads/election/2012/runoff/StateCert-Primary_Runoff_Candidate_Certification-Republican_Party-2012-03-26.pdf, *last visited* October 1, 2013 (showing no Congressional races on the list of races needing a runoff).The Court may take judicial notice of these public records. *Massachusetts v. Westcott*, 431 U.S. 322, 323 n.2, 97 S.Ct. 1755, 1756 (1977).

future events. . . [did] not occur at all." *Texas,* 523 U.S. at 300, 118 S.Ct. at 1259 (internal citations and quotation marks omitted).

Likewise, as to 2014, there is no way to know at this point whether there will be a federal runoff election. The deadline for filing declarations of candidacy is not until April 2014. Ala. Code § 17-13-5 (deadline is 60 days before the primary); Ala. Code § 17-13-3 (primary will be held on the "first Tuesday in June"). And that deadline can only serve to eliminate the possibility of runoff elections (if two or fewer candidates qualify for a particular federal race). Even multiple candidates qualifying for a race would not guarantee that a primary runoff election would be needed.[9] Once again, the claim is dependent on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas,* 523 U.S. at 300, 118 S.Ct. at 1259 (internal citations and quotation marks omitted).

Even if it was a known fact that there would be a federal primary runoff election in Alabama in 2014, this claim still would not be ripe for adjudication. By the time there next is a regularly scheduled federal primary runoff election in Alabama, the law may have changed.

_____

[9]     For instance, in 2012 in the statewide race for Chief Justice, Roy Moore won the Republican primary without a runoff despite substantial competition from the incumbent, Chuck Malone, and from former-Attorney General, now-Circuit Judge, Charlie Graddick.   *See* Recertification of Results - Republican Party Primary (certified April 6, 2012), *available at* http://www.sos.state.al.us/downloads/election/2012/primary/Primary-Results-Recertification-Republican_Party.pdf, at 6, *last visited* October 15, 2013 (showing Chief Justice Moore received 50.38% of the votes cast in the Republican Primary).

It is likely that the Legislature will soon address many aspects of Alabama's election calendar. As is made clear above, the State and the Secretary of State do not dispute that ballots were transmitted late for the 2010 general election and the 2012 federal elections. They also do not dispute that changes to the election calendar would make it easier for the State to comply with its obligations under UOCAVA. (Indeed, as the United States recognizes, doc. 84 at 24, the Secretary drafted proposed legislation for consideration in the 2013 session.) If interim relief is ordered by the Court or agreed to by the parties with respect to other issues in the litigation, the State Defendants would prefer that the Legislature have the opportunity to craft its own remedy. *Cf. Upham v. Seamon*, 456 U.S. 37, 41-42, 102 S.Ct. 1518, 1521 (1982). Thus, UOCAVA-related issues are expected to be before the Legislature in its 2014 session, and the runoff issue may be among them.

If it is, the Legislature will have a number of options. It might change the date of the primary runoff election. It might eliminate federal primary runoff elections in their entirety, instead allowing for the winner to be elected by a plurality vote. It might switch to ranked ballots (instant runoff ballots) of the sort used experimentally in the special election to fill the vacancy in Alabama's 1st Congressional District. Or it might take other action.

Because it is uncertain when there will again be a federal primary runoff election and the Alabama Legislature might change the law before a federal primary runoff election is held, "conditions for deciding the controversy are" not "ideal." *Harrell*, 608 F.3d at 1258. Under the hardship prong of the ripeness analysis, attention then turns to "the costs to the complaining party of delaying review until conditions for deciding the controversy are ideal." *Id.*

Such costs are not evident. There may be no federal runoff election under the challenged scheme before the Alabama Legislature acts. Additionally, the issue presented here is pending before the Eleventh Circuit Court of Appeals in a case arising in Georgia. *U.S. v. Georgia*, Case No. 13-14065 (11th Cir., pending). If the Eleventh Circuit resolves the merits of the legal issue in a binding opinion, it will dispose of the issue in this case.

In the event that the necessity of a federal primary runoff election arises in Alabama before there is a legislative change or a binding decision from the Eleventh Circuit, then the United States can bring the issue to this Court at that time. There is no reason why the United States should not be required to wait until a runoff is a certainty—that is "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136 (internal citations and quotation marks omitted). Until then, the claim is not ripe. *Texas*, 523 U.S. at 300, 118 S.Ct. at 1259.

Both the likelihood of resolution by the Eleventh Circuit and the possibility of legislative action are also prudential considerations counseling in favor of delay. *See Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808, 123 S.Ct. 2026, 2030 (2003) ("The ripeness doctrine is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction . . . .'") (quoting *Reno v. Catholic Social Services, Inc.,* 509 U.S. 43, 57 n. 18, 113 S.Ct. 2485, 2495 n. 18 (1993)); *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005) ("When determining [whether] a claim is ripe for judicial review, we consider both constitutional and prudential concerns."). *See also Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997) ("Even when the constitutional minimum has been met, however, prudential considerations may still counsel judicial restraint.").[10]

For all of these reasons, the claim is not ripe and the Court lacks jurisdiction to hear it.

---

[10]  An additional prudential reason is that, while Alabama in 2006 adjusted its election schedules to provide sufficient time to UOCAVA voters to participate in federal primary runoff elections (as discussed below), it appears that other States continue to have even shorter runoff periods on the books. S.C. Code § 7-13-40 (two weeks); Miss. Code § 23-15-191 (three weeks); A.C.A. § 7-7-202, -203 (Arkansas, three weeks).

### b. For federal runoff elections, UOCAVA requires that validly requested ballots be transmitted in "sufficient time" to allow UOCAVA voters to vote.

UOCAVA has a general standard for ballot transmission that provides that "validly requested absentee ballot[s]" must be transmitted to UOCAVA voters "at least 45 days before an election for Federal office," when they have been requested by that time. 42 U.S.C. §§ 1973ff-1(a)(8)(A).[11] The phrase "an election for Federal office," is used here to reinforce UOCAVA's applicability to federal, rather than State or local, elections. It is not used to define *which* federal elections the provision applies to, and, in fact, it does not apply to federal runoff elections.

