UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| UNITED STATES OF AMERICA,     ) | |
|     ) | |
| Plaintiff,     ) | |
|     ) | |
| v.     ) | Case No. 2:12-cv-179-MHT-WC |
|     ) | |
| THE STATE OF ALABAMA and JIM     ) | |
| BENNETT, SECRETARY OF STATE OF     ) | |
| ALABAMA, in his official capacity,     ) | |
|     ) | |
| Defendants.     ) | |
|     ) | |

**UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff United States of America ("United States") respectfully submits the following

response to the partial summary judgment motion filed by Defendants State of Alabama and Jim

Bennett, Alabama's Secretary of State ("Defendants").  For the reasons discussed herein,

Defendants' motion should be denied.

**INTRODUCTION**

If the plain language and legislative history of the Uniformed and Overseas Citizens

Absentee Voting Act of 1986 ("UOCAVA"), 42 U.S.C. § 1973ff et seq., as amended by the

Military and Overseas Voter Empowerment Act ("MOVE Act"), Pub. L. No. 111-84, Subtitle H,

§§ 575-89, 123 Stat. 2190, 2318-35 (2009), demonstrate anything it is this: based on compelling

evidence of widespread military and overseas voter disenfranchisement, Congress mandated a

45-day advance transmission requirement for elections for Federal office.  It created no

categorical exception to the scope of Federal elections covered by the statute.  All elections for

Federal office come within its ambit, unless a State seeks and receives a waiver from the

Department of Defense excusing compliance with the 45-day advance transmission requirement based on undue hardship.

Nonetheless, Defendants ask this Court to carve out a broad exception to UOCAVA's 45-day advance ballot transmission requirement for Federal runoff elections. Alabama law currently requires runoff elections to be held 42 days before the general election, thus making it categorically impossible under current State law for Alabama to conduct a UOCAVA-compliant primary runoff election for Federal office. Ala. Code § 17-13-18(b). As set forth in the United States' memorandum supporting its summary judgment motion ("U.S. Mem.") (ECF No. 82), UOCAVA's 45-day deadline applies to all Federal elections, including runoff elections. The Defendants' motion should be denied.

First, and most fundamentally, Section 102(a)(8)(A)'s plain language establishes that the 45-day advance transmission deadline applies to all Federal elections, including Federal runoff elections. Second, Section 102(a)(9)'s written plan requirement does not obviate Section 102(a)(8)(A)'s application to Federal runoff elections. Third, even if this Court were to find Subsections (a)(8)(A) and (a)(9) ambiguous as to runoff elections, standard statutory interpretation tools establish that UOCAVA's 45-day advance transmission deadline applies to all Federal elections, including Federal runoff elections. And were this Court to conclude that Section 102(a)(8)(A) does not require transmission of absentee ballots 45 days in advance of Federal runoff elections, Alabama's current written plan still violates Section 102(a)(9) because it fails to specify any date by which ballots must be transmitted. It therefore does not even begin to guarantee UOCAVA ballot transmission in "sufficient time" for UOCAVA voters to vote, no matter how that term is defined. Finally, Defendants' alternative argument that this issue is unripe fails because Section 102(a)(8)'s applicability to Federal runoff elections is a pure

question of law that can and should be decided now, especially as Alabama heads into another Federal election cycle.

Accordingly, the United States respectfully requests that this Court deny Defendants' Motion for Partial Summary Judgment and grant the United States' Motion for Summary Judgment, Declaratory Judgment, and Permanent Injunctive Relief.

## ARGUMENT

### I. Congress Used Plain Language to Ensure that UOCAVA's 45-Day Transmission Deadline Applies to Federal Runoff Elections

Since its enactment in 1986, UOCAVA has guaranteed active duty members of the military (and their spouses and dependents) and United States citizens residing overseas (collectively "UOCAVA voters") the right "to vote by absentee ballot in general, special, primary, and runoff elections for Federal office . . . ." 42 U.S.C. § 1973ff-1(a)(1). In 2009, faced with pervasive evidence that states deprived UOCAVA voters of sufficient time to vote in Federal elections under existing law, Congress enacted the MOVE Act. The MOVE Act afforded several significant new protections designed to ensure that UOCAVA voters could register to vote and receive their ballots with time to mark them and return them by election day.

The MOVE Act's commands were straightforward. With regard to the timing of ballot transmission, it amended UOCAVA to require states to transmit absentee ballots to UOCAVA voters at least 45 days before any election for Federal office if the ballot requests were received by that date. 42 U.S.C. § 1973ff-1(a)(8)(A) ("Each State shall . . . transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter . . . not later than 45 days before the election . . . ."); *see also* 42 U.S.C. §1973ff-1(g)(1)(A) ("the purpose [of the 45-day requirement] is to allow absent uniformed services voters and overseas voters enough time to vote").

Yet, Defendants claim that Section 102(a)(8)(A)'s blanket 45-day advance ballot transmission mandate is nullified for Federal runoff elections based on Section 102(a)(9), which, Defendants assert, merely requires states to do no more in Federal runoff elections than establish written plans to provide UOCAVA voters "sufficient time" to vote in those elections.  These claims fail.  UOCAVA's plain language, structure, and legislative history amply demonstrate that UOCAVA's 45-day advance transmission mandate applies to *all* Federal elections, including Federal runoff elections, as another federal court recently held.  *See United States v. Georgia*, No. 1:12-cv-2230, 2013 WL 3421982, at *5-6 (N.D. Ga. Apr. 30, 2013), *appeal docketed*, No. 13-14065 (11th Cir. Sept. 6, 2013).[1]

### A.  The Phrase "an election" in Section 102(a)(8)(A) of UOCAVA Includes Each and Every Federal Election, Including Primary Runoff Elections.

