IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
UNITED STATES OF AMERICA     )
                             )
     Plaintiff,              )
                             )
          v.                 )     CIVIL ACTION NO.
                             )       2:12cv179-MHT
THE STATE OF ALABAMA and     )          (WO)
JIM BENNETT, in his          )
official capacity as         )
Secretary of State of        )
Alabama,                     )
                             )
     Defendants.             )
```

OPINION

In this lawsuit, plaintiff United States of America
named as defendants the State of Alabama and its
Secretary of State and asserted claims based on the
Uniformed and Overseas Citizens Absentee Voting Act of
1986 ("UOCAVA"), as amended, 42 U.S.C. § 1973ff.  The
United States sought to enforce the right of military
members, their families, and other United States citizens
living overseas ("UOCAVA voters") to vote by absentee
ballot in Alabama's federal elections.  Jurisdiction is

proper under 42 U.S.C. § 1973ff-4 and 28 U.S.C. §§ 1345 and 2001.

This matter is now before the court on cross-motions for summary judgment on the one remaining claim in this case: that, with regard to runoff elections, Alabama is in violation of UOCAVA's requirement that States transmit absentee ballots to UOCAVA voters at least 45 days before an election for federal office. For reasons that will be discussed, the court will enter summary judgment finding in favor of the United States and holding that part of Alabama's runoff-election statute, 1975 Ala. Code § 17-13-18, violates UOCAVA.


## I. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  Here, the parties agree that, because the issues presented by the remaining claim are legal ones, the claim is appropriate for resolution on summary judgment.


## I.  BACKGROUND

### A.

The initial question posed by the remaining claim is whether UOCAVA's 45-day transmittal requirement applies to federal runoff elections conducted by States.  Because the answer to this question turns on a close analysis of UOCAVA, the court will begin with an overview of some of the act's relevant provisions.  The court divides this

overview into four parts with a focus on primarily four UOCAVA provisions.

THE GENERAL PURPOSE PROVISION: UOCAVA was passed in 1986 to protect the voting rights of military members, their families, and other United States citizens living overseas, that is, UOCAVA voters.  Section 1973ff-1 of 42 U.S.C. contains a number of provisions setting forth "State responsibilities" under UOCAVA.  Subsection (a)(1) of § 1973ff-1 provides that "Each State shall-- ... permit absent uniformed services voters and overseas voters to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office."  This section sets forth UOCAVA's general purpose as to the States: to guarantee to UOCAVA voters the right to use absentee registration procedures and to vote by absentee ballot in federal elections.  And this section (as do all the other sections that follow § 1973ff-1(a)'s "Each State shall" language) places the implementation of that guarantee on

4

the States.   Accordingly, this court has held that
Alabama bears full responsibility to ensure statewide
compliance with § 1973ff-1 of UOCAVA.   United States v.
Alabama, 857 F.Supp. 2d 1236, 1238-39 (M.D. Ala. 2012)
(Thompson, J.) (UOCAVA provides an "explicit statutory
directive that Alabama bears full responsibility" for
statutory compliance).

THE 45-DAY TRANSMITTAL REQUIREMENT: So as to effect
UOCAVA's guarantee to UOCAVA voters more fully, Congress
amended § 1973ff-1 of UOCAVA in 2009 with passage of the
Military and Overseas Voter Empowerment Act, Pub. L. No.
111-84, 123 Stat. 2190, 2318-35 (2009).   With this
amendment, Congress intended "a complete renovation of
UOCAVA that brings it into the twenty-first century and
streamlines the process of absentee voting for military
and overseas voters through a series of common sense,
straightforward fixes." 156 Cong. Rec. S4517 (daily ed.
May 27, 2010) (Sen. Schumer).   Subsection (a)(8)(A), one
of the provisions the 2009 amendment added to § 1973ff-1,

sets forth the 45-day transmittal requirement at issue. The subsection provides that, subject to a hardship exemption in another provision, States are required to transmit absentee ballots to UOCAVA voters at least 45 days before an election for federal office if those voters request absentee ballots by then.  The subsection states in relevant part: "Each State shall-- ... transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter ..., except as provided in subsection (g), in the case in which the request is received at least 45 days before an election for Federal office, not later than 45 days before the election."   42 U.S.C. § 1973ff-1(a)(8)(A).   UOCAVA explicitly states that "the purpose of [subsection (a)(8)(A)] is to allow absent uniformed services voters and overseas voters enough time to vote in an election for Federal office." 42 U.S.C. § 1973ff-1(g)(1)(A).