Federal runoff elections are governed by the specific subsection that follows. Subsection (a)(9) requires States that hold federal runoff elections to "establish a written plan that provides absentee ballots are made available to [UOCAVA] voters in [a] manner that gives them *sufficient time* to vote in the runoff election . . . ." 42 U.S.C. § 1973ff-1(a)(9) (emphasis added). "Sufficient time" is an alternative standard to the 45-day requirement. Declining to enforce that alternative standard fails to give effect to subsection (a)(9) and creates an absurdity in the requirement for a written plan for the runoff election alone. On the other hand, recognizing that "sufficient time" is an alternative standard for federal runoff elections gives effect to that provision, and respects the canon that specific statutes

---

[11]     A highlighted copy of UOCAVA is attached as Exhibit A.

control over general ones. Reading subsection (a)(9)'s "sufficient time" standard as a more flexible alternative to the rigid 45-day requirement also respects Congress' reasonable policy choice.

Alabama's election schedule provides "sufficient time" for UOCAVA voters to vote in federal runoff elections. It was enacted in response to litigation brought by the United States. *U.S. v. Alabama*, Civil Action No. 2:06-cv-00225-MEF-CSC (M.D. Ala.). That litigation was resolved when the United States noticed its dismissal of the case, representing to this Court that the new schedule provided sufficient time for UOCAVA voters to vote in Alabama's federal primary runoff elections. It was sufficient then, and it is sufficient now.

### 1. The United States' focus on subsection (a)(8)(A)

Subsection (a)(9) of 42 U.S.C. § 1973ff-1 specifically provides that "Each State shall-- . . . (9) if the State declares or otherwise holds a runoff election for Federal office, establish a written plan that provides absentee ballots are made available to [UOCAVA] voters in [a] manner that gives them *sufficient time* to vote in the runoff election . . . ." 42 U.S.C. § 1973ff-1(a)(9) (emphasis added). There is no mention of the 45-day requirement that has been at the heart of this case. Instead, Congress said "sufficient time" and required the States, when they hold a runoff election, to have a written plan for ensuring that "sufficient time" will be provided. *Id.*

Despite the clarity of subsection (a)(9), the United States takes the position that UOCAVA's general 45-day provision (subsection (a)(8)(A)) applies to runoff elections, and that subsection (a)(9) is simply an additional requirement with which the States can and must comply while still providing 45-day transmissions. Doc. 84 at 27-28, 31.

The general 45-day provision provides: "Each State shall-- . . . (8) transmit a validly requested absent ballot to [a UOCAVA] voter—(A) . . . in the case in which the request is received at least 45 days before *an* election for Federal office, not later than 45 days before the election . . . ." 42 U.S.C. § 1973ff-1(a)(8)(A) (emphasis added).; *cf.* doc, 84 at 25 (emphasizing "an"). The United States urges this Court to conclude that "because a Federal runoff election is inarguably 'an election for Federal office,' Subsection (a)(8) plainly includes runoff elections," doc. 84 at 28; *see also id.* (arguing that "an election" means "all elections" when no qualification is present). In the course of making this argument, the United States points to another subsection where "an election" was used to refer to any of the four kinds of federal elections (*i.e.,* primary, runoff, general and special), as made clear *via* cross-reference, and argues the phrase should be consistent. Doc. 84 at 28.

The United States' reasoning is wrong. Even assuming that a federal primary runoff election is a federal election and is usually encompassed within a general reference to "an election," that is the beginning, not the end, of the analysis.

In context, Congress' repeated references throughout UOCAVA to "an election for Federal office" and variations of that phrase were all making clear that UOCAVA applies to federal elections as opposed to State and local elections (which Congress lacks authority to regulate).  *See e.g.,* 42 U.S.C. § 1973ff-1(e)(4) (requiring "an online repository of State contact information with respect to elections for Federal office"). By use of that phrase, Congress was not specifically delineating which federal elections were governed. When it wanted to specify *which* federal elections were governed, it did so expressly. For example, in 42 U.S.C. § 1973ff(b)(3), Congress said "in general elections for Federal office." And in 42 U.S.C. § 1973ff-1(a)(1), Congress said "in general, special, primary, and runoff elections for Federal office." In referring to "an election for Federal office," Congress was not engaging a term of art to be defined and rigorously applied throughout the statute. It was "[using] the words . . . as they are commonly and ordinarily understood," *Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1212 (11th Cir. 2010), and it was doing so for the simple purpose of distinguishing non-federal elections.

Even if one wanted to define "an election," however, it would be no easy task. "Judge Harold Leventhal used to describe the use of legislative history as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends." *Conroy v. Aniskoff*, 507 U.S. 511, 519, 113 S.Ct. 1562, 1567 (1993) (Scalia, J., concurring in judgment).  Picking through UOCAVA to decide what "an election" means is a similar exercise. Here are our friends in the text of UOCAVA:

- When Congress meant "*any election for Federal office*," Congress said it. *See* 42 U.S.C. § 1973ff-1(a)(2); 42 U.S.C. § 1973ff-3; *see also* 42 U.S.C. § 1973ff-2b(a)(2) ("each election for Federal office").

- Congress also knew how to list out "*general, special, primary, and runoff elections for Federal office*," when it wanted to be clear that a provision applied to each. *See* 42 U.S.C. § 1973ff-1(a)(1), (a)(6)(A), & (a)(7); 42 U.S.C. § 1973ff-2(a)(1); *see also* 42 U.S.C. § 1973ff-2(e), (g)(1) & (g)(2) ("general, special, primary or runoff election for Federal office").

- Congress used the "*any*" descriptor in the very same section that is under consideration here. *Compare* 42 U.S.C. § 1973ff-1(a)(8) ("an election" in the 45-day provision) *with* 42 U.S.C. § 1973ff-1(a)(2) ("*any election for Federal office*"). And it used the list of elections on three occasions in the section, including the subsection just before the 45-day provision. *Compare*

42 U.S.C. § 1973ff-1(a)(8) ("an election" in the 45-day provision) *with* 42 U.S.C. § 1973ff-1(a)(1) & (a)(6)(A) & (a)(7) ("*general, special, primary, and runoff elections for Federal office*"). Accordingly, Congress knew how to do both, and, in subsection (a)(8), it did neither.