Congress' use of the phrase "an election for Federal office" to define, without qualification, the scope of elections to which UOCAVA's 45-day advance transmission requirement applies is straightforward.  Because each and every election for Federal office is "*an* election for Federal office," the statute's plain language leads to the unremarkable conclusion that Congress intended Section 102(a)(8)(A) to apply to *each*, and therefore *any* election for Federal office.  *See* Black's Law Dictionary at 1 (6th ed. 1990) (the indefinite article "a" is "often used in the sense of 'any'"); *see also United States v. Georgia*, 2013 WL 3421982, at *5 ("The commonly understood meaning of the indefinite article "an" is "one" or "any.").  Thus, because a Federal primary runoff election is inarguably "*an* election for Federal office," Section 102(a)(8)(A) includes Federal runoff elections.

---

[1]  On October 16, 2013, the district court denied the Georgia defendants' motion to stay the permanent injunction pending their appeal to the Eleventh Circuit. *United States v. Georgia*, No. 1:12-cv-2230, Motion for Stay, ECF No. 41 (N.D. Ga. Oct. 16, 2013).  On November 8, 2013, Georgia moved to stay the district court's injunction in the United States Court of Appeals for the Eleventh Circuit.  Motion for Stay of Injunction, *United States v. Georgia*, No. 13-14065 (11th Cir. Nov. 8, 2013).  The United States filed an opposition to that motion on November 21, 2013. Response to Motion for Stay of Injunction, *United States v. Georgia*, No. 13-14065 (11th Cir. Nov. 21, 2013).

This interpretation is supported when Section 102(a)(8)(A) is considered within the entire statutory context.  *See* U.S. Mem. 25-28.  As the *Georgia* Court explained:

> To the extent there is doubt as to the breadth of the term "an election," it is settled by looking to the interplay between § 1973ff-1(a)(7) and § 1973ff-1(f).  Section 1973ff-1(a)(7) addresses the transmittal of blank absentee ballots for 'general, special, primary, and runoff elections for Federal office' and requires that transmittal procedures be established in accordance with § 1973ff-1(f).  Notably, § 1973ff-1(f)'s transmittal procedures apply to "an election for Federal office."  Thus, considering § 1973ff-1(f) together with § 1973ff-1(a)(7), it is apparent that the reference to "an election for Federal office" is applicable to any of the four types of elections listed in § 1973ff-1(a)(7).

*United States v. Georgia*, 2013 WL 3421982, at *6.  Given the canon that identical words used in different parts of the same statute usually have the same meaning, *see Gustafson v. Alloyd Co.,* 513 U.S. 561, 570 (1995), Congress was not required to enumerate again each possible type of Federal election when it used the shorthand phrase—"an election for Federal office"—in Section 102(a)(8).

Defendants nevertheless suggest that Congress did not mean what it plainly said.  They claim that the phrase "an election for Federal office" and its variations merely make clear that UOCAVA applies to Federal elections only, as opposed to State and local elections.  Defs.' Mem. in Support of Mot. For Partial S. J.  7-8 ("Defs.' Mem.") (ECF 82).  This argument misses the mark.  It is, of course, undisputed that UOCAVA applies to Federal elections only.  *See* 42 U.S.C. § 1973ff-1(a)(1) ("Each State shall—(1) permit absent uniformed services voters and overseas voters to use absentee registration procedures and to vote by absentee ballot in general, special, primary and runoff elections *for Federal office*.") (emphasis added).[2]  Thus, Defendants' focus on the unnecessary State/Federal distinction to explain the use of the modifying language

---

[2] Since its enactment in 1986, UOCAVA's requirements have uniformly applied only to elections for Federal office.  The 2009 MOVE Act amendments, including the addition of Section 102(a)(8), simply conform to the original mandate by similarly referencing their application to Federal elections.  Indeed, UOCAVA defines "Federal office," but not State and local elections because there is no need to do so.  42 U.S.C. 1973ff-63

"for Federal office" is illogical, and ignores Subsection (a)(8)(A)'s plain language describing the broad scope of Federal elections to which the 45-day advance transmission requirement applies.

Defendants also urge this Court to ignore the plain meaning of "an election for Federal office" because Congress used four different phrases to reference Federal elections in UOCAVA—1)  "elections for Federal office;" 2) "general, special, primary, and runoff elections for Federal office;" 3) "any election for Federal office;" and 4) "an election for Federal office." They therefore claim that, because Congress referenced Federal elections in different ways, it must not have intended those phrases to define the specific Federal elections to which a statutory provision was meant to apply.  But there is no mystery here.  UOCAVA applies to four types of Federal elections—general, special, primary, and runoff elections for Federal office—and any general reference to Federal elections in UOCAVA, in the absence of limiting language, should be construed to reference *all* Federal elections.  *See United States v. Georgia*, 2013 WL 3421982, at *6 ("[Section 102] deals with four different types of elections, and a general reference within the section to an election, in the absence of language narrowing the focus of the term, is best construed as a reference to any of the four types of elections identified in the section.").

Defendants' attempt to recast the phrase "an election for Federal office" as a kind of legislative throwaway is equally unavailing.  *See* Defs.' Mem. 10 ("Congress was not writing to withstand an in-depth analysis of an extraordinarily popular indefinite article.").  This argument is undone by the elementary presumption that a statute means what it says and says what it means.  *See United States v. La Bonte*, 520 U.S. 751, 757 (1997) (holding that courts must "assume that in drafting [] legislation, Congress said what it meant."); *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253-54 (1992) (same).  And while the indefinite article "an" is small, its

import is large.  Congress employed it to define the scope of Federal elections to which the 45-day advance transmission requirement applies.  But to avoid UOCAVA requirements, Defendants would discard the plain meaning of "*an election* for Federal office*"* and render Congress' careful wording a mere nullity.  They may not do so.  *See TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (holding that statutes must be construed so that "no clause, sentence, or word shall be superfluous, void, or insignificant").