THE HARDSHIP EXEMPTION PROVISION: The hardship exemption mentioned in subsection (a)(8)(A)'s 45-day

6

transmittal requirement is, as stated, found in <u>subsection (g)</u> of § 1973ff-1.  This provision states in relevant part that: "If the chief State election official determines that the State is unable to meet the requirement under subsection (a)(8)(A) with respect to an election for Federal office due to an undue hardship ... the chief State election officials shall request that the Presidential designee grant a waiver to the State."  42 U.S.C. § 1973ff-1(g)(1).  In other words, under the hardship exemption, a Presidential designee is permitted to grant a State a waiver from the 45-day transmittal requirement in instances where undue hardships make it impossible for the State to meet the otherwise required advanced-transmittal deadline.  Other parts of subsection (g) set forth conditions a State must meet to establish such hardship and be granted a waiver. 42 U.S.C. § 1973ff-1(g).

THE WRITTEN PLAN REQUIREMENT: In <u>subsection (a)(9)</u> which was also added to § 1973ff-1 in 2009, UOCAVA places

another responsibility on the States: to establish a
written plan for federal runoff elections.  It provides
that, "Each State shall-- ... if the State declares or
otherwise holds a runoff election for Federal office,
establish a written plan that provides absentee ballots
are made available to absent uniformed services voters
and overseas voters in [a] manner that gives them
sufficient time to vote in the runoff election."  42
U.S.C. § 1973ff-1(a)(9).


### B.

The United States initially filed this case in 2012
because Alabama had failed to meet UOCAVA's 45-day
transmittal requirement in federal general and primary
elections.  The State conceded that it failed to meet the
requirement in each of the last three federal elections;
the parties reached an agreement on the appropriate
remedy for these past violations; and the court approved

their joint remedial order.  United States v. Alabama,
2014 WL 200668 (M.D. Ala. 2014) (Thompson, J.).

As stated, the one remaining claim is the United
States' claim that, with regard to federal runoff
elections, Alabama is in violation of UOCAVA's
requirement that States transmit absentee ballots to
UOCAVA voters at least 45 days before an election for
federal office.  Section 17-13-18 of the 1975 Alabama
Code provides that a runoff election, which is required
when no candidate receives the majority of votes in a
primary election, must occur exactly 42 days after a
primary election.  Alabama has not held a federal runoff
election since Congress passed the 2009 amendment, which
added the 45-day transmittal requirement to UOCAVA.
Nevertheless, the United States claims that, on its face,
the State's runoff statute, § 17-13-18, violates the 45-
day transmittal requirement.  Specifically, the United
States argues, the 42-day schedule for runoff elections
under state law makes it impossible for UOCAVA voters

9

from Alabama to receive ballots 45 days in advance of a
federal election.  The State responds that UOCAVA's 45-
day transmittal requirement does not apply to federal
runoff elections and that, in any event, the United
States' claim is not ripe for resolution.


III.  DISCUSSION

A.

A stated, the initial question is whether UOCAVA's
45-day transmittal requirement applies to federal runoff
elections.  In answering this question, this court's
"starting point" is the plain language of the statute
itself. United States v. DBB Inc., 180 F.3d 1277, 1281
(11th Cir. 1999).  The court must "read the statute to
give full effect to each of its provisions" and interpret
words "as they are commonly and ordinarily understood."
Id.  The court does "not look at one word or term in
isolation" and instead considers the "entire statutory

10

context." Id.; see also United States v. McClemore, 28
F.3d 1160, 1162 (11th Cir. 1994).

As stated, subsection (a)(8)(A)'s 45-day transmittal
requirement requires each State to transmit a validly
requested absentee ballot to UOCAVA voters at least 45
days before "an election for Federal office."  42 U.S.C.