- "Elections for federal office" was not consistently and carefully used, and so there is no reason to believe than "an election for Federal office" had to be. Specifically, Congress instructed the Secretary of Defense ("The Presidential designee") to "carry out section 1973ff-2a of this title with respect to the collection and delivery of marked absentee ballots of [UOCAVA] voters in *elections for Federal office.*" 42 U.S.C. § 1973ff(b)(8). But the referenced section, § 1973ff-2a, says four times that it concerns only regularly scheduled general elections for Federal office. 42 U.S.C. § 1973ff-2a(a), (b)(1), (b)(3)(A), & (c). Hence, in § 1973ff(b)(8), "elections for Federal office" did not include primary, special, or runoff elections.[12]

---

[12]     Section 1973ff-2a(a) provides: "The Presidential designee shall establish procedures for collecting marked absentee ballots of absent overseas uniformed services voters in regularly scheduled general elections for Federal office, *including absentee ballots prepared by States and the Federal write-in absentee ballot prescribed under section 1973ff-2 of this title*, and for delivering such marked absentee ballots to the appropriate election officials." 42 U.S.C. § 1973ff-2a(a) (emphasis added). To the extent, if any, that the italicized phrase concerns ballots for elections other than the general election, then Congress' use of "elections for Federal office" in § 1973ff(b)(8)—discussed in the bullet—would be correct, but the remainder of § 1973ff-2a would be incorrect in its repeated reference to regularly scheduled general elections for Federal office. *See* 42 U.S.C. § 1973ff-2a(b)(1), (b)(3)(A), & (c). In that case, Congress' careless draftsmanship would itself undermine too great a reliance on an in-depth analysis of use of the common phrase "an election" in the statute. *See also* 42 U.S.C. § 1973ff-1(e)(4) (assigning responsibility to a federal agency in a statute entitled "State responsibilities").

Congress was writing to be understood on the simple point that UOCAVA applied only to federal elections and not to State and local elections. It was not writing to withstand an in-depth analysis of an extraordinarily popular indefinite article. *Cf. Wachovia Bank, N.A. v. U.S.*, 455 F.3d 1261, 1267 (11th Cir. 2006) ("Courts should avoid slicing a single word from a sentence, mounting it on a definitional slide, and putting it under a microscope in an attempt to discern the meaning of an entire statutory provision.").

### 2. Reading subsections (a)(8)(A) and (a)(9) to give effect to both, avoid absurd results, and allow the specific provision to control over the general

Stepping back from the trees to view the forest, it is plain that the general 45-day provision would apply to federal runoff elections *if* that were the only provision in issue. It does not apply, however, because: **(A)** A statute should be read "to give full effect to each of its provisions." *Harrison*, 593 F.3d at 1212 (internal citation omitted). **(B)** "[A] statute should, if at all possible, be read so as to avoid an unjust or absurd conclusion." *Durr v. Shinseki*, 638 F.3d 1342, 1349 (11th Cir. 2011) (internal citations and quotation marks omitted). And, **(C)** "when presented with a potential overlap between the broadly sweeping terms of a statute of general application that appear to apply to an entire class, and the narrow but specific terms of a statute that apply to only a subgroup of that class, we avoid conflict between the two by reading the specific as an exception to the general."

*ConArt, Inc. v. Hellmuth, Obata Kassabaum, Inc.,* 504 F.3d 1208, 1210 (11th Cir. 2007).

Subsection (a)(9) provides that "if the State declares or otherwise holds a runoff election for Federal office, [the State must] establish a written plan that provides absentee ballots are made available to [UOCAVA] voters in [a] manner that gives them *sufficient time* to vote in the runoff election." 42 U.S.C. § 1973ff-1(a)(9) (emphasis added). As explained below, to apply the 45-day standard to federal runoff elections fails to give effect to subsection (a)(9)'s reference to "sufficient time," creates an absurd requirement for a written plan, and allows the general 45-day standard to govern when a specific standard requires only "sufficient time."

**(A)   Giving effect.** Subsection (a)(9) makes no reference to the 45-day requirement, instead utilizing an alternative phrase, "sufficient time." It did so to invoke an alternative standard. *Cf. Russello v. U.S.*, 464 U.S. 16, 23, 104 S.Ct. 296, 300 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks and citation omitted; alteration by the Court).

If the 45-day transmission requirement applies to federal runoff elections, then there is no reason for the reference to "sufficient time" to exist.  Congress

31

should have said the States are to "establish a written plan that provides absentee ballots are made available to UOCAVA voters 45 days before a runoff election, when they have been requested by that time." Of course, that raises the issue, discussed below, of why one would need a plan to do that.

A better construction of the statute does not render "sufficient time" insignificant. "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant. . . ." *TRW, Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 449 (2001) (internal citations and quotation marks omitted).

"Well-established and soundly based rules of statutory construction require [this Court] to consider the provisions of [subsection (a)(9)], and its language, in context. The Supreme Court has described statutory construction as a holistic endeavor." *Wachovia Bank*, 455 F.3d at 1266 (internal citation and quotation marks omitted). Looking to the "entire statutory context" reveals that the phrase "sufficient time" is used elsewhere in UOCAVA as an alternative to the general standard. *Harrison*, 593 F.3d at 1212 (internal citation omitted)

In addition to subsection (a)(9), the phrase "sufficient time" appears three times in subsection (g), which authorizes waivers of the 45-day rule "due to an

undue hardship." 42 U.S.C. § 1973ff-1(g). The use of the phrase "sufficient time" in subsection (g) makes clear that it is an alternative to the 45-day standard.

A request for a waiver of the 45-day rule must include four factors. 42 U.S.C. § 1973ff-1(g)(1). The fourth factor is:

> (D) *a comprehensive plan* to ensure that [UOCAVA voters] are able to receive absentee ballots which they have requested and submit marked absentee ballots to the appropriate State election official in time to have that ballot counted in the election for Federal office, which includes—
>
>> (i) the steps the State will undertake to ensure that [UOCAVA voters] have time to receive, mark, and submit their ballots in time to have those ballots counted in the election;
>>
>> (ii) why the plan provides [UOCAVA voters] *sufficient time* to vote as a substitute for the requirements under such subsection [*i.e.,* 45-day requirement]; and
>>
>> (iii) the underlying factual information which explains how the plan provides such *sufficient time* to vote as a substitute for such requirements [*i.e.,* the 45-day requirement].