Nor should Congress' demonstrated ability to identify specific elections of concern be ignored.  Section 102(c), for example, expressly requires States to report to the U.S. Elections Assistance Commission certain voting information for "*general elections* for Federal office," 42 U.S.C. § 1973ff-1(c) (emphasis added), leaving no doubt that when Congress wanted to single out, enumerate, highlight, or *exclude* specific elections, it knew how to do it.  *See United States v. Georgia*, 2013 WL 3421982, at *5 ("Where Congress intended to refer to a specific type of election, it left no doubt of its intent.").  Indeed, the only Federal elections excepted from Subsection (a)(8)(A)'s 45-day deadline are specified on the face of that provision: the deadline applies "except as provided in subsection (g)."  42 U.S.C. § 1973ff-1(a)(8)(A).  Subsection (g) is the hardship exemption available only through a waiver application process.  *See* 42 U.S.C. 1973ff-1(g).

If Congress wanted to exempt runoff elections totally from Subsection (a)(8)(A), it clearly would have included a reference to Subsection (a)(9), along with Subsection (g), when it specified Subsection (a)(8)(A)'s 45-day deadline applies to "an election for Federal office" "except as provided" in Subsection (g)'s waiver provision.  *See Consumer Prod. Safety Comm'n v. GTE*, 447 U.S. 102, 109 (1980).  The Court therefore should reject Defendants' invitation to create implied judicial exemptions that Congress never intended.  *See Allstate Life Ins. Co. v.*

*Miller*, 424 F.3d 1113, 1116 n. 3 (11th Cir. 2005) (declining to recognize an implied exception beyond those explicit in the disputed statutory provision and explaining that where the legislature has included certain exceptions, "the doctrine of *expressio unis est exclusio alterius* counsels against judicial recognition of additional exceptions"); *Pugliese v. v. Pukka Dev., Inc.,* 550 F.3d 1299, 1303-4 (11th Cir. 2008) (holding that because Congress demonstrated that it knew how to make specific exemptions in certain provisions of a statute but chose not to do so in the disputed provision, the Court would decline to create new exemptions).

Had Congress intended to exclude runoff elections from the requirements of Section 102(a)(8)(A), it could have simply said so.  It did not.  Instead, it used the phrase "an election" without qualification.  UOCAVA, like all Federal statutes, is "most coherent and consistent when [it] is read to mean what it literally says"— that States must transmit ballots in "*an*" election for Federal office and not just in "some" elections for Federal office.  *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008) ("But Congress could not have chosen a more all-encompassing phrase than 'any other law enforcement officer' to express that intent.").  Accordingly, the plain language of Section 102(a)(8)(A) includes all Federal elections, including Federal runoff elections.

### B.  UOCAVA Section 102(a)(9) Complements Section 102(a)(8)(A) by Requiring Additional Measures to Protect UOCAVA Voters in the Unique Circumstances Presented by Runoff Elections.

#### 1.  Sections 102(a)(8)(A) and 102(a)(9) Work Together to Further Congress' Determination to End UOCAVA Voter Disenfranchisement.

Defendants argue that Section 102(a)(9), which imposes additional responsibilities on States in the relatively rare event of runoff elections for Federal office, supersedes Section 102(a)(8)(A)'s 45-day advance transmission requirement.  They are incorrect.

Section 102(a)(9) provides that if a "State declares or otherwise holds a runoff election for Federal office," it must "establish a written plan that provides that absentee ballots are made available" to UOCAVA voters "in [a] manner that gives them sufficient time to vote in the runoff election."  42 U.S.C. 1973ff-1(a)(9).  Thus, Subsections (a)(8)(A) and (a)(9) together establish a simple and reasonable structure for protecting UOCAVA voters by 1) applying Subsection (a)(8)(A)'s 45-day advance transmission requirement to all Federal elections, and 2) requiring states that permit runoff elections to take additional steps beyond the 45-day advance transmission deadline to ensure that, under the unique circumstances presented by runoff elections, UOCAVA voters' rights are fully protected.

This straightforward reading obeys the "fundamental" statutory construction canon that statutory words are to "be read in their context and with a view to their place in the overall statutory scheme." *Boroski v. Dynacorp Int'l*, 700 F.3d 446, 451 (11th Cir. 2012) (quoting *Roberts v. Sea-Land Servs., Inc.*, __U.S. __, 132 S.Ct. 1350, 1357 (2012)); *see also FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959) (noting that a court's task when interpreting a statute is "to fit, if possible, all parts into an harmonious whole.").  Here, Congress acted to ensure UOCAVA voters were not disenfranchised.  Congress determined that an explicit ballot transmission deadline was necessary to ensure this goal.[3]  And nothing in the statutory language suggests that the need for UOCAVA voters to receive absentee ballots in time for them to be cast and counted is any less critical in Federal runoff elections than it is in any other Federal election.

---

[3] The purpose of the MOVE Act's advance ballot transmission requirement can be readily ascertained from the face of the statute; however, as discussed below, the legislative history of the MOVE Act also supports this determination.  *See* pp. 15, *infra*.

This Court's interpretation of Section 102(a)(8)(A) and Section 102(a)(9) should fully effectuate that legislative purpose.