§ 1973ff-1(a)(8)(A).  The issue presented is whether the
phrase "an election for Federal office" includes runoff
elections.   It does for several reasons.


### 1.

Congress's reference to "an election" indicates, on
its face, its intent to refer to "any" kind of election
for federal office.  See Black's Law dictionary at 1 (6th
ed. 1990) (The indefinite article "a" is often used in
the sense of "any").  Because a primary runoff election
falls within the reach of any kind of election,
subsection (a)(8)(A) includes runoffs.  Indeed, if the
words "an election" were read otherwise to exclude a

runoff, the phrase would be meaningless, for the phrase also does not expressly mention "general," "special," or "primary" elections either and thus the phrase would exclude them as well, with the result that the phrase would illogically cover no federal elections at all.

### 2.

This interpretation of "an election" as covering all four types of election (general, special, primary, and runoff) is reinforced by UOCAVA's overall statutory scheme.

First, the word "election" first appears in UOCAVA's general purpose provision, subsection (a)(1), which requires each State to permit UOCAVA voters to vote by absentee ballot in "general, special, primary, and runoff elections for Federal office." 42 U.S.C. § 1973ff-1(a)(1). Later, in subsection (a)(2), the act requires each State to accept and process requests for absentee ballots from UOCAVA voters so long as the State receives

the request 30 days before "<u>any</u> federal election." 42 U.S.C. § 1973ff-1(a)(2).  Surely, it cannot be argued that this broad-reaching provision does not cover runoff elections.  This shows that, when Congress used the generic term "any election," it intended to refer to the four explicitly listed federal elections in subsection (a)(1), which includes runoff elections.  The same intent would apply to the generic term "an election."

Second, UOCAVA's subsection (a)(3) requires that States accept federal "write-in" absentee ballots but limits this requirement to "<u>general</u> elections for federal office."  42 U.S.C. § 1973ff-1(a)(3) (emphasis added). Subsection (a)(3)'s reference to one type of federal election for write-in ballots, in contrast to subsection (a)(2)'s reference to any federal election for the acceptance and processing of absentee ballots in general, shows that when Congress wanted to highlight or exclude a particular kind of federal election it made that intention explicit and clear.  <u>See United States v.</u>

13

<u>Georgia</u>, 952 F. Supp. 2d 1318, 1327 (N.D. Ga. 2013) (Jones, J.), appeal pending No. 13-14065 (11th Cir. Sept. 6, 2013) (stating with respect to UOCAVA that, "Where Congress intended to refer to a specific type of election, it left no doubt of its intent").

Third, and perhaps most compellingly, the cross-reference between two other UOCAVA subsections clearly reveals Congress's intent to use the term "an election" to encompass all federal elections, including runoffs. Subsection (a)(7) requires each State to establish procedures for transmitting ballots to UOCAVA voters in federal elections.  The subsection explicitly requires these procedures to be used in "general, special, primary, and runoff elections for Federal office." 42 U.S.C. § 1973ff-1(a)(7).  It then directs States to turn to and follow subsection (f) for the explicit rules to be applied for transmittal procedures.  However, in subsection (f), rather than restate the four categories of federal elections as listed in subsection (a)(7), Congress instead uses the phrase "an election for Federal

office." 42 U.S.C. § 1973ff-1(f). It is therefore obvious from the explicit connection between the two subsections that Congress intended the generic phrase "an election" in subsection (f) to refer to any of the four kinds of elections explicitly listed in subsection (a)(7). See Georgia, 952 F. Supp. 2d 1327. It then follows that, if Congress intended the phrase "an election" in subsection (f) to include runoff elections, the identical phrase in subsection (a)(8)(A), the 45-day requirement provision, does as well, for the "normal rule of statutory construction" is that "identical words used in different parts of the same act are intended to have the same meaning." Gustafason v. Alloyd Co., 513 U.S. 561, 570 (1995) (internal citation omitted).