42 U.S.C. § 1973ff-1(g)(1)(D) (emphasis added). A waiver is to be granted if certain requirements are met, including that "[t]he *comprehensive plan* . . . provides [UOCAVA voters] *sufficient time* to receive absentee ballots they have requested and submit marked absentee ballots to the appropriate State election official in time to have that ballot counted in the election for Federal office." 42 U.S.C. § 1973ff-1(g)(2)(A).

Thus, waivers of the 45-day requirement are available when certain conditions are met, including the development of a plan to provide "sufficient time" in lieu of 45 days. 42 U.S.C. § 1973ff-1(g). In this subsection, then, "sufficient time" is an alternative to the 45-day standard and use of that alternative is accompanied by a requirement for a plan. *Id.*

This understanding compels a similar interpretation of subsection (a)(9)'s runoff provision: for federal runoff elections, "sufficient time," rather than 45 days, is the standard, and a written plan is required to promote compliance with that standard. *Cf. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc.*, *Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 630 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.") (internal citations omitted).

Focusing on the language "sufficient time" in subsection (a)(9), and interpreting it consistently with the wavier provisions, it is clear that "sufficient time" is an alternative standard to the 45-day requirement. Failing to enforce the "sufficient time" standard makes Congress' use of that language "superfluous,

void, or insignificant," a result which ought to be avoided. *TRW*, 534 U.S. at 31, 122 S.Ct. at 449 (internal citations and quotation marks omitted).[13]

**(B) Avoiding absurdity.** This conclusion is further supported by subsection (a)(9)'s requirement for a written plan. If the States are required to transmit ballots to UOCAVA voters 45 days in advance of a runoff if they have been validly requested by that date, then what possible use does having a written plan to provide "sufficient time" serve? Is not the plan simply to transmit the ballots by the 45-day deadline, just like with every other federal election?

"[T]he legislature is presumed to act with sensible and reasonable purpose, [and so] a statute should, if at all possible, be read so as to avoid an unjust or absurd conclusion." *Durr v. Shinseki*, 638 F.3d 1342, 1349 (11th Cir. 2011) (internal citations and quotation marks omitted).

Without citation, the United States argues that "[r]unoff elections do not regularly occur in most jurisdictions, and when they do, they frequently are announced with comparatively short notice." Doc. 84 at 29. The United States thinks that a plan "might include providing additional notice to UOCAVA voters concerning runoff elections or special ballot preparation requirements for runoff elections to ensure that ballots are made available by the transmission deadline."

---

[13]     This discussion of the text of subsections (a)(8)(A) and (a)(9) is sufficient to trump the United States' resort to legislative history in a single paragraph which admits that "Congress did not specifically discuss applying Subsection (a)(8) to particular types of Federal elections." Doc. 84 at 31.

Doc. 84 at 30. But in Alabama, runoff elections *are* held as a matter of course, and there is nothing unique about runoff elections that would justify a written plan *unless* the transmission standard is "sufficient time."

In Alabama, runoff elections are statutorily scheduled. Ala. Code § 17-13-3; Ala. Code § 17-13-18.[14] And they are commonplace, at least in elections for State offices. Exhibit C, Aff. of Ed Packard, at ¶ 3. Alabama has held *statewide* runoff elections for each of the past four regular election cycles (*i.e.,* 2012, 2010, 2008, and 2006), including for Governor, Attorney General, and seats on both the appellate courts and the Public Service Commission. *Id.* at ¶¶ 4-8.[15]

Any federal runoff elections would have been held simultaneously with these state runoff elections. Exhibit C, Aff. of Ed Packard, at ¶ 2; Ala. Code § 17-13-2; Ala. Code § 17-13-3; Ala. Code § 17-13-18. And, other than UOCAVA's

---

[14]     The same is true in other States. O.C.G.A. § 21-2-501(a) (when needed, and unless a court orders otherwise, Georgia holds runoff elections 21 days after a primary election and 28 days after a general election); Tex. Elec. Code Ann. § 41.007 (Texas' regularly scheduled Congressional primary elections are held on the first Tuesday in March and any primary runoff election is held on the fourth Tuesday in May); Tex. Elec. Code Ann. § 2.025(d) ( "A runoff election for *a special election* to fill a vacancy in Congress . . . shall be held not earlier than the 70th day or later than the 77th day after the date the final canvass of the main election is completed.") (emphasis added); S.C. Code § 7-13-40 ("a party primary must be held . . . on the second Tuesday in June of each general election year, and a second and third primary each two weeks successively thereafter, if necessary."); Miss. Code § 23-15-191 ("The first primary shall be held on the first Tuesday after the first Monday of August preceding any regular or general election; and the second primary shall be held three (3) weeks thereafter."); A.C.A. § 7-7-202, -203 (In Arkansas, a preferential primary election is held three weeks before the general primary election, which, in turn, is held on the second Tuesday in June, if one is needed.).

[15]     Additional runoff elections were held on a less-than statewide scale. Exhibit C, Aff. of Ed Packard, at ¶ 9. Meanwhile, Georgia held three primary runoff elections for seats in the U.S. House of Representatives in 2012. *United States v. Georgia*, Case No. 1:12-cv-02230-SCJ, at doc. 24-1 at 12 (N.D. Ala.).

application, they would have required no different treatment. Exhibit C, Aff. of Ed Packard, at ¶ 10.

If UOCAVA's 45-day requirement applies to runoff elections, and if runoffs were postponed to account for that requirement, then a federal primary runoff election would be just like any other regularly scheduled federal primary election. They would operate exactly the same way mechanically, and there would be no administrative or logistical reason to have a written plan concerning UOCAVA compliance specific to the runoff election. Exhibit C, Aff. of Ed Packard, at ¶ 11. A plan to provide 45 days for runoffs serves no purpose when no plan is required to provide 45 days in other elections.