But Defendants contend that Section 102(a)(9)'s lack of an explicit advance transmission deadline means no such deadline exists for Federal runoff elections. That reading is incorrect, and ignores the essential canon that, when interpreting two statutory provisions, a court should interpret them in tandem by honoring their plain meaning while avoiding conflict where it need not exist. *See, e.g., United States v. Marion*, 562 F.3d 1330, 1339 (11th Cir. 2009).

Interpreting Subsection (a)(8)(A) to apply to all Federal elections, including runoffs, neither conflicts with Subsection (a)(9) nor renders any of Subsection (a)(9)'s language superfluous. Indeed, those Subsections complement each other, with the first provision establishing a firm deadline by which ballots must be transmitted and the second provision requiring States to provide additional protections governing the uniquely challenging circumstances that typify runoff elections. There is no reason—and Defendants do not assert one—that States cannot reasonably comply with both provisions by transmitting ballots to UOCAVA voters at least 45 days before a Federal runoff election, and also by establishing a written plan to govern Federal runoff elections. Because Federal runoff elections do not regularly occur in most jurisdictions, and because they are announced with short notice and occur in rapid succession with regularly-scheduled elections—potentially taxing election officials, vendors, and voters—Congress reasonably required that States conducting such elections establish a written plan as an additional safeguard to protect UOCAVA voters.[4] The

---

[4] Such a plan could impose additional or alternative requirements that would further the ability of military and overseas voters to cast ballots in runoff elections. For example, depending on how a State implements the 45-day advance deadline for runoff elections, such measures may include providing additional or targeted notice to UOCAVA voters concerning runoff elections or special ballot preparation requirements for runoff elections to ensure that ballots are available by the transmission deadline. A plan also may establish interim deadlines, procedures and possible funding for State and local elections officials to follow to ensure that election supply

additional requirement for runoff elections set forth in Section 102(a)(9) does not alter the plain meaning of the deadline for all elections for Federal office established in Section 102(a)(8). And it fully effectuates Congess' intent.

Alabama also suggests that this straightforward interpretation would lead to an absurd result simply because Congress declined to require a written plan for special elections. While Alabama may question Congress' reasonable choices, this Court need not. "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Dean v. United States*, 556 U.S. 568, 573 (2009) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

At any rate, Congress' choice to require additional protections for UOCAVA voters in the singular context of runoff elections was sound. Runoff elections by definition impose an additional round of balloting, a process that is not triggered until the results of a prior election have been certified. Congress was entitled to note and address the special challenges of unplanned rounds of additional balloting, scattered among those rounds already expected, and to require States to ensure that these additional elections unfold in an orderly and efficient fashion that does not adversely impact UOCAVA voters.

To be sure, special elections, like all elections, present challenges. But unlike runoff elections, State officials can have significant control over when special elections will be held. *See, e.g.*, Ala. Code § 17-15-2 ("All special elections shall be held on such day as the Governor may direct."). That authority permits State officials to create a process that weighs competing State interests to determine the optimal time and procedures for holding a special election.

---

vendors are fully prepared to provide all necessary materials, including ballot printing and delivery, on the shortest of notice.

Runoff elections generally allow no such control or repose.  They are unplanned links in a chain of already-calendared elections held in rapid succession and, as such, can present singular challenges to election officials, to the vendors upon whom election officials depend to prepare ballots, to State and local budgets, and, as Congress reasonably anticipated, to UOCAVA voters.

> ## 2. Absent a Hardship Waiver, the Phrase "Sufficient Time" in Subsection (a)(9) Refers to the 45-Day Advance Transmission Standard Established in Subsection (a)(8)(A).

There is no conflict between the 45-day deadline in Subsection (a)(8)(A) and the written plan requirements in Subsection (a)(9).  Absent a hardship exemption pursuant to 42 U.S.C. § 1973ff-1(g) , Subsection (a)(9)'s reference to "sufficient time" simply refers to the 45-day deadline in Section 102(a)(8)(A).  The "sufficient time" reference in Subsection (a)(9) might refer to something other than the 45-day deadline only under the limited circumstances where the State has pursued and received a hardship waiver of the Subsection (a)(8)(A) deadline under the exemption provisions in Section 102(g).  Under Section 102(g)(1), "[i]f the chief State election official determines that the State is unable to meet the requirement under Subsection (a)(8)(A) with respect to an election for Federal office due to an undue hardship described in paragraph (2)(B), the chief State election official shall request that the Presidential designee grant a waiver to the State of the application of such Subsection."  To receive a waiver, the Presidential designee must conclude that a State's procedures allow UOCAVA voters "sufficient time to receive absentee ballots they have requested and submit marked absentee ballots to the appropriate State election official in time to have that ballot counted in the election for Federal office."  42 U.S.C. 1973ff-1(g)(2)(A).  Thus, interpreting UOCAVA so that "sufficient time" in Subsection (a)(9) means 45 days in advance of the election unless the State has received a

hardship waiver, promotes a harmonious reading of Subsections (a)(8), (a)(9), and (g) without creating conflict or rendering any language superfluous.

Yet, Defendants incorrectly contend that because UOCAVA uses the phrase "sufficient time" in Subsection (g) to mean something less than 45 days before the election, its use of the phrase "sufficient time" in Subsection (a)(9) also must mean a period less than 45 days in advance of election day.  That Congress used the phrase "sufficient time" in the singular context of the undue hardship waiver provision is not remarkable and certainly does not create a categorical exception to Subsection (a)(8)(A)'s 45-day advance ballot transmission standard in runoff elections.