Finally, UOCAVA's 45-day transmittal requirement has its own explicit limitation: the hardship exemption provided in subsection (g). As stated, under the hardship exemption, a Presidential designee is permitted to grant a State a waiver in instances where undue hardship makes it impossible for the State to meet the

15

advanced-transmittal deadline and the State can demonstrate that it meets the listed requirements. 42 U.S.C. § 1973ff-1(g)(1). Because the 45-day transmittal requirement contains an explicit exception within the language itself ("except as provided in subsection (g)"), it logically follows that Congress intended that subsection (g) would be the only exception.

### 3.

Because it is apparent from the face of UOCAVA's 45-day requirement as well as from the act's overall structure that the requirement covers runoff elections, the court need not turn to legislative history. See United States v. Rojas-Contreras, 474 U.S. 231, 235 ("extrinsic materials are only required where a statute is ambiguous, its plain meaning renders an absurdity, or there is evidence of contrary legislative intent"). Nevertheless, the legislative history, in particular that for the recent 2009 amendment, provides additional support for the court's reading of the requirement. In

16

the House Conference Report for the 2009 amendment, Congress's only reference to an exception to the 45-day transmittal requirement is when "a hardship exception is approved." H.R. No. 111-288 at 744 (2009) (Conf. Rep.). In all other instances, the history reflects Congress's intent that States transmit requested absentee ballots "at least 45 days before an election for federal office." For example, the history shows that through the 2009 amendment Congress sought specifically to address the "unacceptable" situation of delayed absentee ballots to voters. 156 Cong. Rec. S4514 (daily ed. May 27, 2010) (Sen. Schumer statement).  The Congressional Record is replete with references to evidence of barriers UOCAVA voters face in voting in time for federal elections and Congress's desire to take steps beyond UOCAVA's original provisions to address this challenge. Id. (39 % of UOCAVA voters who requested absentee ballots in the 2008 election received them too late to return the ballots for election day counting).

17

In light of Congress's focus on solving what it considered to be the particular and substantial problem of delayed arrival of absentee ballots from military members, their families, and other United States citizens living overseas, it follows that, had Congress intended to exclude runoff elections from the solution to this great problem, there would be something in the legislative history reflecting that intent. Instead, there is nothing in the legislative history to undermine in any way the congressional intent reflected in the statute's plain language that the 45-day requirement applies to every kind of federal election.

Furthermore, the legislative history particularly emphasizes Congress's "compelling interest to protect the voting rights of American citizens ... when those very individuals who are sworn to defend that freedom are unable to exercise their right to vote." Id. at S4515. To imply an exception to the 45-day remedy to the substantial problem Congress recognized that overseas soldiers faced, where nothing in the statutory language

18

or legislative record supports such an exception, would be contrary to Congress's expressed intent to protect vigorously the voting rights of these persons. See 155 Cong. Rec. S7965 (July, 23, 2009) (Sen. Schumer and Sen. Chambliss joint statements) ("They can risk their lives for us, we can at least allow them to vote."). There is nothing in the legislation to indicate that, for our military, solving the problem of delayed transmittal of ballots from overseas military is any less worthy of remedy in runoffs than in general, special, and primary elections.

Indeed, because runoff elections are so compressed and because, as a result, the likelihood of delayed transmittal is greater than in other elections, it would seem to follow that, for our military, the need for the 45-day remedy is actually greater in runoffs than in other elections. As the court will discuss later, runoffs therefore need, and UOCAVA provides, more, not less, protection than for other elections.

19

Finally, this court finds noteworthy that Alabama criticizes any reliance on legislative history with this quote from Justice Scalia:  "Judge Harold Leventhal used to describe the use of legislative history as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends." Conroy v. Aniskoff, 507 U.S. 511, 519 (1993) (Scalia, J., concurring in judgment).  True though this may be, it is ironic that Alabama relies on it, for, with regard to UOCAVA's legislative history, that history would be plumbed to no avail if one were looking for even one "friend" among the guests confirming Alabama's view that the 45-day transmittal requirement exempts runoff elections.

### 4.

Nevertheless, Alabama argues that the phrase "an election for Federal office" in subsection (a)(8)(A) of § 1973ff-1 reflects a congressional attempt to distinguish federal elections from state ones and that

20

the phrase does not seek to define "which" federal elections (general, primary, special, and runoff) are covered by the provision. Defs. Brief (Doc. No. 92) at 24. The court rejects this argument for several reasons.