If the United States were right that notice issues or the rarity of federal runoffs justified the plan requirement, then such a requirement would have more logically applied to *special* elections. Special elections are held when a vacancy needs to be filled outside the normal election schedule. The Constitution provides for the Governor to call for special elections to fill vacancies in Congress, U.S. Const. Art. I § 2, cl. 4, U.S. Const. Amend. XVII, and Alabama, at least, gives the Governor discretion in selecting the election dates, Ala. Code § 17-15-1 *et seq*. A written plan might inform that discretion by setting guidelines or even windows of time between elections (*i.e.,* the primary, runoff, and general) to account for the rights of UOCAVA voters, while recognizing constitutional ballot access issues,

the need to fill the vacancy so that citizens do not go unrepresented longer than necessary, and other important factors. As to the United States' notice concerns, a written plan might include procedures for notifying UOCAVA voters about the upcoming special election so that they can timely submit absentee ballot applications that would be valid for the newly scheduled election. Yet Congress does not require a written plan for special elections.

Accordingly, the most logical conclusion is that UOCAVA requires a written plan for federal runoffs because the 45-day requirement is not applicable, and Congress wants to promote planning for the more flexible standard of "sufficient time."

**(C)  Elevating specificity.** Given that the reference to "sufficient time" and the requirement for a written plan make clear that subsection (a)(9) sets a different standard for federal runoff elections, all that is left is to ask how that subsection interacts with subsection (a)(8)(A)'s general 45-day requirement. The answer is clear.

While the general 45-day requirement would apply to federal runoff elections in the absence of subsection (a)(9), the existence of the more specific and conflicting provision in subsection (a)(9) means that it must control with respect to federal runoff elections. "In these circumstances the law is settled that [h]owever inclusive may be the general language of a statute, it will not be held to apply to a

matter specifically dealt with in another part of the same enactment. . . . Specific terms prevail over the general in the same or another statute which otherwise might be controlling." *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 228-29, 77 S.Ct. 787, 791-92 (1957) (internal citations and quotation marks omitted; ellipsis by the Court).[16]

This is what Congress intended. Section 579 of Public Law 111-84, contained the relevant MOVE Act amendments. Pub. L. 111-84, § 579, Oct. 28, 2009, 123 Stat. 2322 to 2324, attached hereto as Exhibit B.  It was divided into three parts. The first, subsection (a), was entitled "IN GENERAL," and it established both the 45-day requirement of subsection (a)(8)(A) and the opportunity for a waiver of that requirement in subsection (g). The second, subsection (b), was entitled "RUNOFF ELECTIONS" and it established the alternative "sufficient time" standard and the requirement for a written plan through subsection (a)(9). The third subsection was an effective date. Accordingly, one can view the Section 579 of the legislation as establishing the general rule and

---

[16]    *See also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384, 112 S.Ct. 2031, 2037 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general . . . ."); *Nguyen v. United States*, 556 F.3d 1244, 1253 (11th Cir. 2009) ("The canon is that a specific statutory provision trumps a general one."); *ConArt, Inc. v. Hellmuth, Obata Kassabaum, Inc.,* 504 F.3d 1208, 1210 (11th Cir. 2007) ("Instead, when presented with a potential overlap between the broadly sweeping terms of a statute of general application that appear to apply to an entire class, and the narrow but specific terms of a statute that apply to only a subgroup of that class, we avoid conflict between the two by reading the specific as an exception to the general."); *Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 948 (11th Cir. 2001) ("In making this determination, we rely on the long-standing principle that, if two statutes conflict, the more recent or more specific statute controls.").

then immediately establishing the exception for runoff elections. (And, obviously, the argument just made concerning reading subsection (a)(9)'s use of the phrase "sufficient time" and requirement for a plan consistently with subsection (g)'s waiver provisions is strengthened by the fact that the provisions were added to UOCAVA together as a single section of the Public Law.)

### 3.  Beyond the language of UOCAVA.

**(A) Congress reasonably chose a different standard for federal runoff elections.** In considering the subsections (a)(8)(A) and (a)(9), one should also keep in mind that Congress was on notice that some jurisdictions hold runoff elections too soon after the elections they follow to allow for a standard 45-day transmission requirement. For one thing, these are the elections that the Members themselves run in.   And, for another, Congress has passed legislation providing for quick runoffs.

Section 1712 of Title 48 concerns the election of delegates to the United States Congress for Guam and the Virgin Islands.[17] It provides that "If no candidate receives [a majority of the votes cast], on the fourteenth day following such election a runoff election shall be held between the candidates receiving the highest and second highest number of votes cast for the office of Delegate." 48

---

[17]      UOCAVA applies to Guam and the Virgin Islands as they are within the definition of the term "State" for purposes of the Act. 42 U.S.C. § 1973ff-6(6).

U.S.C. § 1712. Congress provided similarly for the elections of the Governor and Lieutenant Governor in these jurisdictions, though those elections are not federal elections. 48 U.S.C. § 1422 (Guam)[18]; 48 U.S.C. § 1591 (Virgin Islands).

Perhaps Congress was also aware that there are good reasons why runoffs should not be held a long time after the elections they follow. One study shows that while there is almost always a drop in turnout between the primary and the runoff elections, the drop is greater when the wait for the runoff is longer. The *Summary of Facts and Findings* from that study included:

*Near-Universal Decline in Turnout:*

❖ Of 171 regularly scheduled primary runoffs in U.S. House and U.S. Senate from 1994 to 2012, all but six of them resulted in a turnout decrease between the initial primary and the runoff, meaning that 96.5% of runoff elections had fewer people voting in the second round than in the first. The average decline in turnout was 35.3% and the median decline was 33.2%.

*Primary-Runoff Time Gap a Key Factor:*

❖ The longer the wait between the initial primary and the runoff, the higher the decrease in voter turnout between elections. Primary elections with a gap of more than thirty days had an average decline in voter participation of 36.9%, while those with a gap of twenty days or less had an average decline of 27.4%.

Fair Vote Research Report, Federal Primary Election Runoffs and Voter Turnout Decline, 1994-2012 (July 2013), *available at*

---

[18]    This statute was at issue in *Gutierrez v. Ada*, 528 U.S. 250, 120 S.Ct. 740 (2000).

http://www.fairvote.org/assets/Uploads/Federal-Primary-Election-Runoff-Turnout3.pdf, *last visited* Sept. 26, 2013. Obviously, a longer wait for a runoff also has implications for candidates competing for voter attention and campaign donations.