"Sufficient time" in the waiver context is a specific determination reached by the Presidential designee under the explicit terms of the hardship waiver exemption.[5]  42 U.S.C. 1973ff-1(g)(2)(A).  Alabama's interpretation of Section 102(a)(9) would read the whole category of runoff elections out of this detailed waiver evaluation process.  Instead, Alabama would have this Court create a permanent waiver for runoff elections unmoored to the detailed waiver request and approval process Congress mandated.  The State's interpretation plainly conflicts with the structure of the hardship exemption and Congress' intent.

Thus, outside of that hardship waiver context, "sufficient time" in Subsection (a)(9) simply means the 45-day advance ballot transmission standard mandated by Subsection (a)(8)(A).  Congress used the broad term "sufficient time" in Subsection (a)(9) to apply to all run offs, those for which a State had obtained a hardship waiver as well as those for which no waiver

---

[5] Obtaining a hardship waiver requires among other things, that 1) the jurisdiction establish an undue hardship exists based on the limited circumstances specified by Subsection (g), 2) the jurisdiction make a written request claiming to be unable to provide UOCAVA voters with "enough time to vote" under Subsection (a)(8)(A), 3) the jurisdiction submit a comprehensive plan demonstrating how that will be accomplished, and 4) the Presidential designee in consultation with the Attorney General subsequently approve that request.  42 U.S.C. 1973ff-1(g).

had been approved.  The exemption recognizes the presumption that a 45-day advance transmission of absentee ballots is necessary to provide sufficient time to vote.  *See* 42 U.S.C. 1973ff-1(g)(1)(A) (recognizing "that the purpose of [Subsection (a)(8)(A)] is to allow absent uniformed services voters and overseas voters enough time to vote in an election for Federal office.").

The unusual circumstance in which the State requests and obtains a waiver under Subsection (g) is thus the only explicit exception to Congress's determination that 45-day advance transmission is "sufficient time" or "enough time" for UOCAVA voters to receive their ballots and return them in Federal elections.  42 U.S.C. 1973ff-1(g)(1)(D)(i).  The waiver provision also establishes a clear process by which the Presidential designee may determine what constitutes "sufficient time" in cases where compliance with the 45-day rule is not possible in the limited set of circumstances in which the waiver process applies.  It does not, however, indicate that Congress intended to categorically exempt Federal runoff elections from the panoply of Federal elections for which UOCAVA voters are guaranteed the fullest protection of their right to vote.  It would make little sense for Congress to put such effort into creating, on the one hand, a clear across-the-board 45-day advance ballot transmission requirement for Federal elections with a carefully limited waiver process, while, on the other hand, exempting categorically an entire class of Federal elections from the 45-day advance transmission requirement *and* the waiver process.

**C. Should the Court Determine That Subsections (a)(8)(A) and (a)(9) Are Collectively Ambiguous, Other Statutory Construction Tools Confirm That Congress Intended Section 102(a)(8)(A) to Encompass Federal Runoff Elections.**

**1. UOCAVA's Legislative History Demonstrates Congress' Intent to Apply The 45-Day Deadline to All Federal Elections Absent a Waiver.**

This Court can turn to legislative history if it believes that the statutory language of UOCAVA is unclear about the inclusion of runoff elections in 42 U.S.C. 1973ff-1(a)(8). *See United States v. Rojas-Contreras*, 474 U.S. 231, 235 (1985). The Eleventh Circuit treats as most authoritative the portions of legislative history that reflect indicia of agreement between the House of Representatives and the Senate. *See In Re Burns*, 887 F.2d 1541, 1548-49 (11th Cir. 1989). The House Conference Report for the 2009 MOVE Act, which contains such indicia of agreement, confirms that Congress intended for States to "transmit a validly requested absentee ballot" to a UOCAVA voter "at least 45 days before an election for federal office unless . . . a hardship exemption is approved." H.R. No. 111-288, at 744 (2009) (Conf. Rep.), attached as Exhibit 1.

The Court may also consider the legislative history of the MOVE Act that was incorporated and printed in the Congressional Record by unanimous bipartisan consent as another weighty source of legislative history. *See* 156 Cong. Rec. S4517 (daily ed. May 27, 2010) (Statement of Sen. Schumer), attached as Exhibit 2, (reflecting unanimous consent to inclusion of history in the record). The legislative history of the MOVE Act is replete with hearing testimony and reports attesting that 45 days of advance ballot transmittal time were necessary to resolve the longstanding and distressing problem of service member disenfranchisement. Indeed, Congress was clearly focused on solving that particular problem, and thus permitted no exceptions to a 45-day advance ballot transmittal requirement except, as

stated in Subsection (a)(8)(A), those specifically outlined in the hardship waiver provision of Subsection (g). *Id.* at S4513-4521.

Yet, Defendants speculate that Congress may have excluded runoff elections from the Section 102(a)(8)(A) requirements because turnout rates may drop when there is a time gap between initial elections and runoff elections.[6] They then suggest that expanding the runoff period in Alabama would hurt voter turnout. The 2013 Fair Vote Report Defendants cite, however —which of course Congress did not consider in 2009—is irrelevant here. The MOVE Act's legislative history demonstrates Congress' zealous intent to reverse troubling trends indicating that UOCAVA voters simply did not have enough time to receive, mark, and return their ballots in time for them to be counted. Congress evaluated compelling evidence of UOCAVA voter disenfranchisement to determine the need for the MOVE Act amendments, including the minimum pre-election ballot transmission time necessary to safeguard the rights of UOCAVA voters, with "special attention paid to recommendations from witnesses who possess extensive experience with the military and overseas absentee voting process." *Id*. at S2414. Ultimately, Congress adopted "a 45-day mandate on States to promptly respond to military and overseas absentee ballot requests." *Id*. at S4518 ("the consensus recommendation emerged for a 45-day requirement ... because it provides sufficient time for UOCAVA voter to request, receive,