First, it is true that the phrase is aimed at only federal elections. But the State's interpretation signals out only one word ("federal") and fails to reach the full breadth of the phrase, which has five words, including in particular, as discussed previously, the two words "an election." If the entire phrase (including its use of the word "an," which, as stated, is commonly understood to mean "any") is considered, it is clear that, while the phrase does limit itself to "federal" elections, the phrase also reaches "any" kind of federal elections, which includes a federal runoff election.

Second, that UOCAVA is aimed at only federal elections is an obvious given: the title of the subchapter in which the act is codified is "Registration and Voting by Absent Uniformed Services Voters and

21

Overseas Voters in Elections for <u>Federal</u> Office," 42
U.S.C. Chapter 20, Subchapter 1-G (emphasis added), and
the word "federal" modifies the term "election" in many
phrases throughout § 1973ff-1, not just in subsection
(a)(8)(A).  Alabama does not contend that the word, when
used in phrases throughout § 1973ff-1, limits those
phrases to only one purpose, to distinguish federal
elections from state ones.  Absent a universal limitation
for every time the word is used in other phrases, the
State has not explained why subsection (a)(8)(A) should
be singled out for that limitation.

Finally, as stated, the "normal rule of statutory
construction" is that "identical words used in different
parts of the same act are intended to have the same
meaning."  <u>Gustafason</u>, 513 U.S. at 570 (internal citation
omitted).  Therefore, because, as demonstrated above,
Congress intended the phrase "an election" in subsection
(f) (which sets forth the rules States must follow in
carrying out the transmittal procedures placed on them by
subsection (a)(7)) to include "federal" runoff elections,

its use of the identical phrase in subsection (a)(8)(A)
(the 45-day requirement provision) does as well.

The State further argues that subsection (a)(9) of
§ 1973ff-1 excludes federal runoff elections from
UOCAVA's 45-day transmittal requirement.   Subsection
(a)(9) reads:

> "Each State shall--- ... if the State
> declares or otherwise holds a runoff
> election for Federal office, establish
> a written plan that provides absentee
> ballots are made available to absent
> uniformed services voters and overseas
> voters in [a] manner that gives them
> sufficient time to vote in runoff
> elections."

42 U.S.C. § 1973ff-1(a)(9).   The State argues that the
phrase "sufficient time to vote" creates an alternative
time requirement for transmitting ballots in the instance
of a federal runoff election. It further argues that,
because subsection (a)(9) creates this supposed new or
different time requirement for runoff elections,
subsection (a)(8)(A)'s 45-day requirement cannot also
apply to runoffs.   According to the State, reading both
provisions to apply to federal runoff elections renders

23

subsection (a)(9) superfluous and results in an absurd reading of the statute. <u>See</u> <u>Durr v. Shinseki</u>, 638 F.3d 1342, 1349 (11th Cir. 2011) ("a statute should ... be read so as to avoid an unjust or absurd conclusion"). The court disagrees on all counts.

First, subsection (a)(9) does not create any substantive transmittal requirement at all.  In this subsection, Congress merely requires each State to "establish" a written plan setting forth its overall views on how UOCAVA voters can be assured to receive ballots in "sufficient time to vote" in federal runoff elections.  It does not require the State to do anything other than that, for most notably it does not even require the State to implement the plan.  As a result, UOCAVA sets up this statutory scheme: On the one hand, there is subsection (a)(9), which is essentially nothing more than precatory, and, on the other hand, there is the 45-day transmittal requirement, which is expressly mandatory ("Each State shall") and is expressly recognized in the statute as needed "to allow absent

uniformed services voters and overseas voters enough time
to vote in an election for Federal office." 42 U.S.C.
§ 1973ff-1(g)(1)()A). It would be illogical to conceive
the precatory former as a reasonable substitute for the
mandatory latter, which is at the heart of UOCAVA. The
only reasonable reading of subsection (a)(9) is that it
is a supplemental, an additional, remedy, not a
substitute.