If this Court holds that the 45-day rule applies to federal runoff elections, the gap will be substantial (assuming the federal runoff election is simply rescheduled). In the Georgia case, the Court's remedy was to require that the State hold any federal runoffs nine (9) weeks – 63 days – after the election prompting the runoff. *U.S. v. Georgia*, Civil Action No. 1:12-cv-2230-SCJ (N.D. Ga.), doc. 38 at 6-7; *id.* doc. 44 at 3 (amending the earlier order because of a holiday conflict but retaining the 9 week timeframe).  If the study results are accurate predictors, voter interest in federal runoffs will likely wane and voter turnout will likely suffer.

In addition to the turnout issues generated by the length of the gap, one also has to wonder how turnout will be affected by the fact that Alabama's State and county runoff elections would necessarily be held when statutorily scheduled, Ala. Code § 17-13-3 & Ala. Code § 17-13-18, while any federal runoff elections would follow weeks later by Court order. At present, the federal, State, and county elections are held simultaneously. Ala. Code § 17-13-2; Ala. Code § 17-13-3; Ala. Code § 17-13-18; Ala. Code § 17-14-3; Ala. Code § 17-14-10; Ala. Code § 17-14-

11.   In 2014, when the next regularly scheduled federal elections are held, Alabama will elect, among others, a Governor, a Secretary of State, an Attorney General, judges at every level, and every single Member of both chambers of the Legislature.   Offices   up   for   Election   2014,   *available   at* http://www.sos.state.al.us/Elections/2014/2014Offices.aspx, *last visited* October 4, 2013.[19]

Accordingly, with this context in mind, it is reasonable to conclude from the existence of subsection (a)(9) that Congress was well aware that runoffs might follow more closely on the heels of the elections they succeed than the 45-day rule would allow, and that it might well be appropriate for some of them, at least, to stay there. Subsection (a)(9) should be viewed as a recognition of the variety of laws and policies concerning runoffs across the nation and the competing factors at issue in the scheduling and handling of those elections. In requiring "sufficient time," rather than a rigid 45-days, Congress appropriately allowed the States some flexibility in achieving the shared goal of protecting UOCAVA voters while minimizing the disruption to established election procedures and practices.

**(B)   No deference is due to FVAP's position.** The United States urges *Skidmore* deference to the "well-reasoned administrative interpretation of

---

[19]      The Court may take judicial notice of these public records. *Massachusetts v. Westcott*, 431 U.S. 322, 323 n.2, 97 S.Ct. 1755, 1756 (1977).

Subsection (a)(8)" by the Federal Voting Assistance Program, FVAP. Doc. 84 at 31-32. But the United States has pointed to no such "well-reasoned administrative interpretation." It has instead pointed to a single sentence in a several page memorandum offering guidance to the States on what will be required to receive a waiver of UOCAVA's 45-day requirement and how to make the request. Doc. 84-4 at 100-16.

Admittedly, for FVAP to know when a waiver is potentially available, it should be aware of which elections are governed by the 45-day rule. However, the memorandum gives no indication that FVAP has given the matter much thought. In the sentence to which the United States points, FVAP is informing the States that the 45-day rule applies to more elections than it did in the last cycle—though MOVE was enacted in 2009, *see* Pub. L 111-84, Oct. 28, 2009, 123 Stat 2190, the 45-day rule first took effect for the 2010 General Election, rather than sooner, Pub. L. 111-84, § 579(c), Oct. 28, 2009, 123 Stat. 2322 to 2324 (Exhibit B); *see also* doc. 84-4 at 101—but no analysis is offered as to which elections. Specifically, the key paragraph says:

> Since the last time waiver applications were considered by the Department of Defense (DoD), additional requirements of the MOVE Act have come into effect. Most importantly for this memorandum, States and localities are required to transmit absentee ballots 45 days prior to *any* election for Federal office, which includes all general, special, primary (including Presidential preference primaries) and run-off elections.[5]

[5] 42 U.S.C. 1973ff-1 note, Section 579(c), National Defense Authorization Act of 2009, PL 111-84 123 STAT. 2324, (10/28/2009).

Doc. 84-4 at 101. There is no "well-reasoned administrative interpretation," doc. 84 at 31, there is just a footnote to an effective date. And the effective date is to the very Section 579 discussed above and attached as Exhibit B.

The effective date provision says "The amendments made by this section shall apply with respect to the regularly scheduled general election for Federal office held in November 2010 and each succeeding election for Federal office." Exhibit B at 3. If FVAP read the effective date provision to mean that the 45-day rule applied to "each succeeding election to Federal office," it is sorely mistaken. The effective date is for all of Section 579, and that includes not only section 579(a)'s imposition of the 45-day rule and provision for obtaining a waiver, but also section 579(b)'s special "sufficient time" rule for federal runoff elections. Hence, the citation to the effective date in no way evidences a considered judgment about the interplay between subsection (a)(8)(A) and subsection (a)(9), and it does not support any conclusion that the 45-day rule applies to federal runoff elections.

Moreover, FVAP's statement contains a clear error that further undermines any suggestion that its conclusion was well-reasoned. In addition to claiming that the 45-day rule applies to federal runoff elections, FVAP contends that it applies to Presidential preference primary elections. However, Congress lacks the authority

to impose UOCAVA requirements with respect to Presidential elections; the Elections Clause only refers to Congressional elections. U.S. Const. Art. I, § 4, cl. 1. *Cf. Arizona v. Inter Tribal Council of Arizona*, 570 U.S. ___, ___, 113 S.Ct. 2247, 2268 n. 2 (2013) (Thomas, J., dissenting) ("Constitutional avoidance is especially appropriate in this area because the [National Voter Registration Act] purports to regulate presidential elections, an area over which the Constitution gives Congress no authority whatsoever.").

In *Skidmore*, the Supreme Court was clear that the "rulings, interpretations, and opinions" at issue there were "not controlling upon the courts by reason of their authority." *Skidmore v. Swift & Co.*, 323 U.S. 134, 410 (1944). They instead "constitute[d] a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasons, its consistency with earlier and later pronouncements, and all those factors which give it the power to persuade, if lacking power to control." *Id.* Here, FVAP's statement in the letter is lacking any evidence of thorough consideration, the effective date provision is no reason for a conclusion that the 45-day rule applies to federal runoff elections, and no other factors of persuasion appear. No deference is due.