---

[6] Defendants suggest that when Congress passed the MOVE Act it was aware that the Virgin Islands and Guam are required to hold a runoff election 14 days after a general election if no candidate for Congressional delegate obtains a majority of the vote. *See* 48 U.S.C. 1712. However, there is no evidence in the legislative history to suggest that Congress considered 48 U.S.C. 1712 when it passed the MOVE Act. The MOVE Act's omission of a conforming change to 48 U.S.C. 1712, a provision residing in a separate title from UOCAVA and affecting only two territories, should not be construed to create ambiguity where none exists from the plain reading of the statute that was Congress' primary object. It is a basic rule of statutory construction that extrinsic statutes cannot be used to create ambiguity in an otherwise unambiguous statute. *See, e.g., United States v. Shreveport Grain & Elevator Co.,* 287 U.S. 77, 83 (1932) ("extrinsic aids to construction" may be used "to solve, but not to create, an ambiguity") (internal quotation marks omitted). Because the 14-day runoff period in the Virgin Islands and Guam is less than 45 days, the better view is that, until Congress reconciles the two provisions, 48 U.S.C. 1712 provides a limited exception to the 45-day advance transmission deadline that otherwise remains fully in effect in the other states that hold Federal runoff elections.

and cast their ballots in time to be counted . . .").  And, based on the data before it, it is reasonable to assume that Congress felt assured the MOVE Act would *increase* voter turnout by establishing firm timelines to allow military and overseas voters adequate time to receive, mark, and cast their ballots.  Had Congress intended to exclude runoff elections from the 45-day transmission requirement, surely the legislative history would have demonstrated consideration of that issue.  Instead, the legislative history tracks the Statute's plain language and together they establish Congress' firm intent that the 45-day advance ballot transmission requirement applies in all Federal elections, including Federal runoff elections.[7]

### 2.  Alabama Ignores FVAP and the Attorney General's Reasonable Interpretations of Section 102(a)(8)(A).

As noted in the United States' opening brief, if this Court finds the statutory language to be ambiguous, it also may consider the interpretations of the Attorney General and other federal agencies with roles in implementing and enforcing UOCAVA to determine the meaning of Subsections (a)(8)(A) and (a)(9).  U.S. Mem. 29-30.  The Federal Voting Assistance Program ("FVAP"), a Department of Defense office, has been delegated the responsibility for

---

[7] Defendants erroneously argue that in interpreting Sections 102(a)(8)(A) and 102(a)(9), this Court should rely upon the informal section titles and structure of the 731-page Public Law, of which the MOVE Act was a small part. Defs.' Mem. 20-21.  These titles, however, reflect none of the agreement between the Senate and House of Representatives, discussed above, that this Court finds significant when determining how to weigh various sources of legislative history.  *See, e.g., In Re Burns*, 887 F.2d 1541 at 1545-1552.  This history, along with the legislative history incorporated in the Congressional Record with bipartisan consent, reflects Congress' intent to enfranchise UOCAVA voters in all Federal elections by imposing the 45-day deadline of Subsection (a)(8)(A), along with a limited opportunity to obtain a waiver from those requirements.  Moreover, section headings should not be read to limit the plain meaning or discern legislative intent of a statute.  *See Scarborough v. Office of Personnel Management*, 723 F.2d 801, 811 (11th Cir. 1984) (holding that section headings "cannot limit the plain meaning of [a statute's] text and may be utilized to interpret a statute, if at all, only where the statute is ambiguous.").  The statute's plain language, therefore, makes the Public Law section headings referenced by the Defendants immaterial. And even if those headings are considered, along with their placement, it is hardly surprising and certainly not definitive here that a section of a Public Law imposing additional requirements as to runoff elections would be titled "Runoff Elections" and be positioned near the section addressing UOCAVA's limited waiver process.

administering UOCAVA.[8]  *See* 42 U.S.C. 1973-ff(a) & (b).  FVAP's February 7, 2012 written

guidance to all Chief State Election Officials specifies that the UOCAVA requirement to

transmit absentee ballots 45 days prior to "any election for Federal Office" includes runoff

elections.  *See* Guidance on Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA)

Ballot Delivery Waivers, FVAP (Feb. 7, 2012), attached as Exhibit 3, at 3 (emphasis in original).

The Attorney General, as the statutorily designated enforcer of UOCAVA, interprets Subsection

(a)(8)(A) identically.  The Attorney General's and FVAP's interpretations reasonably and

properly construe requirements of Subsection 1973ff-1(a)(8)(A) to cover runoff elections.  This

Court thus should give deference to the consistent interpretations of the two agencies—the

United States Department of Justice and the United States Department of Defense—that

Congress assigned statutory roles in implementing and enforcing UOCAVA.  *See Skidmore v.*

*Swift & Co.,* 323 U.S. 134 (1944); *Pugliese*, 550 F.3d at 1304-05 (giving substantial deference,

under *Skidmore*, to HUD's director's letter opining on the scope of a disputed statutory

exemption and the United States' amicus curiae brief explaining HUD's interpretation); *Durr v.*

*Shinseki*, 638 F.3d 1342, 1348-1350 (11th Cir. 2001) (crediting a federal agency's longstanding

interpretation of a statute, expressed in its personnel handbook, to resolve a statutory

construction dispute).