This conclusion is reinforced when other factors are
considered. First, there is the fact that Congress
recognized as a particular and substantial problem the
delayed transmittal of absentee ballots from UOCAVA
voters. Second, there is the fact that Congress enacted
subsection (a)(2)(8) to remedy to that problem, for, as
observed, UOCAVA explicitly states that "the purpose of
[subsection (a)(8)(A)] is to allow absent uniformed
services voters and overseas voters enough time to vote
in an election for Federal office." 42 U.S.C. § 1973ff-
1(g)(1)(A)"). Third, there is nothing in the statute or
its legislative history to indicate that federal runoffs

25

do not suffer from the same transmittal problem as do
other federal elections.   And, fourth, there is the
obvious fact that, because runoff elections typically
occur on a compressed time schedule, States are actually
more likely to make logistical errors and fail to meet
their UOCAVA obligations in runoffs than in other
elections. It follows that, when these last two facts are
considered against the backdrop of the first two,
subsection (a)(9) merely reflects that Congress wisely
saw the need to provide an additional remedy when it
comes to runoffs: to require States to develop a written
plan that would help to protect further against UOCAVA
violations that will more likely occur under the time
constraints of a runoff election.   This requirement,
while only a paper one, embodies an apparent
congressional recognition that runoff elections are
logistically more demanding and that States need an added
nudge to meet the 45-day transmittal requirement.

Indeed, the fact that an additional remedy is
warranted is more than amply demonstrated by the very

26

record before this court. Alabama concedes that it has failed to meet the 45-day requirement and thus provide what Congress considered to be needed for the timely transmittal of ballots with regard to, comparatively speaking, the <u>logistically less demanding</u> general and primary elections in each of the last three federal elections. Moreover, this court has found that, "The record before [it] ... amply demonstrates that the State of Alabama has consistently and substantially violated UOCAVA's 45-day requirement." <u>United States v. Alabama</u>, 2014 WL 200668 at *2 (M.D. Ala. 2014). That an additional requirement is needed for <u>logistically more demanding</u> runoff elections is self-evident.

Therefore, subsection (a)(9) neither creates a new substantive transmittal deadline nor dictates an exception to the substantive transmittal deadline in subsection (a)(8)(A). Subsection (a)(9) merely reflects the fact that States should go the extra mile to protect the voting rights of military members, their families and

other United States citizens living overseas when it comes to runoff elections--nothing more.

(The parties have spilt much virtual ink disputing the meaning of the phrase "sufficient time to vote" in subsection (a)(9). Because the United States has not asserted a separate claim that Alabama has failed to comply with subsection (a)(9)'s requirement that the States "establish a written plan that provides absentee ballots are made available to absent uniformed services voters and overseas voters in [a] manner that gives them sufficient time to vote in the runoff election," the court does not address or resolve this dispute.)

### 5.

Finally, the court rejects Alabama's argument that the issue--whether the 45-day transmittal requirement applies to federal runoff elections--is not ripe for adjudication because Alabama has not held a runoff election since Congress enacted the requirement with the 2009 amendment to UOCAVA.

28

UOCAVA authorizes the United States Attorney General "to bring a civil action ... for such declaratory or injunctive relief as may be necessary" to enforce UOCAVA. 42 U.S.C. § 1973ff-4(a). Therefore, the United States is expressly authorized, and thus has standing, to challenge Alabama's runoff statute on the ground that it violates UOCAVA's 45-day transmittal requirement. Nevertheless, Alabama questions the timing of the United States' claim. It argues that, because a runoff election has not yet occurred, the United States' facial attack is not yet ripe.

The ripeness doctrine provides that, for a court to have jurisdiction, a claim must be "sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decisionmaking by the court." Cheffer v. Reno, 55 F.3d 1517, 1524 (11th Cir. 1995). Ripeness depends on two factors: (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration. Harrell v. The Florida Bar, 608 F.3d 1241, 1258 (11th Cir. 2000). The fitness

29

portion of the analysis focuses on "the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." Id. (internal citation omitted). However, where a claim presents a purely legal issue, additional fact development is not necessary because the claim is that the law operates unlawfully on its face regardless of any other facts. Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1308 (11th Cir. 2009) ("a purely legal claim is presumptively ripe for judicial review because it does not require a developed factual record"). In other words, a purely legal challenge to a statute will succeed only if the statute can never be applied in a lawful manner. Id. at 1308. The hardship prong of the ripeness test examines the costs of delaying review until conditions for deciding a controversy are further developed. Harrell, 608 F.3d at 1258.