**(C) If this Court were to place a thumb on the scale based on the substance of the statutory provisions at issue, it should favor the State and the Secretary of State.**

The United States argues that "provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor and that statutory benefits for military service members are to be construed liberally." Doc. 84 (internal citations and quotation marks omitted). This argument is problematic.

First, as the United States acknowledges, UOCAVA is not solely applicable to military servicemen and veterans; it applies to civilians who are overseas for reasons having nothing to do with military service. *See id.* at 33; 42 U.S.C. § 1973ff-6(5) (defining "overseas voter").

Second, the right to vote is not a "military benefit." It is not a right that can be construed more liberally in favor of uninformed service members over any other citizen. *See Obama for America v. Husted*, 888 F.Supp.2d 897 (S.D. Oh. 2012), *aff'd*, 697 F.3d 423 (6th Cir. 2012) (holding that UOCAVA voters have no greater right to vote early and in-person during the last three days of early voting period despite the fact that they might be subject to deployment at any moment).

Third, the cases upon which the United States relies are very different from UOCAVA, and it is not at all clear that the canon they apply would be equally applicable here even if UOCAVA were limited to the military. *Fishgold v. Sullivan*

*Drydock & Repair Corporation*, 328 U.S. 275, 66 S.Ct. 1105 (1946), and *King v. St. Vincent's Hospital*, 502 U.S. 215, 112 S.Ct. 570 (1991), both deal with employment in the private sector following military service, while *Henderson v. Shinseki*, 562 U.S. ___, 131 S.Ct. 1197 (2011), arose in the context of disability benefits for a veteran.

Fourth, and importantly, Alabama and Secretary Bennett are not trying to deny the military anything. They share the United States' commitment to serving UOCAVA voters and are committed to providing "sufficient time" to participate in federal runoff elections. What they are not committed to is a bright-line rule that only 45 days can be sufficient when a federal runoff election is at issue.[20]

---

[20] When considering the application of canons of construction based on the substance of the law, it is the view of the State of Alabama and the Secretary of State that a very different analysis should prevail: the Tenth Amendment and general principles of federalism dictate that Congress should be abundantly clear if it wants the States to re-schedule federal elections. We recognize that the majority in *Arizona v. Inter Tribal Council of Arizona, Inc.,* 570 U.S. ___, 133 S. Ct. 2247 (2013), rejected application of the presumption against preemption in that case. 133 S.Ct. at 2256-57. To the extent that is a rejection of our position, we respectfully disagree and preserve the argument.

As Justice Kennedy explained in his separate opinion,

> Whether the federal statute concerns congressional regulation of elections or any other subject proper for Congress to address, a court must not lightly infer a congressional directive to negate the States' otherwise proper exercise of their sovereign power. This case illustrates the point. The separate States have a continuing, essential interest in the integrity and accuracy of the process used to select both state and federal officials. The States pay the costs of holding these

### c. Alabama's federal primary runoff schedule provides "sufficient time."

Having concluded that "sufficient time" is the standard, the next question is whether Alabama's federal primary runoff schedule allows sufficient time. It may be that this is an intensely factual question which cannot be answered absent a federal primary runoff—something this litigation lacks. Indeed, what is sufficient may vary by the election, depending on the location and circumstances of the

---

elections, which for practical reasons often overlap so that the two sets of officials are selected at the same time, on the same ballots, by the same voters. It seems most doubtful to me to suggest that States have some lesser concern when what is involved is their own historic role in the conduct of elections. As already noted, it may be that a presumption against pre-emption is not the best formulation of this principle, but in all events the State's undoubted interest in the regulation and conduct of elections must be taken into account and ought not to be deemed by this Court to be a subject of secondary importance.

*Arizona*, 133 S. Ct. at 2261 (Kennedy, J., concurring in part and concurring in judgment); *see also id.* at 2272 ("the integrity of federal elections is a subject over which the States and the Federal Government are mutually concerned") (Alito, J., dissenting) (internal citations and quotation marks omitted); *id.* (recognizing that changes to federal elections can impact State and local elections as well, such that "we should expect Congress to speak clearly when it decides" to make a change). Justice Alito was correct that "Under the Elections Clause, the States have the authority to specify the times, places, and manner of federal elections except to the extent that Congress chooses to provide otherwise. And in recognition of this allocation of authority, it is appropriate to presume that the States retain this authority unless Congress has clearly manifested a contrary intent." *Id.* at 2271 (Alito, J., dissenting).

UOCAVA voters applying for absentee ballots[21] and their preferred methods of ballot transmission.[22] And it may be a question best answered *definitively* after a (or each) federal runoff election has been conducted. To the extent that the question can be answered without further factual development, however, the answer is 'yes.' At least, that is what the United States represented to Judge Fuller in prior litigation.

MOVE added the 45-day requirement for federal elections other than runoffs and the "sufficient time" requirement for federal runoffs. 42 U.S.C. § 1973ff-a(8) – (9); *see* Pub. L. 111-84, § 579, Oct. 28, 2009, 123 Stat. 2322 to 2323. Prior to that, the U.S. Department of Justice wrote to Alabama's Secretary of State in December 2005 describing the State's responsibilities pursuant to UOCAVA at that time:

> As you know, pursuant to UOCAVA, qualified overseas civilian and military voters who have applied for an absentee ballot by

---

[21]     Are they at Universities in London and Paris or in foxholes in a war zone?

[22]     MOVE amended UOCAVA to require the States to establish procedures for transmitting ballots to UOCAVA voters electronically. 42 U.S.C. § 1973ff-1(f); *see* Pub. L. 111-84, § 578, Oct. 28, 2009, 123 Stat. 2321. Electronic transmission makes ballots available to Alabama's UOCAVA voters more quickly than traditional transmission through the U.S. Mail. *See* Ala. Code § 17-11-5 (authorizing transmission by U.S. Mail or "by handing the absentee ballot to the voter in person or, in the case of emergency voting, his or her designee in person.") And it is an option that many of Alabama's UOCAVA voters have embraced. *See* doc. 43-1 (supplemental 45-day report for the 2012 General Election, reflecting that 1404 UOCAVA voters chose electronic ballots compared to 1656 who chose to receive their ballots *via* mail).