---

[8] The Secretary of Defense was designated the Presidential designee under UOCAVA by Executive Order 12642 (June 8, 1988), 53 FR § 21975.  The Secretary of Defense has delegated this authority to the Under Secretary of Defense (Personnel & Readiness) through DOD Directive 1004.04.  Pursuant to Section 5.1 of that Directive: "The Undersecretary of Defense for Personnel and Readiness shall . . . Designate a civilian employee as the Director, Federal Voting Assistance Program. The Director shall be responsible for all aspects of the FVAP, and shall have the necessary authority to administer that responsibility."

**3. This Court Should Apply the Canon of Statutory Construction Requiring Liberal Interpretation of Section 102(a)(8)(A) in Favor of Military Service Members.**

As noted in the United States' opening brief, applying Subsection (a)(8)(A) to runoff elections also effectuates the canon that statutes providing benefits to uniformed service members should be liberally construed in their favor.  U.S. Mem. 30-31; *see Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1206 (2011); *see also King v. Saint Vincent's Hosp.,* 502 U.S. 215, 220-221 & n. 9 (1991) (liberally construing a statute in favor of military service members to resolve a dispute over the time period during which statutory protections apply).

Although some UOCAVA voters are not military service members, this Court still should apply this canon of statutory interpretation when interpreting Subsection (a)(8)(A) because a significant number of military service members are among the intended beneficiaries of the MOVE Act.  *See* 156 Cong. Rec. S4513-21 (daily ed. May 27, 2010) (Statement of Sen. Schumer), attached as Exhibit 2.  Indeed, ample evidence demonstrates that Congress amended UOCAVA out of its deep concern for the plight of military service members who risk their safety for this country but were prevented from casting ballots to elect its leaders.  *Id.* at S4517 (citing testimony of Lieutenant Colonel Joseph DeCaro at Rules Committee May 2009);  *see also* 155 Cong. Rec. S7965 (Jul. 23, 2009) (Statements of Sen. Schumer and Sen. Chambliss), attached as Exhibit 5 ("They can risk their lives for us, we can at least allow them to vote;" "[Not since UOCAVA originally passed in 1986] have we proposed such significant legislation designed to help the men and women of the military who . . . defend the rights and freedoms we Americans hold so sacred.").

Interpreting Subsection (a)(8)(A) to include runoff elections comports with Congress' "solicitude" towards uniformed service members and Congress' indisputable goal of fully

enfranchising them.  *See Henderson*, 131 S. Ct. at 1205; *cf. United States v. New York*, No. 1:10-cv-1214, 2012 WL 254263, at *1 (N.D.N.Y. Jan. 27, 2012) ("It is unconscionable to send men and women overseas to preserve our democracy while simultaneously disenfranchising them while they are gone.").

**II.     Alabama's Written Runoff Plan Violates Subsection (a)(9) as a Matter of Law.**

The written plan that Alabama has adopted pursuant to Section 102(a)(9) violates UOCAVA insofar as it does not, even at a minimum, ensure that timely-requested ballots will be transmitted at least 45 days prior to a Federal runoff election.  Instead, the plan merely reflects that under current State law, any Federal primary runoff will be held 42 days after the Federal primary election, meaning that ballots would not be transmitted until at least 35 days before the runoff election at the earliest.  As such, the State's plan deprives Alabama's UOCAVA voters of sufficient time to vote in Federal runoff elections, as contemplated by Subsection 102(a)(9).

Even if this Court finds that UOCAVA's 45-day advance transmission requirement for UOCAVA ballots does not apply to Federal runoff elections, Alabama's written runoff plan still deprives its military and overseas voters "sufficient time" to vote in runoff elections.  That plan, found in Emergency Rule 820-2-8-.11-.11ER, attached as Exhibit 4, lacks any specific deadlines by which counties must transmit absentee ballots to UOCAVA voters.  Instead, it merely requires Alabama's Secretary of State to certify the names of opposed candidates for the runoff election to the probate judges "as soon as practicable" and for the probate judges to then "deliver the absentee ballots to the absentee election manager as soon as practicable after the primary election."

The closest the plan comes to providing a deadline is in its citation to Alabama Code Section 17-11-12, which requires that for runoff primary elections, probate judges distribute

absentee ballots to the absentee election manager "not more than seven days after the first primary election," *i.e.*, just 35 days before the date of the runoff.  The delivery of absentee ballots to an absentee election manager, however, is not the same as actually transmitting those ballots to UOCAVA voters (and it may well take yet more time).  Alabama's plan therefore fails to meet the "sufficient time" requirement, no matter how the term is defined, because it fails at the most basic level to provide a definite transmission date.  Even more troubling here is the undisputed evidence in this case demonstrating Alabama's persistent difficulties meeting even its own State law deadlines.  U.S. Mem. 8-22.

Yet, Defendants contend its runoff election schedule should be upheld because it was approved by the United States in a prior lawsuit.  *See* ECF No. 82 at 26–28.  However, that litigation occurred before Congress enacted the MOVE Act and thus before Congress established a 45-day advance transmission requirement.  *See* Pub. L. 111-84, § 579, 123 Stat. 2322 to 2324. As discussed above, in passing the MOVE Act, Congress intensively investigated the time that was needed to ensure that UOCAVA voters have a full opportunity to receive, cast and return their ballots in time to be counted.  Congress determined that a transmission date of 45 days before an election for Federal office was the minimum time necessary to afford UOCAVA voters the opportunity to vote.  Accordingly, Defendants' argument is inapt.

III.    **The United States' Runoff Election Claim is Ripe for Adjudication**

Defendants also contend that the United States' runoff election claim is not ripe for adjudication because Alabama has not held a runoff election since Congress passed the MOVE Act.  This argument fails.[9]

---

[9] While prior to this year, Alabama has not conducted a primary runoff election for Federal office in some time, less than one month ago it conducted a special primary runoff election to fill a vacancy in the State's First Congressional District.