The United States' claim is ripe for review because it is a facial challenge to the State's runoff statute and therefore presumptively fit for judicial review. The

30

court does not need facts surrounding a runoff election to determine whether the State's statute violates UOCAVA. As written, Alabama's current runoff statute, 1975 Ala. Code § 17-13-18, requires that a runoff election occur exactly 42 days after a primary election.  Unless the State can hold a runoff election 42 days after the primary while still transmitting ballots to UOCAVA voters 45 days in advance of that election, its runoff statute violates UOCAVA on its face.  The State has not put forth, and the court is unaware of, a way that the State could meet both the 45-day requirement under UOCAVA and still hold a primary runoff election 42 days after a primary election.  Indeed, because of other related tasks that necessarily occur between the primary and runoff election--such as election certification and ballot printing--the transmittal of UOCAVA ballots would likely occur at least a week, if not substantially longer, after even the 45th day before the runoff election.

Moreover, although there is no guarantee of when a runoff election will occur, it is certain that one will

31

occur, for, as the State admits, "in Alabama, runoff elections are held as a matter of course." Defs. Brief (Doc. No. 92) at 36.

Thus, it is all but certain that a federal runoff election will soon occur, and it is certain that, when that election occurs, Alabama will violate UOCAVA if it follows state law, which the court presumes the State will--indeed, must--do in the absence of either the repeal or invalidation of that law. And other than this litigation there is no indication that a repeal or invalidation is in works.

The United States' claim also satisfies the hardship requirement of the ripeness test, for, if the court waits to assess this claim until after the State holds its next federal runoff election in accordance with state law and thus in violation of UOCAVA, UOCAVA voters will be denied the 45 days UOCAVA has recognized as logistically needed to cast their votes and they therefore will be irreparably harmed. There is no way that the issue of the application of the 45-day transmittal requirement to

32

federal runoff elections could be litigated between a
primary and a runoff election in time for the requirement
to be applied to that runoff.  Indeed, the State joined
the United States in asking this court, should it find in
favor of the United States, to expedite and resolve this
issue by no later than mid-February in order for State to
meet the logistical demands of implementing the
requirement four months later, in June of this year.


### B.

     For the foregoing reasons, the court holds that
UOCAVA's 45-day transmittal requirement applies to
federal runoff elections.

     The next issue, therefore, is whether Alabama is in
violation of UOCAVA.  As stated in the preceding section
of this opinion, the court is unaware of a way that the
State could meet both the UOCAVA's 45-day transmittal
requirement under UOCAVA and still hold a primary runoff
election 42 days after a primary election as it is
required to do by state law, that is, 1975 Ala. Code

33

§ 17-13-18.   As further stated, it is certain that a federal runoff election will occur in Alabama and that when it does the State will violate UOCAVA.   The court, therefore, further holds that Alabama's runoff statute, § 17-13-18, violates UOCAVA to extent the state statute requires that a federal runoff election occur within 42 days of a primary.

***

An appropriate judgment will therefore be entered as follows: (1) granting the United States' motion for summary judgment; (2) denying the State of Alabama and its Secretary of State's motion for summary judgment; (3) entering summary judgment in favor of the United States and against the State of Alabama and its Secretary of State; (4) declaring that UOCAVA's 45-day transmittal requirement, 42 U.S.C. § 1973ff-1(a)(8)(A), applies to federal runoff elections; (5) declaring that Alabama's runoff statute, 1975 Ala. Code § 17-13-18, violates UOCAVA's 45-day transmittal requirement to extent the state statute requires that a federal runoff election

occur within 42 days of a primary; and (6) giving the
parties 14 days to propose or request any addition
relief.

DONE, this the 11th day of February, 2014.

                    /s/ Myron H. Thompson
                    UNITED STATES DISTRICT JUDGE