That said, paper ballots can apparently move quickly too. FVAP's letter tells us that "during the 2010 election, the Military Postal Service Agency (MPSA) data indicate[] that overseas uniformed services ballots delivered through their Express Mail service were returned to local election officials, on average, in 5.2 days." Doc. 84-4 at 109.

the 30th day before a federal election must be given an opportunity to vote by absentee ballot. To effectuate this right, election officials must mail absentee ballots to such voters *sufficiently in advance of the election* to allow them a reasonable opportunity to cast a valid ballot. The guarantees of UOCAVA apply in all general, special, primary, and run-off elections for federal office. 42 U.S.C. 1973ff-1. Studies conducted by federal postal authorities have established that a *minimum* of 30 days is necessary for the round-trip transit of absentee ballots mailed to overseas voters. The Federal Voting Assistance Program of the Department of Defense (FVAP) strongly recommends allowing 45 days to ensure voters have time to receive, cast and return the ballots by the applicable [S]tate deadlines.

Letter from Wan J. Kim, Assistant Attorney Gen., Civil Rights Div., U.S. Dep't of Justice, to Nancy L. Worley, Ala. Sec'y of State (Dec. 20, 2005) (attached as Exhibit D) (first emphasis added).

The next March the United States filed suit against the State, the Governor, the Attorney General, and the Secretary of State. *U.S. v. Alabama*, Civil Action No. 2:06-cv-00225-MEF-CSC (M.D. Ala.). The Complaint argued that, "[i]n order to allow UOCAVA voters a fair opportunity to vote by absentee ballot, election officials in Alabama must mail the ballots to the voters *sufficiently in advance of the election* so that voters can receive, cast and return their absentee ballots by the deadline established under Alabama law." Exhibit E at ¶ 8 (emphasis added); *see also id.* at ¶ 11 ("sufficiently in advance"); *id.* at 5, prayer for relief ("in sufficient time"). The Complaint stated that "[b]ased on data from the United States Postal Service and the Military Postal Service Agency, the [FVAP] and the United States Election Commission recommend that States allow 45 days for the round-trip

transit of an overseas ballot. At a minimum, FVAP has determined that States must provide no less than 30 days for the round-trip transit of a ballot to overseas locations." *Id.* at ¶ 9.

The litigation was resolved when Alabama enacted Act No. 2006-354. The legislation pushed back the regularly scheduled primary runoff election to six weeks (42 days) after the primary election. *See* Ala. Code § 17-13-3; Ala. Code § 17-13-18. And it provided that UOCAVA ballots would be timely if received by noon seven (7) days after the primary runoff election. Ala. Code § 17-9-51; Ala. Code § 17-11-10(c); Ala. Code § 17-11-18. The ballots would otherwise have been due by noon on Election Day. Ala. Code § 17-9-51; Ala. Code § 17-11-10(a); Ala. Code § 17-11-18.

After Act No. 2006-354 became law, the United States filed a motion with this Court in which it represented that the "legislative changes [made by Act No. 2006-354] afford relief to Alabama's UOCAVA voters whose rights the United States sought to protect in this suit." Exhibit F at ¶ 3.

Not long after, the United States filed a notice of dismissal.  (Exhibit G). That notice described the allegations in the Complaint as concerning "*insufficient time for round-trip transmission of absentee ballots to and from Alabama's [UOCAVA] voters.*" Exhibit G at 2 (emphasis added). And it represented to Judge Fuller that: "The legislative changes [made by Act No. 2006-354] afford

substantial long-term relief to Alabama's UOCAVA voters whose rights the United States sought to protect in this suit. Based upon the changes to Alabama law, the claim set forth in the Complaint has now been satisfied." *Id.* at 4.

If Alabama's primary runoff schedule was sufficient in 2006, as the United States represented it was, then it remains sufficient today.

### d. A written plan.

The United States argues that Alabama's written plan is not UOCAVA compliant. Doc. 84 at 29 n. 19. It points to the 2012 plan, an emergency rule, which it attached as Exhibit 66 to its dispositive motion papers. Doc. 84 at 29 n. 19; doc. 84-6 at 133-35.

Subsection (a)(9) requires that "if the State declares or otherwise holds a runoff election for Federal office, [it must] establish a written plan . . . ." 42 U.S.C. § 1973ff-1(a)(9). Alabama has not declared that there will be any federal runoff elections in the near future, and is not yet otherwise holding the same. The next time a regularly scheduled federal primary runoff election might happen is July 15, 2014, and the State has plenty of time before then to develop an appropriate written plan for that election. At that time, the United States can challenge the substance of the plan if it believes the plan to be insufficient.

III.    **Conclusion.**

For the foregoing reasons, as to the claims concerning federal primary elections and federal general elections, should the Court enter judgment for the United States, then, as discussed above in section I, the Court should consider the equitable matters raised above. And as the United States agrees, the State and the Secretary should be given a substantial role in shaping appropriate relief.

As to the United States' claim concerns federal runoff elections, the claim is not ripe and should be dismissed. Alternatively, this Court should hold that subsection (a)(9)'s "sufficient time" standard applies and that Alabama allows sufficient time.

** In further support of their opposition to the United State's Motion for Summary Judgment concerning federal runoff election, the Defendants further rely on their Motion for Partial Summary Judgment and the arguments and materials submitted in support thereof, docs. 81-82.

Respectfully submitted,

LUTHER STRANGE (ASB-0036-G42L)
*Attorney General*

BY:


s/ James W. Davis
James W. Davis (ASB-4063-I58J)
Misty S. Fairbanks Messick (ASB-1813-T71F)
*Assistant Attorneys General*

**OFFICE OF THE ATTORNEY GENERAL**
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
Telephone:  (334) 242-7300
Facsimile:  (334) 353-8440
jimdavis@ago.state.al.us
mmessick@ago.state.al.us

**Attorneys for the State & Secretary Bennett**


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 4th day of December, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record: Victor J. Williamson, Amanda Hine, Anna Baldwin, Elizabeth M. Ryan, Erin M. Velandy, Ernest McFarland, Richard Dellheim, Spencer R. Fisher, Stephen M. Doyle, and T. Christian Herren, Jr.


s/ James W. Davis
Of Counsel