Determining whether a case is ripe for judicial review requires courts to evaluate two factors: "(1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration." *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997) (citing *Abbott Lab v. Gardner*, 387 U.S. 136, 148–49 (1967)). In this case, both factors point to the same conclusion: The United States' claim is ripe.

The fitness prong typically involves questions of "finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1258 (11th Cir. 2010) (internal citations omitted). Because the runoff claim presents a pure legal question, it does not require any additional fact development. *Thomas v. Union Carbide Agric. Prod.s Co*., 473 U.S. 568, 581 (1985) ("The issue presented in this case is purely legal, and will not be clarified by further factual development."); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (concluding that because the question at issue was legal, the issue did not need further development before it could be adjudicated); *Harris v. Mexican Specialty Foods, Inc*., 564 F.3d 1301, 1308 (11th Cir. 2009) ("In the context of a facial challenge, a purely legal claim is presumptively ripe for judicial review because it does not require a developed factual record."). Moreover, the fact that the runoff election has not yet occurred is of no moment. *United States v. Georgia*, 2013 WL 3421982 (finding that Georgia's runoff statute violates UOCAVA as a matter of law, even though Georgia had yet to hold a runoff election). "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Pac. Gas & Elec. Co*., 461 U.S. at 201. "[E]ven when the direct application of a statute is open to a charge of remoteness by reason of a lengthy, built-in time delay before the statute takes effect, ripeness

may be found as long as the statute's operation is inevitable (or nearly so)." *Riva v. Massachusetts*, 61 F.3d 1003, 1010 (1st Cir. 1995). Here, Alabama's runoff election period is less than 45 days, and as a result "the statute's [impermissible] operation is inevitable . . . ." *Riva*, 61 F.3d at 1010. This Court can therefore be certain that, if Alabama adheres to its current State law deadlines, the next runoff election that occurs will violate UOCAVA.

Alabama also suggests that the United States' claim is not fit for adjudication because it is possible that Alabama's legislature could change the current law defining Alabama's runoff election schedule, thereby alleviating the conflict with UOCAVA before the next runoff is scheduled. However, what Alabama's legislature may do is theoretical at best.[10] Mere speculation about what may occur in the future does not render this purely legal issue non-justiciable.

The United States also satisfies the hardship prong of the ripeness test. Alabama's UOCAVA voters will suffer significant hardship if judicial review of this matter is delayed. The right to vote is "fundamental." *Bartlett v. Strickland*, 556 U.S. 1, 10 (2009). If Alabama is allowed to continue administering its runoff elections so that UOCAVA voters are not provided ballots 45 days before the election, UOCAVA voters will suffer significant hardship. *See United States v. Georgia*, 892 F. Supp. 2d 1367, 1375 (N.D. Ga. 2012) ("[A]n irreparable harm occurs when a UOCAVA voter is denied the right to receive a sufficient absentee ballot at least forty-five days before the primary runoff election.").

Alabama, however, argues that the United States would not be harmed if the case were dismissed as not ripe because it could simply bring another suit once a runoff election is

---

[10] Indeed, it is at best unclear that the legislature would unilaterally correct its primary runoff schedule. As discussed in the United States' opening brief, the Alabama legislature's most recent legislative proposal to amend Alabama's election calendar (HB 516) (2013) did not include any changes to the State's primary runoff calendar. U.S. Mem. 22.

scheduled to take place. *See* Defs.' Mem. 34.  However, this would mean that the United States could not bring an action until after a primary runoff election has been announced, *i.e.*, 42 days before the runoff election.  By this time, UOCAVA voters would already have been harmed by not having their ballots mailed by the 45-day deadline; and, little time would remain to remedy the violation.

Finally, Alabama argues that even if the constitutional concerns under Article III are met, the Court should delay review for prudential concerns because the issue is currently before the United States Court of Appeals for the Eleventh Circuit.  However, it is unclear when the Eleventh Circuit will resolve this issue.  Alabama will require some level of guidance as the 2014 election cycle rapidly approaches as to how Federal law will apply to those elections. Indeed, regardless of how Subsection (a)(9) is interpreted, Alabama's current written plan provides no deadlines whatsoever for ballot transmission, and thus no assurance that UOCAVA voters will be afforded the full protections Congress guaranteed.

## CONCLUSION

Defendants' Motion for Partial Summary Judgment should be denied.

Respectfully submitted,

Date:  December 4, 2013

GEORGE L. BECK, JR.                          JOCELYN SAMUELS
United States Attorney                        Acting Assistant Attorney General
Middle District of Alabama                    Civil Rights Division


                                              ___/s/ Amanda Hine_____
STEPHEN M. DOYLE                             T. CHRISTIAN HERREN, JR.
Assistant United States Attorney             RICHARD DELLHEIM
131 Clayton Street                           ERNEST A. MCFARLAND
Montgomery, AL 36104                         SPENCER R. FISHER
Phone: (334) 223-7280                        ANNA M. BALDWIN
Fax: (334) 223-7418                          AMANDA HINE
                                             Attorneys, Voting Section
                                             Civil Rights Division
                                             U.S. Department of Justice
                                             950 Pennsylvania Avenue, N.W.
                                             NWB - 7254
                                             Washington, D.C. 20530
                                             Telephone:  (202) 305-4278
                                             Facsimile:   (202) 307-3961
                                             Amanda.Hine@usdoj.gov

**CERTIFICATE OF SERVICE**

This certifies that on December 4, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

James W. Davis
Misty S. Fairbanks Messick
Office of the Attorney General
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152

/s/  Amanda Hine
Attorney, U.S. Department of Justice